No. 23-13253

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ERIC ANDRÉ and CLAYTON ENGLISH,

*Plaintiffs-Appellants,*

v.

CLAYTON COUNTY, GEORGIA; KEVIN ROBERTS, in his official capacity as Chief of the Clayton County Police Department; AIMEE BRANHAM, individually and in her official capacity as a police officer of the Clayton County Police Department; MICHAEL HOOKS, individually and in his official capacity as an investigator of the Clayton County District Attorney; TONY GRIFFIN, individually and in his official capacity as a police officer of the Clayton County Police Department; KAYIN CAMPBELL, individually and in his official capacity as a police officer of the Clayton County Police Department; and CAMERON SMITH, individually and in his official capacity as a police sergeant of the Clayton County Police Department,

*Defendants-Appellees.*

On Appeal from the United States District Court for the Northern District of Georgia, Hon. Mark H. Cohen, No. 1:22-cv-04065-MHC

## OPENING BRIEF OF APPELLANTS
## ERIC ANDRÉ AND CLAYTON ENGLISH

Richard H. Deane, Jr.
JONES DAY
1221 Peachtree St., N.E., Suite 400
Atlanta, Georgia 30361
(404) 581-8502
rhdeane@jonesday.com

Jason T. Burnette
JONES DAY
1221 Peachtree St., N.E., Suite 400
Atlanta, Georgia 30361
(404) 581-8743
jtburnette@jonesday.com

*Counsel for Plaintiffs-Appellants*
*(additional counsel listed on signature page)*

*André v. Clayton County, Georgia*, No. 23-13253

**CERTIFICATE OF INTERESTED PERSONS AND**
**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, Plaintiffs-Appellants Eric André and Clayton English provide this Certificate of Interested Persons and Corporate Disclosure Statement:

1. André, Eric (Plaintiff-Appellant).

2. Branham, Aimee (Defendant-Appellee).

3. Burnette, Jason T. (Counsel for Plaintiffs-Appellants).

4. Campbell, Kayin (Defendant-Appellee).

5. Canfield, Peter C. (Counsel for Plaintiffs-Appellants).

6. Clayton County, Georgia (Defendant-Appellee).

7. Cohen, Mark H. (Judge, United States District Court for the Northern District of Georgia).

8. Deane, Richard H., Jr. (Counsel for Plaintiffs-Appellants).

9. Emmons, Chandler J. (Counsel for Defendants-Appellees).

10. English, Clayton (Plaintiff-Appellant).

11. Freeman Mathis & Gary, LLP (Counsel for Defendants-Appellees).

12. Friedman, Barry E. (Counsel for Plaintiffs-Appellants).

13. Ganske, Rodney J. (Counsel for Plaintiffs-Appellants).

14. Griffin, Tony (Defendant-Appellee).

15. Hancock, Jack R. (Counsel for Defendants-Appellees).

*André v. Clayton County, Georgia*, No. 23-13253

16. Heydari, Farhang (Counsel for Plaintiffs-Appellants).

17. Hinkson, Ashley F. (Counsel for Plaintiffs-Appellants).

18. Hooks, Michael (Defendant-Appellee).

19. Hoynes, Ben (Counsel for Plaintiffs-Appellants).

20. Hudson-Price, Annie (Counsel for Plaintiffs-Appellants).

21. Jones Day (Counsel for Plaintiffs-Appellants).

22. Lawrence-Hardy, Allegra J. (Counsel for Plaintiffs-Appellants).

23. Lawrence & Bundy LLC (Counsel for Plaintiffs-Appellants).

24. Meyer, Paul D. (Counsel for Plaintiffs-Appellants).

25. Nocharli, Rebecca (Counsel for Plaintiffs-Appellants).

26. Reilly, Samuel B. (Counsel for Plaintiffs-Appellants).

27. Roberts, Kevin (Defendant-Appellee).

28. Sabzevari, A. Ali (Counsel for Defendants-Appellees).

29. Scherzer, Aaron (Counsel for Plaintiffs-Appellants).

30. Sloan, Sarah (Counsel for Plaintiffs-Appellants).

31. Smith, Cameron (Defendant-Appellee).

32. The Policing Project at NYU School of Law (Counsel for Plaintiffs-Appellant).

*André v. Clayton County, Georgia*, No. 23-13253

No other persons, associations of persons, firms, partnerships, corporations,

guarantors, insurers, affiliates, parent or subsidiary corporations, or other legal enti-

ties are financially interested in the outcome of this case or appeal.

/s/ *Jason T. Burnette*

Jason T. Burnette
**JONES DAY**
1221 Peachtree St. N.E., Suite 400
Atlanta, Georgia 30361
Telephone: (404) 581-8724
Facsimile: (404) 581-8330
jtburnette@jonesday.com

*Counsel for Plaintiffs-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

Appellants Eric André and Clayton English respectfully request oral argument. This case involves important constitutional questions arising out of a jet bridge interdiction program run by Defendants at the Atlanta airport.  Clayton County police officers single out certain passengers—supposedly randomly, although the majority of those stopped are Black—for purportedly "consensual" interrogation and searches on the narrow jet bridges that connect the airplanes to the airport gates.  Defendants claim the point of the program is drug interdiction, but drugs rarely are found; rather, in many instances officers seize large amounts of cash from people for whom there is no evidence of criminal wrongdoing.  Plaintiffs sued, alleging the stops violate the Fourth Amendment and the Equal Protection Clause.  The district court dismissed the complaint for failure to state a claim.  This appeal raises serious constitutional questions, as well as the procedural issue of whether the district court—in dismissing the claims—violated Rule 12(b)(6) by ignoring key allegations in the complaint and making inferences against Plaintiffs.  Oral argument will aid the Court's decision-making process as to these issues.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DIS-
CLOSURE STATEMENT ..................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ...............................i

TABLE OF AUTHORITIES ...............................................................iv

JURISDICTIONAL STATEMENT ......................................................1

INTRODUCTION .................................................................................1

STATEMENT OF THE ISSUES..........................................................4

STATEMENT OF THE CASE AND FACTS ......................................5

    A.    The Airport-Interdiction Program .................................5

    B.    Stop and Search of Clayton English.................................8

    C.    Stop of Eric André..........................................................9

    D.    Stops of Other Black Passengers.....................................10

    E.    This Lawsuit and the District Court's Order....................11

STANDARD OF REVIEW .................................................................12

SUMMARY OF ARGUMENT ...........................................................13

ARGUMENT ......................................................................................18

I.    THE COMPLAINT PLAUSIBLY ALLEGED FOURTH AMEND-
MENT VIOLATIONS.................................................................18

    A.    Mr. André And Mr. English Plausibly Alleged Unreasonable
Seizures.........................................................................18

        1.    Binding precedent demonstrates that Mr. André and Mr.
English were seized...............................................19

        2.    The district court erred in concluding that the complaint
alleged consensual encounters rather than seizures.................25

    B.    Mr. English Plausibly Alleged A Claim For An Unreasonable
Search. ..........................................................................32

    C.    The Officers Are Not Entitled To Qualified Immunity. ....................34

II.    THE COMPLAINT PLAUSIBLY ALLEGED EQUAL PROTEC-
TION VIOLATIONS...................................................................35

A.  Mr. André And Mr. English Plausibly Alleged Discriminatory Effect. ..................................................................35

    1.  The airport-interdiction program has a profoundly dispro-portionate effect on Black travelers. .......................................36

    2.  The district court misconstrued precedent and allegations in the complaint about discriminatory effect. .........................37

B.  Mr. André And Mr. English Plausibly Alleged Discriminatory Purpose. ..............................................................44

C.  The Officers Are Not Entitled To Qualified Immunity. ...................48

III.  THE COMPLAINT PLAUSIBLY ALLEGED CLAIMS AGAINST CLAYTON COUNTY ...................................................................48

CONCLUSION ....................................................................53

CERTIFICATE OF COMPLIANCE ....................................................55

CERTIFICATE OF SERVICE ...........................................................56

## TABLE OF AUTHORITIES

**Page**

CASES

*B.T. by and through Jackson v. Battle*,
  No. 21-10318, 2021 WL 4147087 (11th Cir. Sept. 13, 2021) ............................ 39

*Barnett v. MacArthur*,
  956 F.3d 1291 (11th Cir. 2020) ............................................................................ 49

*Baxter v. Roberts*,
  54 F.4th 1241 (11th Cir. 2022) ............................................................ 34, 49, 52

*Brower v. County of Inyo*,
  489 U.S. 593 (1989) .............................................................................................. 18

*California v. Hodari D.*,
  499 U.S. 621 (1991) .............................................................................................. 19

*Carpenter v. United States*,
  138 S. Ct. 2206 (2018) .......................................................................................... 18

*Castaneda v. Partida*,
  430 U.S. 482 (1977) ................................................................ 16, 39, 40, 43, 44

*Chaparro v. Carnival Corp.*,
  693 F.3d 1333 (11th Cir. 2012) .......................................................................... 13

*Delaware v. Prouse*,
  440 U.S. 648 (1979) .............................................................................................. 23

*FindWhat Inv'r. Grp. v. FindWhat.com*,
  658 F.3d 1282 (11th Cir. 2011) .......................................................................... 41

*Florida v. Bostick*,
  501 U.S. 429 (1991) .............................................................................. 14, 29, 30

*Florida v. Royer*,
    460 U.S. 491 (1983)........................................................32

*Greater Birmingham Ministries v. Sec'y of State for State of Ala.*,
    992 F.3d 1299 (11th Cir. 2021) ............................................35, 45, 46

*Griffin v. City of Opa-Locka*,
    261 F.3d 1295 (11th Cir. 2001) ............................................49

*Hoefling v. City of Miami*,
    811 F.3d 1271 (11th Cir. 2016) ............................................50

*Hunter v. Underwood*,
    471 U.S. 222 (1985)........................................................43

*Ingram v. Kubik*,
    30 F.4th 1241 (11th Cir. 2022) ............................................34

*INS v. Delgado*,
    466 U.S. 210 (1984)........................................................29, 31

*J.D.B. v. North Carolina*,
    564 U.S. 261 (2011)........................................................31

*Jean v. Nelson*,
    711 F.2d 1455 (11th Cir. 1983) ............................................43

*Lewis v. Gov. of Ala.*,
    896 F.3d 1282 (11th Cir. 2018) ............................................43

*McCleskey v. Kemp*,
    481 U.S. 279 (1987)........................................................45

*Michigan v. Chesternut*,
    486 U.S. 567 (1988)........................................................19

*Monell v. Dep't of Soc. Servs.*,
    436 U.S. 658 (1978)........................................................2, 3, 4, 12, 49, 52

*Noell v. Clayton County*,
No. 1:15-CV-2404-AT, 2016 WL 11794207 (N.D. Ga. Sept. 21, 2016) ............................................................................................50, 52

*Nunez v. J.P. Morgan Chase Bank*,
648 F. App'x 905 (11th Cir. 2016) ...................................................41

*Pegues v. Miss. State Emp't Serv. of Miss. Emp't Sec. Comm'n*,
699 F.2d 760 (5th Cir. 1983) ...........................................................44

*Resnick v. AvMed, Inc.*,
693 F.3d 1317 (11th Cir. 2012) .......................................................12

*Schneckloth v. Bustamonte*,
412 U.S. 218 (1973) .........................................................................32

*Sewell v. Town of Lake Hamilton*,
117 F.3d 488 (11th Cir. 1997) .........................................................51

*Swint v. City of Wadley*,
51 F.3d 988 (11th Cir. 1995) ...............................................17, 39, 48

*United States v. Armstrong*,
517 U.S. 456 (1996) .........................................................................35

*United States v. Armstrong*,
722 F.2d 681 (11th Cir. 1984) ...................................................27, 28

*United States v. Bacca-Beltran*,
741 F.2d 1361 (11th Cir. 1984) .............................................32, 33, 34

*United States v. Berry*,
670 F.2d 583 (5th Cir. Unit B 1982) (en banc)
............................... 13, 14, 15, 20, 21, 22, 23, 24, 25, 26, 29, 30, 34, 52

*United States v. Brantley*,
803 F.3d 1265 (11th Cir. 2015) .......................................................39

*United States v. Brignoni-Ponce*,
 422 U.S. 873 (1975) ...................................................................22

*United States v. Cannon*,
 987 F.3d 924 (11th Cir. 2021) ...................................................38

*United States v. Chemaly*,
 741 F.2d 1346 (11th Cir. 1984) .............................15, 32, 33, 34

*United States v. Drayton*,
 536 U.S. 194 (2002)......................................................29, 30, 31

*United States v. Elsoffer*,
 671 F.2d 1294 (11th Cir. 1982) ...........................................23, 25, 28

*United States v. Jensen*,
 689 F.2d 1361 (11th Cir. 1982) ...........................................26, 27, 33

*United States v. Jordan*,
 635 F.3d 1181 (11th Cir. 2011) ...............................................39

*United States v. Knights*,
 989 F.3d 1281 (11th Cir. 2021) ...............................................31

*United States v. Mendenhall*,
 446 U.S. (1980)..........................................................................28

*United States v. Puglisi*,
 723 F.2d 779 (11th Cir. 1984) ...................................................27

*United States v. Schultz*,
 565 F.3d 1353 (11th Cir. 2009) ...............................................20

*United States v. Thompson*,
 712 F.2d 1356 (11th Cir. 1983) ...........................................23, 28

*Utah v. Strieff*,
 579 U.S. 232 (2016)...................................................................32

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977)......................................................................................45, 47

**STATUTES**

28 U.S.C. § 1291 ................................................................................................1

28 U.S.C. § 1331 ................................................................................................1

28 U.S.C. § 1343 ................................................................................................1

49 U.S.C. § 44901(a) ........................................................................................21

**OTHER AUTHORITIES**

49 C.F.R. § 1540.107(a).....................................................................................21

1 W. Blackstone, Commentaries on the Laws of England (1769) ........................18

**JURISDICTIONAL STATEMENT**

This is an appeal from a final order dismissing all claims. The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction under 28 U.S.C. § 1291. The district court entered its order and final judgment on September 5, 2023. Docs. 40, 41. Mr. André and Mr. English appealed on October 3, 2023. Doc. 42.

**INTRODUCTION**

Eric André and Clayton English brought this case to challenge the longstanding program of the Clayton County Police Department ("CCPD") of disproportionately stopping Black passengers in the narrow jet bridges connecting airport gates to planes at Atlanta's Hartsfield-Jackson International Airport.

Mr. André and Mr. English are prominent Black entertainers. In separate incidents, both men were singled out by officers based on their race and detained on the jet bridge in front of other passengers who gawked at them as those passengers squeezed around the men to enter the aircraft. Officers hemmed Mr. André and Mr. English in and retained their IDs and boarding passes while interrogating them about drug possession. Mr. English's bag was searched. All of this occurred without any suspicion of criminal activity. Defendants claim such stops are "random." Doc. 24 ¶¶ 2, 5, 56, 62, 97. Yet open records data cited in the complaint shows that where the race of a detained passenger was recorded, 56% of those passengers were Black,

while only 8% of the Atlanta airport's domestic passengers are Black. *Id.* ¶¶ 77-78. Plaintiffs maintain this treatment violates the Fourth Amendment and the Equal Protection Clause of the United States Constitution. They also claim it is part of an established program for which Clayton County is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

The district court's order describes a starkly different scenario than what is alleged in the complaint. The district court found no "coercion or detention" of Mr. André or Mr. English, and thus concluded that there had been no seizure. Doc. 40 at 28, 31. Yet the complaint alleges, among other things, that officers obstructed both Mr. André's and Mr. English's paths to the airplane, even moving Mr. English to a different location in the jet bridge (Doc. 24 ¶¶ 31, 36, 51), that the officers retained Mr. André's and Mr. English's IDs and boarding passes while questioning them and during the search of Mr. English's bag (*id.* ¶¶ 33, 38, 41, 43, 53, 55), and that it was only *after* the officers were finished that Mr. André and Mr. English were told they were free to leave (*id.* ¶¶ 44, 58).

The district court's treatment of the equal protection claim reveals a similar refusal to accept the complaint's well-pleaded allegations, as well as a misapprehension of the law. The court faulted Mr. André and Mr. English for not "identify[ing] a similarly situated individual of a different race." Doc. 40 at 37. Yet the complaint does describe CCPD's treatment of similarly-situated individuals of a different race:

It sets out detailed statistical evidence of Black and white passengers being treated differently, despite CCPD's claim that the stops are "random."  Doc. 24 ¶¶ 77-80.  The district court also concluded that the complaint failed to allege a discriminatory purpose.  Doc. 40 at 42-45.  But the complaint presents sufficiently stark evidence of discriminatory impact to give rise to a presumption of discriminatory purpose (*id.* ¶¶ 77-80) and also explains that senior CCPD leaders had ongoing knowledge and notice of the disparate impact yet did nothing about it (*id.* ¶¶ 81-82).

In concluding that the complaint failed to state a *Monell* claim, the district court similarly mischaracterized the allegations as involving "only two other incidents [besides the stops of Mr. André and Mr. English] … that occurred twenty months apart from one another," rather than a "widespread and repeated" practice.  Doc. 40 at 48 n.13.  Yet the complaint specifically alleges that the jet bridge stops Mr. André and Mr. English experienced were pursuant to a "longstanding, formal CCPD program" (Doc. 24 ¶ 60), a program dating back to at least 2014 (*id.* ¶ 113 (citing *Noell v. Clayton County*, No. 1:15-CV-2404-AT, 2016 WL 11794207 (N.D. Ga. Sept. 21, 2016))), and that the program is operated by a "'specialized' 'Airport Interdiction Unit'" (*id.* ¶ 61), which conducted over four hundred jet bridge stops in an eight-month period (*id.* ¶ 84) following a standard (including regularized record-keeping) that officers themselves describe as "protocol" (*id.* ¶¶ 56, 64, 81).

In short, the district court's order fundamentally mischaracterizes Plaintiffs' allegations, fails to draw inferences in Plaintiffs' favor, and imposes legal requirements not supported by the district court's own cited authorities. Accordingly, this Court should reverse the dismissal of Mr. André and Mr. English's complaint.

## STATEMENT OF THE ISSUES

**I.** Whether the district court erred in dismissing the Fourth Amendment claims when the complaint plausibly alleges that police officers stopped Mr. André and Mr. English without suspicion; blocked their paths to the aircraft door; took and retained their IDs and tickets while peppering them with questions, including about illegal drug possession, and while searching Mr. English's bag; and only at the end told each he was "free to go"—all within the narrow confines of an airport jet bridge.

**II.** Whether the district court erred in dismissing the equal protection claim when the complaint contains detailed factual allegations about the airport-interdiction program's stark discriminatory impact—56% of the passengers stopped are Black while only 8% of the Atlanta airport's domestic passengers are Black—as well as its discriminatory purpose.

**III.** Whether the district court erred in dismissing the *Monell* claim when the complaint demonstrates that Clayton County has had a policy or custom of unlawfully seizing passengers in jet bridges, has stopped hundreds of passengers pursuant to that policy or custom, and disproportionately targets Black people for those

stops, and that—at the very least—Clayton County is deliberately indifferent to the constitutional rights of passengers.

## STATEMENT OF THE CASE AND FACTS

The allegations in the complaint, taken in the light most favorable to Mr. André and Mr. English, show as follows.

### A.    The Airport-Interdiction Program

At all commercial airports, passengers must go through the now well-known comprehensive post-9/11 Transportation Security Administration ("TSA") security screening—which includes presenting a government ID and ticket at various check-points, walking through a full-body scanner or metal detector, putting luggage on a belt for x-ray, and, occasionally, submitting to a physical pat down or manual search of belongings.  Doc. 24 ¶ 65.

But in Atlanta's Hartsfield-Jackson International Airport, something more happens:  After going through all of that, some passengers are selectively stopped again just before boarding their aircraft, without any suspicion of wrongdoing.  *Id.* ¶ 2.

Police wait in the narrow jet bridges to step into their target passenger's pathway.  *Id.* ¶¶ 31, 51, 64, 96, 106.  The officers corner passengers against the tunnel walls, take and retain the passengers' IDs and boarding passes, and pepper them with

questions about whether they have cocaine, methamphetamine, unauthorized pre-scription drugs, narcotics, or other illegal drugs—while passengers gawk and squeeze by. *Id.* ¶¶ 33-39, 53-57, 64, 107. In some instances, the officers search the passenger's carry-on luggage (which already has passed security) and seize any cash they find. *Id.* ¶¶ 41-43, 96-100, 107-09.

The officers conducting these stops do not work for TSA or the Department of Homeland Security. They are part of CCPD's "'specialized' 'Airport Interdiction Unit.'" *Id.* ¶ 61. CCPD purports to select passengers for these suspicionless stops at random. *Id.* ¶¶ 2, 5, 56, 62, 97. But data obtained from an open records request shows otherwise. The police stopped 402 passengers in the Atlanta airport's jet bridges over eight months. *Id.* ¶¶ 5, 77. For 378 of those jet bridge stops, police records indicate the race of the passengers. *Id.* ¶ 77. Of those 378 stops, 211 (56%) targeted Black passengers, even though only 8% of the Atlanta airport's domestic passengers are Black and 67% are white. *Id.* ¶¶ 77-78; *accord id.* ¶ 5.

There is a "less than one in one hundred trillion" chance that this racial dis-parity occurred randomly. *Id.* ¶ 5; *see id.* ¶ 79. Put differently, for there to be a statistically significant possibility that the racial disparities in stops were truly ran-dom, 52% of the Atlanta airport's domestic travelers would have to be Black. *Id.* ¶ 80. But, in fact, only 8% are. *Id.* Indeed, if the stops were random, then during

the eight-month period discussed above, CCPD would have stopped 39 Black passengers out of 378—but instead they stopped 211.  *Id.*

The interdiction program is run by the "Clayton County Narcotics Unit-Airport Investigations Group."  *Id.* ¶ 61.  But "narcotics" are hardly ever found.  The open-records data shows the 402 jet bridge stops "resulted in a grand total of three seizures: roughly 10 grams (less than the weight of one AAA alkaline battery) of drugs from one passenger, 26 grams (the weight of about 4 grapes) of 'suspected THC gummies' from another, and 6 prescription pills (for which no valid prescription allegedly existed) from a third."  *Id.* ¶ 84.

While the program fails to seize drugs, it is financially lucrative for CCPD.  *Id.* ¶ 86.  Over an eight-month period, the police seized over $1 million from 25 individuals purportedly via civil asset forfeiture laws—without any suspicion of wrongdoing and even though traveling domestically with large sums of cash is perfectly legal.  *Id.* ¶¶ 8, 86, 89.  Indeed, 24 of the 25 passengers who had cash seized continued with their travels.  *Id.* ¶ 86.  Only two faced any charges.  *Id.*  (The fact that only two of the 25 passengers who had cash seized faced charges is consistent with the fact that carrying substantial amounts of cash "does not equate to illicit narcotics activity."  *Id.* ¶ 89.  Black individuals in particular are less likely to have bank accounts—and thus are more likely to travel with large amounts of cash.  *Id.* ¶¶ 83, 89.)

### B.    Stop and Search of Clayton English

Clayton English is a Black, internationally-celebrated stand-up comedian, actor, and writer.  *Id.* ¶ 12.  While boarding a flight from Atlanta to Los Angeles in 2020, two plain-clothes officers with badges around their necks emerged from a bend in the jet bridge tunnel and cut off his path.  *Id.* ¶¶ 23, 31-32.  The officers flashed their badges and began peppering Mr. English with questions about whether he was carrying various illegal drugs.  *Id.* ¶ 33.  Though alarmed and caught off guard, Mr. English responded that he was not.  *Id.*

Officers instructed Mr. English to step to the side of the narrow jet bridge; he "understood that he did not have any choice," so he did.  *Id.* ¶ 35.  One officer stood on Mr. English's left while another stood on his right, blocking his path to the plane.  *Id.* ¶ 36.  An officer asked Mr. English to hand over his ID and boarding pass; believing he had no choice, he complied.  *Id.* ¶ 37.  While holding those documents, officers continued to ask him questions about drugs, his trip, and his profession.  *Id.* ¶ 38.

After additional questioning, one officer "stated that he wanted to search Mr. English's carry-on luggage."  *Id.* ¶ 41.  Believing he had no choice, Mr. English acquiesced.  *Id.*  The officers took and began searching his bag and then returned his documents, all the while continuing to question him.  *Id.* ¶¶ 42, 43.  When Mr. English asked the officers what was going on, they did not answer.  *Id.* ¶ 44.  Instead,

they returned his luggage, and—only then—told him he was free to leave. *Id.* All the while, other passengers "squeezed" and "maneuvered" around him and "openly gawked." *Id.* ¶ 39.

### C.    Stop of Eric André

Eric André is a Black, internationally-celebrated stand-up comedian, actor, and writer. *Id.* ¶ 11. In 2021, he had a layover in Atlanta on his way to Los Angeles after shooting a television show in Charleston. *Id.* ¶ 47. As Mr. André boarded his flight in Atlanta, police officers obstructed his path and flashed their badges at him. *Id.* ¶¶ 51-52. The officers began "challenging him with a series of questions"— asking him "specifically and in quick succession whether he was carrying cocaine, methamphetamine, prescription drugs that were not prescribed to him by a doctor, or other narcotics." *Id.* ¶ 53. Mr. André "understood that he did not have any choice but to continue to reply to the officers' questions, and that he was not free to leave." *Id.* ¶ 54.

The officers asked Mr. André to hand over his ticket and ID. *Id.* ¶ 55. He complied because he "did not believe he could say no." *Id.* The agents recorded his information and continued to ask him questions about his travel plans and reasons for flying. *Id.* One officer told Mr. André that "they were conducting 'random' stops" and that their "questions were 'protocol.'" *Id.* ¶ 56. Only after the officers finished questioning Mr. André did they tell him he was free to leave and board the

plane. *Id.* ¶ 58. As all of this was happening, other passengers had to "squeeze" around him, and many "stopped to gawk." *Id.* ¶ 57.

### D.    Stops of Other Black Passengers

Mr. English and Mr. André's experiences were not isolated incidents. *Id.* ¶ 60. Preston Lewis is a 37-year-old Black man who works as a tree surgeon. *Id.* ¶¶ 105, 108. In 2017, as Mr. Lewis was approaching a jet bridge in the Atlanta airport, CCPD officers stopped him without any suspicion of wrongdoing. *Id.* ¶¶ 105-06. The officers took his boarding pass and ID and asked him in quick succession whether he was carrying various illegal drugs. *Id.* ¶ 107. While holding Mr. Lewis's documents, the officers informed him that they wanted to search his bags. *Id.* Believing "he had no choice," Mr. Lewis acquiesced. *Id.* The officers did not find anything illegal in his bags, but they did find and seize $14,000 that came from his job earnings and an insurance settlement after his neighbor crashed into his parked truck. *Id.* ¶¶ 108-09. Mr. Lewis had to spend thousands of dollars on attorneys' fees to get his money back—even though there was no evidence that Mr. Lewis had committed a crime. *Id.* ¶¶ 110-11.

Jean Elie is a Black internationally-respected actor and producer. *Id.* ¶ 94. While he was boarding a flight at the Atlanta airport in 2019, two officers obstructed his path. *Id.* ¶¶ 95-96. Mr. Elie saw no other Black individuals in the jet bridge, but many white passengers were there—none of whom were stopped. *See id.* ¶ 95; *see*

-10-

*also id.* ¶ 99 at n.1 (linking to video of Mr. Elie's jet bridge detention, in which Mr. Elie shows "all these white folks" not being stopped). The officers told him that the stop was random and that they needed to look through his two carry-on bags. *Id.* ¶¶ 96-97. Mr. Elie recorded the encounter in a video that "shows the officers rifling through [his] bags and exposing [his] clothing and personal items to the view of the other passengers," while another officer "peppered Mr. Elie with questions." *Id.* ¶¶ 99-100 & n.1. Mr. Elie made clear to officers that he did not want to answer questions, but they continued to ask. *Id.* ¶ 100. After returning home, Mr. Elie notified a CCPD supervisor that he believed "that he was targeted because of his race." *Id.* ¶ 102. He sought to file a complaint, but the supervisor told him that he could only do so in person, and he lived hundreds of miles away. *Id.* ¶¶ 102-04.

Mr. Lewis's and Mr. Elie's experiences—along with Emily Noell's experience and the data alleging hundreds more "consensual" stops—illustrate the longstanding policy and custom of the airport-interdiction program. *Id.* ¶¶ 92-113.

### E.    This Lawsuit and the District Court's Order

Mr. André and Mr. English brought this action asserting claims under the Fourth Amendment and the Equal Protection Clause. Docs. 1, 24. Defendants moved to dismiss for failure to state a claim, Doc. 25, and the district court granted that motion, Doc. 40.

The district court dismissed the Fourth Amendment claim because—despite the allegations that officers blocked Mr. André's and Mr. English's paths on the narrow jet bridge, held their IDs and boarding passes while peppering them with questions, and only notified them they were free to go at the end of the encounters— the court concluded that CCPD's interrogations of Mr. André and Mr. English were consensual, and thus that no seizure or search had occurred. *Id.* at 20-35. The court also held that the equal protection claim failed because—despite the allegations of the dramatic racial disparity in passengers subjected to jet bridge stops and CCPD's knowledge of that disparity—in the court's view: (1) the complaint does not allege a similarly-situated comparator, *id.* at 37-38, (2) the statistical allegations in the complaint do not suffice to allege a discriminatory effect because they do not account for hypothetical scenarios imagined by the district court, *id.* at 39-42, and (3) the complaint does not allege that the airport-interdiction program was motivated by a discriminatory purpose. *Id.* at 42-44. The court decided it need not address the *Monell* claims in light of these rulings, but held in the alternative that the complaint did not allege a sufficiently widespread pattern of conduct so as to constitute a custom or policy. *Id.* at 47-48 & n.13. This timely appeal followed.

## STANDARD OF REVIEW

This Court reviews de novo a district court's dismissal of a complaint for failure to state a claim upon which relief may be granted. *See Resnick v. AvMed, Inc.*,

693 F.3d 1317, 1324 (11th Cir. 2012). A court must accept the complaint's factual allegations as true and construe them in the light most favorable to plaintiffs. *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1335 (11th Cir. 2012).

## SUMMARY OF ARGUMENT

**I.** The complaint plausibly alleges that Defendants violated Mr. André's and Mr. English's Fourth Amendment rights.

**A.** CCPD officers seized Mr. André and Mr. English. The officers approached the men in a narrow jet bridge, obstructed their paths, asked for their IDs and boarding passes, and held those documents—which are necessary to travel—while interrogating them about illegal drugs and the purposes of their travels. A reasonable person in that position would not feel free to ignore the officers and continue down the jet bridge.

The binding decision of *United States v. Berry*, 670 F.2d 583 (5th Cir. Unit B 1982) (en banc), makes clear that Mr. André and Mr. English were seized. The *Berry* Court identified factors that carry "great weight" in determining whether an airport stop constitutes a seizure: (1) whether officers block an individual's path; (2) whether officers implicitly constrain an individual's freedom, like by retaining his ticket for more than a minimal amount of time; and (3) whether officers make statements suggesting that an individual is suspected of smuggling drugs. 670 F.2d at 597. All three of those factors exist here.

-13-

The district court nevertheless concluded that Mr. André and Mr. English were not seized. In doing so, the court brushed aside the *Berry* factors as ones that "*might* be relevant," Doc. 40 at 51 (emphasis added), ignoring *Berry*'s instruction that "a court should place great weight" on those factors, 670 F.2d at 597. And the district court considered each factor in isolation, rather than viewing the circumstances as a whole, as it was required to do.

The district court further erred by analogizing the allegations here to factually distinguishable cases—for example, those in which officers did not retain individuals' IDs or tickets while interrogating them—and by relying on inapplicable precedent to conclude that the complaint did not plausibly allege a seizure. The Supreme Court has made clear that one framework governs cases like this one, where an individual wishes to leave but police restrict his freedom of movement, while a *different* framework governs cases where an individual does *not* wish to leave. *See Florida v. Bostick*, 501 U.S. 429, 436 (1991). Mr. André and Mr. English wanted to leave: They wanted to continue walking down the jet bridge to board their flights. Yet the district court applied the framework from cases where individuals do *not* want to leave. That was error.

**B.** In addition to experiencing an unconstitutional seizure, Mr. English also experienced an unconstitutional search. Because Mr. English was unlawfully seized, his acquiescence to the search of his bag was ineffective to justify the search. Even

-14-

if he were not unlawfully seized, the search still would be unlawful because the officer Defendants coerced Mr. English into acquiescence. *See United States v. Chemaly*, 741 F.2d 1346, 1353 (11th Cir. 1984).

**C.** The officer Defendants are not entitled to qualified immunity on the Fourth Amendment claims. The law governing airport seizures has been clearly established for more than four decades, *see Berry*, and the law governing searches likewise has been clearly established for decades, *see Chemaly*.

**II.** The complaint also plausibly alleges that Mr. André and Mr. English experienced equal protection violations.

**A.** Mr. André and Mr. English plausibly alleged that the airport-interdiction program has a discriminatory effect. Although 8% of Atlanta's domestic air travelers are Black, approximately 56% of the passengers stopped are Black. CCPD officers claim the stops are random, but there is a less than one-in-one-hundred-trillion chance that racial composition occurred randomly.

The district court nevertheless concluded that the complaint did not plausibly allege discriminatory effect. The district court determined that Mr. André and Mr. English had not identified a similarly-situated comparator—even though the complaint plainly does so, as it compares the experiences of Black travelers and white

-15-

travelers at the Atlanta airport, and even though every non-Black traveler at the At-
lanta airport is a similarly-situated comparator in light of Defendants' statements
that the stops occur randomly.

In insisting that the complaint does not allege a similarly-situated comparator,
the district court relied on cases where the challenged action depended at least in
part on an individual's particular characteristic rather than cases where the chal-
lenged action was random, as CCPD officers claim the stops here are.  Because the
jet bridge stops purportedly are random, the percentage of stopped passengers who
are Black should be consistent with the percentage of domestic air travelers at the
Atlanta airport who are Black.  *See Castaneda v. Partida*, 430 U.S. 482, 496 n.17
(1977).  But in fact, those percentages are drastically out of proportion (56% vs. 8%).

The district court went on to imagine that the airport-interdiction program op-
erates only on certain flights and that the demographics of those flights are wildly
different from the general demographics of domestic travelers at the Atlanta airport,
and then to fault Mr. André and Mr. English for failing to account for those hypo-
thetical scenarios.  But the district court cannot manufacture its own set of facts.  It
must instead accept all plausible allegations as true and construe all reasonable in-
ferences in the light most favorable to Mr. André and Mr. English.

**B.** Mr. André and Mr. English plausibly alleged that the airport-interdiction
program has a discriminatory purpose.  In addition to the stark disparate impact of

-16-

the program—which itself is enough to demonstrate discriminatory purpose—the complaint alleges that the disparate impact was foreseeable, that CCPD supervisors and officials had notice of that impact, and that CCPD chose not to adopt less discriminatory alternatives.

**C.** The officer Defendants are not entitled to qualified immunity on the equal protection claim, as it is clearly established that selective policing based on race is unconstitutional. *See, e.g.*, *Swint v. City of Wadley*, 51 F.3d 988, 1000 (11th Cir. 1995).

**III.** Mr. André and Mr. English plausibly alleged that Clayton County's jet bridge interdiction program constitutes a policy or custom that caused Mr. André's and Mr. English's constitutional injuries. Clayton County has a specialized unit that conducts the jet bridge stops; the program dates back to at least 2014; officers conducting the stops follow a protocol; officers complete weekly logs with data about the stops they made; and officers conducted 402 stops from August 30, 2020, to April 30, 2021. The interdiction program is thus an official policy or a custom, and, at the very least, CCPD displayed deliberate indifference to individuals' constitutional rights in establishing and continuing the program.

## ARGUMENT

## I.    THE COMPLAINT PLAUSIBLY ALLEGED FOURTH AMEND-MENT VIOLATIONS.

The "basic purpose" of the Fourth Amendment "is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018).  The common law jealously guarded personal liberty "[n]ext to personal security"; such "personal liberty" included "removing one's person to whatsoever place one's own inclination may direct; without imprisonment or restraint, unless by due course of law."  1 W. Blackstone, Commentaries on the Laws of England 130 (1769).  The Fourth Amendment's paramount concern—both today and at its adoption—is ensuring an individual's freedom of movement against arbitrary restraints.  *See, e.g.*, *Brower v. County of Inyo*, 489 U.S. 593, 597 (1989) (describing a seizure as the government's intentional "termination" of a person's "freedom of movement").

The complaint plausibly alleges that CCPD officers (1) unlawfully restrained Mr. André's and Mr. English's freedom of movement when the officers stopped them on the jet bridge, (2) unlawfully searched Mr. English's bag, and (3) violated their clearly established Fourth Amendment rights.

### A.    Mr. André And Mr. English Plausibly Alleged Unreasonable Seizures.

To conclude that Mr. André and Mr. English were not seized for Fourth Amendment purposes, the district court misconstrued binding circuit decisions with

-18-

remarkable factual similarities to this case and instead relied on cases with dissimilar facts. The district court also improperly relied on cases that involved individuals who did not want to leave, even though the Supreme Court has expressly distinguished that context from the situation here, where Mr. André and Mr. English wanted to leave the jet bridge and board their planes.

### 1. Binding precedent demonstrates that Mr. André and Mr. English were seized.

A "seizure" occurs under the Fourth Amendment when—given all of the circumstances surrounding a particular police encounter—a reasonable person would believe he was not free to leave. *See California v. Hodari D.*, 499 U.S. 621, 627-28 (1991). That analysis is fact-specific and depends on, for example, "the particular police conduct at issue" and "the setting in which the conduct occurs." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988). Courts must view the facts "as a whole" and consider the totality of the circumstances surrounding the incident. *Id.*

A reasonable person in Mr. André's and Mr. English's positions would not have felt free simply to walk away from the CCPD officers and continue boarding. Both men were in the narrow jet bridge when CCPD officers blocked their paths, asked for their IDs and boarding passes, and held onto the documents as the officers peppered them with questions about illegal drug possession, their professions, and the purposes of their travels. Doc. 24 ¶¶ 31, 36-39, 41-43, 51, 53, 55. A reasonable

person would not feel free to ignore the officers under these circumstances and board the plane.

The binding decision of *United States v. Berry*, 670 F.2d 583 (5th Cir. Unit B 1982) (en banc), confronted the question of when an airport stop is the result of coercion and thus constitutes a seizure.[1] *Berry* began by emphasizing that "the very nature of [airport] stops may render them intimidating":

> [T]he need quickly to make connections for continuing one's journey, the mere surprise from being accosted in a crowded airport concourse by a law enforcement officer for no apparent reason, and the pressure to cooperate with police to avoid an untoward scene before the crowds of people, all make it easy for implicit threats or subtle coercion to exert tremendous pressure on an individual to acquiesce to the officer's wishes.

*Id.* at 596. The Court warned that in the airport context it is particularly important not to "misinterpret acquiescence to an officer's demands as consent." *Id.*

Mr. André and Mr. English experienced just such coercive airport stops, except worse. They were stopped in narrow jet bridges in the post-9/11 security environment in which cooperation with law enforcement is stressed repeatedly. Upon arriving at the airport, Mr. André and Mr. English were subjected to loudspeaker announcements and a barrage of signs warning them that they and their luggage were

---

[1] *Berry* issued from "Unit B" of the Fifth Circuit. The Eleventh Circuit has adopted Unit B decisions as binding. *United States v. Schultz*, 565 F.3d 1353, 1360 n.4 (11th Cir. 2009).

subject to search while on airport premises.  Doc. 24 ¶¶ 24-25, 48.  To even get to their gate, they had to have their IDs and boarding passes reviewed and their belongings x-rayed, and they had to go through a full-body scanner or metal detector.  *Id.* ¶¶ 25, 48, 65; *see also* 49 U.S.C. § 44901(a) (directing TSA to screen all passengers and property); 49 C.F.R. § 1540.107(a) (requiring airport passengers to submit to screening and inspection of their person and property).  Had additional screening been required—such as a pat down, dog sniff, or hand swab—Mr. André and Mr. English would have been required to comply.  Doc. 24 ¶ 27.  All of these procedures were overseen by law enforcement whose requests airport travelers must follow.  *Id.* ¶ 66.  Thus, by the time Mr. André and Mr. English were stopped in the jet bridge, they—like any reasonable person flying post 9/11—had been drilled into understanding that compliance with airport law enforcement is both mandatory and in the interest of the flying public.  *Id.* ¶¶ 27-28, 48.  The narrow, highly restricted nature of jet bridges—where passengers are steps away from a plane that will depart imminently—further exacerbated that feeling.  *See id.* ¶ 69.

The *Berry* Court prescribed "specific factors … on which a court should place *great weight*" in analyzing whether an airport stop constitutes a seizure.  670 F.2d at 597 (emphasis added).  Three of the four factors are directly applicable here: (1) whether officers "block[] an individual's path or otherwise intercept[] him to prevent his progress in any way"; (2) whether there are "implicit constraints on an

individual's freedom," like "retaining an individual's ticket for more than a minimal amount of time"; and (3) whether officers make statements intimating that "individuals are suspected of smuggling drugs," leading a reasonable individual to believe that refusal to respond would result in formal detention.[2] *Id.*

As to the first *Berry* factor, CCPD officers obstructed Mr. André's and Mr. English's paths to the airplane. The complaint explicitly alleges that CCPD officers "cut off [Mr. English's] path," Doc. 24 ¶ 31; "instructed" him to "step to the side of the jet bridge," *id.* ¶ 35; and then stood on either side of him, "blocking his path onto the plane," *id.* ¶ 36. Likewise, the complaint expressly states that two officers "obstructed [Mr. André's] path." *Id.* ¶ 51.

Mr. André and Mr. English could rest their case on this factor alone: "[B]locking an individual's path or otherwise intercepting him to prevent his progress in any way is a consideration of *great, and probably decisive, significance*." *Berry*, 670 F.2d at 597 (emphasis added). Indeed, the Supreme Court has been clear: Whenever a police officer "restrains" an individual's "freedom to walk away," the officer "has 'seized' that person." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). That is true even if "the purpose of the stop is limited and the resulting detention

---

[2] The *Berry* Court described a fourth factor that similarly addresses whether police suggest that an individual must respond to questioning: whether the police stated "that an innocent person would cooperate with police." 670 F.2d at 597.

quite brief." *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). But there is more here than just officers blocking Mr. André's and Mr. English's paths.

CCPD officers also "retain[ed] [Mr. André's and Mr. English's] ticket[s] for more than a minimal amount of time"—the second *Berry* factor. 670 F.2d at 597. In fact, CCPD officers retained Mr. André's and Mr. English's boarding passes *and* driver's licenses while continuing to question them about illegal drugs, their professions, and their reasons for traveling. *See* Doc. 24 ¶¶ 38, 41, 43, 53, 55. In *Berry* and in cases since, this Court consistently has reiterated that when, as here, officers retain tickets or IDs beyond the brief time necessary to examine them, a seizure has occurred. *See, e.g.*, *Berry*, 670 F.2d at 603 n.26. That makes sense: Passengers like Mr. André or Mr. English "hardly" can feel "free to leave while [the agent] retain[s] [his] ticket—especially since [he] need[s] the ticket in order to continue his flight .…" *United States v. Elsoffer*, 671 F.2d 1294, 1297 (11th Cir. 1982); *see also United States v. Thompson*, 712 F.2d 1356, 1359 (11th Cir. 1983) (driver was "effectively immobilized" when police held license and thus was seized).

Mr. André and Mr. English could rest their case on this factor alone as well: When an officer retains an individual's license or ticket while continuing to ask questions, the encounter "mature[s] into an investigative stop." *Thompson*, 712 F.2d at 1359; *see also Elsoffer*, 671 F.2d at 1297 ("retaining an individual's ticket for

more than a minimal amount of time might well tip the balance in favor of holding that … a seizure has occurred"). But, again, there is more.

The officers also made statements suggesting that they "suspected [Mr. André and Mr. English] of smuggling drugs," the third *Berry* factor. 670 F.2d at 597. The officers "pepper[ed]" and "challeng[ed]" Mr. André and Mr. English with questions about whether they were smuggling drugs, and "rattl[ed] off a litany of potential illegal substances … such as cocaine, methamphetamine, unprescribed pills, and others" that they might be carrying. *Id.* ¶¶ 33, 53. Questions like these, "which intimate that an investigation has focused on a specific individual"—here, Mr. André and Mr. English—"easily could induce a reasonable person to believe that failure to cooperate would lead only to formal detention." *Berry*, 670 F.2d at 597. Indeed, it was not until *after* questioning Mr. André and Mr. English (and searching Mr. English's bag), that the officers informed the men that they were free to leave—confirming quite explicitly that a seizure had in fact occurred. Doc. 24 ¶¶ 44, 58.

Taking these factors together and considering the totality of the circumstances, Mr. André and Mr. English were seized. Because officers approached them on the jet bridge, blocked their paths to the plane, retained their IDs and boarding passes while questioning them, and interrogated them about illegal drugs, a reasonable person in Mr. André's or Mr. English's position would not have felt free to leave.

-24-

> **2. The district court erred in concluding that the complaint alleged consensual encounters rather than seizures.**

The district court concluded that Mr. André and Mr. English were not seized because it misread *Berry* and its progeny. The court stated that *Berry* merely suggests factors "that might be relevant to a court's inquiry" without holding "that one factor or a particular combination of factors will necessarily tip the balance." Doc. 40 at 51. To the contrary, *Berry* stated that "*a court should place great weight*" on the specific factors described above. 670 F.2d at 597 (emphasis added). And the first *Berry* factor—whether an individual's path was obstructed—is "of great, and *probably decisive*, significance." *Id.* (emphasis added). Similarly, in *Elsoffer*, this Court explained that "retaining an individual's ticket for more than a minimal amount of time"—the second *Berry* factor—"*might well tip the balance* in favor of holding that … a seizure has occurred." 671 F.2d at 1297 (emphasis added). Had the district court applied the *Berry* factors as it should have, the conclusion that Mr. André and Mr. English were seized would have been inescapable.

The district court also attempted to distinguish *Berry* on the ground that, unlike Mr. André and Mr. English, the traveler in *Berry* matched a drug courier profile and misrepresented his identity and travel plans. Doc. 40 at 23. But the *Berry* Court cited those facts in determining whether there was reasonable suspicion to *justify* a seizure, not whether there was a seizure in the first place. *See* 670 F.2d at 603-04. That Mr. André and Mr. English "were not suspects and did not misrepresent their

identities or their travel plans" has no bearing on whether they were seized. Doc. 40 at 23. Indeed, the district court's reasoning has the perverse consequence of extending greater Fourth Amendment protection to those reasonably suspected of engaging in criminal activity than to those for whom there is no suspicion of criminality.

More fundamentally, the district court erred in viewing each *Berry* factor in isolation, rather than as contributing to the totality of the circumstances. Even if each factor on its own did not convert the encounter into a seizure, the court still was required to step back and ask whether "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Berry*, 670 F.2d at 591 (quoting *United States v. Mendenhall*, 446 U.S. at 544, 554 (1980) (opinion of Stewart, J.)). But it never did so.

The district court further erred in finding that Mr. André and Mr. English were not seized by misconstruing allegations in the complaint and relying on factually distinguishable cases. For example, the district court determined that Mr. André's and Mr. English's IDs and boarding passes were retained for only "a minimal amount of time," Doc. 40 at 25, by relying on cases in which officers did *not* retain the individuals' IDs during their interrogations. *See id.* at 25, 29 (citing *United States v. Armstrong*, 722 F.2d 681 (11th Cir. 1984), *United States v. Jensen*, 689 F.2d 1361 (11th Cir. 1982), and *United States v. Puglisi*, 723 F.2d 779 (11th Cir. 1984)). In *Jensen*, the officer did not ask any questions while holding the individual's ticket

and driver's license. 689 F.2d at 1362. In *Armstrong*, the individual did "not assert[] any facts to show that [the agent] kept both pieces of identification while continuing to interrogate him." 722 F.2d at 685. And in *Puglisi*, the agent "never held [the individual's] ticket or identification longer than 20-30 seconds," "returning them promptly each time," and the questions the officer asked while in short possession of the documents were almost entirely *about discrepancies in those documents*. 723 F.2d at 781, 784. Also, the retention of documents in those cases took place in the airport's concourse—that is, spacious areas that were (at that time) open to the public and unsecured.[3] *See Armstrong*, 722 F.2d at 684; *Puglisi*, 723 F.2d at 781; *Jensen*, 689 F.2d at 1362.

Here, unlike in *Armstrong*, *Puglisi*, and *Jensen*, the officers retained Mr. André's and Mr. English's tickets and IDs throughout their questioning—long after the officers had a reasonable amount of time to view the documents. And, of course, the officers' questioning occurred on a narrow jet bridge and was not related to the IDs or boarding passes, much less to any discrepancies in the documents. *See* Doc. 24 at ¶¶ 38, 55. A reasonable person in Mr. André's and Mr. English's positions

---

[3] Additionally, *Armstrong* and *Puglisi* highlighted that the officers informed the individuals of their right to leave or refuse consent. *See Armstrong*, 722 F.2d at 685; *Puglisi*, 723 F.2d at 784. This warning would minimize coercion, but was absent here.

thus would not have felt free to leave, particularly because they would need those documents to travel.

Similarly, the district court erred in trying to distinguish *Elsoffer* by reasoning that the retention of documents there lasted longer than here. *See* Doc. 40 at 25 n.6. But in *Elsoffer*, the seizure occurred in the time it took the officer to ask just *one* question after he was in possession of Elsoffer's ticket.[4] *See* 671 F.2d at 1297. The same was true in *Thompson*. *See* 712 F.2d at 1359-61. Here, officers asked Mr. André and Mr. English *a litany* of questions while holding their IDs and boarding passes. Doc. 24 ¶¶ 38, 55.

The district court also cited *Mendenhall* (Doc. 40 at 27), but in that case the encounter "took place in the public concourse," 446 U.S. at 555, not on a jet bridge; occurred after the passenger had disembarked from her flight, *id.* at 547, rather than during the boarding process; and involved only a few questions while agents held her ID and ticket, two of which—her address and her name—specifically related to those documents. *See id.* at 547-48.

Beyond relying on factually distinguishable cases, the district court profoundly erred by relying on the wrong set of precedents altogether. The Supreme

---

[4] The district court relied on *Armstrong*, 722 F.2d 681, in holding that *Elsoffer* is inapplicable where the officer retains the individual's ticket and ID for only a minimal amount of time. Doc. 40 at 25-26 n.6. But, as discussed, the officer in *Armstrong* did not retain the defendant's travel documents while interrogating him.

Court explicitly distinguishes cases like this one, in which police restrict an individual's freedom of movement, from cases in which an individual's "freedom of movement [i]s restricted by a factor independent of police conduct," because that individual has no desire to leave. *Florida v. Bostick*, 501 U.S. 429, 436 (1991); *see also United States v. Drayton*, 536 U.S. 194 (2002) (passenger sitting on a bus, not wishing to leave); *INS v. Delgado*, 466 U.S. 210 (1984) (individuals at work, not wishing to leave). When an individual has no desire to leave, the free-to-leave framework is, in the Supreme Court's words, "inapplicable." *Bostick*, 501 U.S. at 436. Yet, in reaching the conclusion that Mr. André and Mr. English were not seized, the district court relied heavily on Supreme Court cases involving individuals who had no desire to leave. *See* Doc.40 at 22-24, 30 (citing *Drayton*, 536 U.S. 194; *Bostick*, 501 U.S. 429; *Delgado*, 466 U.S. 210).

This error was consequential because, as the Supreme Court has further made clear, different factors govern the "seizure" question when individuals wish to remain where they are and when they wish to leave. This only makes sense. When an individual wants to leave, factors like blocking his path or retaining his ticket demonstrate that the individual's freedom of movement is restricted and, thus, that a seizure has occurred. *See Berry*, 670 F.2d at 597. But if a person does not want to leave—if, for example (as in *Bostick* and *Drayton*), he is sitting on a bus and wishes to remain in his seat to continue his travels—then the coercive nature of the

encounter must be shown by other factors, like, for instance, whether an officer bran-

dished a weapon or made threats. *See Drayton*, 536 U.S. at 203-04.

Here, the district court relied heavily on factors regarding individuals who do

not wish to leave while minimizing those related to individuals who do wish to

leave—despite the fact that Mr. André and Mr. English were in the latter category.

Although the question of whether officers blocked an individual's path logically is

"of *great, and probably decisive, significance*" in the free-to-leave analysis, *Berry*,

670 F.2d at 597 (emphasis added), the district court brushed aside the fact that CCPD

officers blocked Mr. André's and Mr. English's paths. *See* Doc. 40 at 23-24, 30-31.

Similarly, the court downplayed the officers' retention of IDs and boarding passes

during their interrogations. *Id.* at 25, 29-30. Instead, the court focused on the fact

that the officers did not brandish weapons or use aggressive tones, *id.* at 21-22, 30,

33, factors that are highlighted in cases when the individual wishes to remain where

he is, not in cases where the individual wishes to leave, *see Drayton*, 536 U.S. at

204-05; *Bostick*, 501 U.S. at 437. Although it unquestionably also would have been

a seizure had the officers brandished their weapons, and though an aggressive tone

certainly would have added to that coercion, what matters is that a reasonable person

in Mr. André's and Mr. English's positions would not have felt "free to leave"; in-

deed, because the officers were blocking their paths and holding their travel docu-

ments, they actually could not leave.

The court below not only misapplied cases like *Drayton* and *Delgado*, it also misconstrued them in consequential ways. The district court cited *Drayton* for the proposition that "an officer's mere positioning between a passenger and an exit does not indicate that the passenger 'could not exit[.]'" Doc. 40 at 23. But *Drayton* held no such thing. Instead, the *Drayton* Court concluded that an officer's position at the front of a bus did not transform the encounter into a seizure because the officer "said nothing to suggest that people could not exit *and indeed he left the aisle clear*." 536 U.S. at 205 (emphasis added). Similarly, in *Delgado*, the Supreme Court found "nothing in the record indicating that" agents were "prevent[ing] people from leaving." 466 U.S. at 218. By contrast, where, as here, officers block someone's path, that person plainly is prevented from leaving.[5]

It is of no moment that CCPD officers did not brandish weapons or threaten Mr. André and Mr. English. The officers blocked their paths and retained their essential documents throughout a litany of questions, telling them only at the end of the encounter that they were free to go. Had the district court focused its attention

---

[5] Although foreclosed, *see United States v. Knights*, 989 F.3d 1281, 1288 (11th Cir. 2021), Mr. André and Mr. English preserve for further review the argument that race should be considered in the totality-of-the-circumstances test. Race, like age, "affect[s] how a reasonable person in the suspect's position would perceive his or her freedom to leave." *J.D.B. v. North Carolina*, 564 U.S. 261, 271-72 (2011).

-31-

on those well-pleaded facts, and followed well-established caselaw making those factors determinative, it could not have dismissed the seizure claim as it did.

### B.    Mr. English Plausibly Alleged A Claim For An Unreasonable Search.

The district court also erred in finding that the search of Mr. English's bag was constitutional.  If an individual is seized unlawfully—as Mr. English was—then *even if* he had consented to the search, that consent is "tainted by the illegality and … ineffective to justify the search," *Florida v. Royer*, 460 U.S. 491, 508 (1983) (plurality opinion).  That is the simple answer here.  The taint of an unlawful seizure can be attenuated from a subsequent search in some cases, *see Utah v. Strieff*, 579 U.S. 232, 242 (2016), but nothing remotely occurred here to attenuate the taint, and the district court did not conclude otherwise.

Even if he were not unlawfully seized, Mr. English still did not voluntarily consent to the search of his bag.  Although he "acquiesced" to the officers' request, Doc. 24 ¶ 41, that acquiescence was coerced.  Consent cannot be coerced.  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 228-29 (1973).  What happened to Mr. English is strikingly similar to *United States v. Chemaly*, 741 F.2d 1346, 1353 (11th Cir. 1984), where this Court held "that [Chemaly's] consent to search was not voluntary" when "the agent retained Chemaly's ticket and passport, removed him from the other passengers for questioning, and did not inform him of his right to refuse consent."  Similarly, in *United States v. Bacca-Beltran*, 741 F.2d 1361, 1362-63

(11th Cir. 1984), this Court held that "the retention of Bacca-Beltran's ticket and passport, the removal of him from the stream of passengers, and the failure to advise him of his right to refuse consent to the search rendered his consent involuntary." The same three facts this Court *twice* has found to obviate consent—the retention of documents necessary for travel, an instruction to move to the side of the jet bridge to allow others to pass, and the failure to advise of the right to refuse—are all present here.

The district court deemed those cases "inapposite," Doc. 40 at 34, on the ground that unlike in those cases, "there are no allegations which indicate that [Mr.] English was a suspected drug smuggler," *id.* at 34.[6] But what mattered in *Chemaly* was that the agents treated Chemaly like a suspect by telling him to "step aside" while letting other passengers continue and by questioning him about the currency he was carrying. 741 F.2d at 1353; *see also Bacca-Beltran*, 741 F.2d at 1362 (same). Likewise, here, officers instructed Mr. English to step to the side and questioned him about illegal drugs. Doc. 24 ¶¶ 33-41. Even if Mr. English was not unlawfully

---

[6] The district court found another case, *Jensen*, to be more analogous, Doc. 40 at 34, but it is not: The question in *Jensen* was whether a seizure occurred, not whether consent to a search was coerced. *See* 689 F.2d at 1363. As explained above, CCPD officers seized Mr. English. For that reason, the search of his bag was unlawful. It was also unlawful because Mr. English's consent to the search was coerced.

seized, then, the consent he gave was involuntary, and therefore, the search still was unlawful.

### C.    The Officers Are Not Entitled To Qualified Immunity.

Qualified immunity is inappropriate where, as here, (1) the complaint plausibly alleges constitutional violations, and (2) "the right violated was clearly established." *Baxter v. Roberts*, 54 F.4th 1241, 1256 (11th Cir. 2022).  An injured party can show that a constitutional right "was clearly established at the time of the alleged violation" by "point[ing] to a materially similar case that has already decided that what the police officer was doing was unlawful." *Ingram v. Kubik*, 30 F.4th 1241, 1252 (11th Cir. 2022).

The law governing airport seizures was settled by *Berry* and its progeny over four decades ago.  That caselaw clearly establishes that a passenger is seized when an officer: (1) blocks his path, (2) retains his identification or ticket while interrogating him, and (3) asks questions that insinuate he is suspected of smuggling drugs.  Nothing since has altered that basic law.

As to the search, qualified immunity also is inappropriate because *Chemaly* and *Bacca-Beltran* clearly establish that Mr. English's consent was involuntary and that the search was therefore illegal.

-34-

## II.    THE COMPLAINT PLAUSIBLY ALLEGED EQUAL PROTECTION VIOLATIONS.

The stops of Mr. André and Mr. English violated their equal protection rights because CCPD officers, acting pursuant to CCPD's airport-interdiction program, singled them out for interrogation because of their race.  To succeed on an equal protection claim, a plaintiff must show that the challenged conduct (1) had a discriminatory effect and (2) was motivated by a discriminatory purpose.  *See United States v. Armstrong*, 517 U.S. 456, 465 (1996).  The complaint more than plausibly alleges both.

### A.    Mr. André And Mr. English Plausibly Alleged Discriminatory Effect.

Government action has a discriminatory effect when it "bears more heavily on one race than another."  *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)).  Mr. André and Mr. English plausibly alleged that the airport-interdiction program bears more heavily on Black passengers than white passengers.  The district court concluded otherwise only by misapplying the law, erroneously refusing to accept the complaint's plausible allegations as true, and faulting Mr. André and Mr. English for not accounting for hypothetical scenarios the district court imagined.

### 1. The airport-interdiction program has a profoundly disproportionate effect on Black travelers.

The complaint plainly alleges that the airport-interdiction program has a discriminatory effect on Black travelers. The complaint states that although 8% of American air travelers are Black, Doc. 24 ¶ 77, and "Atlanta's domestic airline population reflects the general population of American air travelers," *id.* ¶ 78, 56% of the passengers stopped pursuant to CCPD's airport-interdiction program were Black. *Id.* ¶ 77. And although white passengers account for 67% of travelers at the Atlanta airport, they make up 32% of the persons stopped.[7] *See* Doc. 24 ¶ 77. As the complaint alleges, it is only statistically possible for random stops to result in 56% of travelers stopped being Black if more than one-half (fully 52%)—not 8%—of travelers at the Atlanta airport are Black. *Id.* ¶ 80. Put otherwise, if the stops made by CCPD truly were random, as Defendants assert, no more than 39 of the 378 travelers stopped would have been Black. *Id.* The number of Black travelers whom CCPD officers actually stopped (211) far exceeds that number.

The individual experiences described in the complaint confirm that CCPD targeted Black passengers for jet bridge stops. Officers singled out Mr. André for questioning while allowing the other passengers who were boarding at the same time as

---

[7] The complaint alleges that 258 of the 378 travelers (68%) who were stopped and whose race was recorded were people of color, *see* Doc. 24 ¶ 77, which means that the remaining 32% of those travelers were not people of color, i.e., were white.

Mr. André to enter the plane.  *See id.* ¶ 57.  Mr. André did not see a single other Black passenger boarding with him.  *See id.* ¶ 50.  Similarly, officers selected Jean Elie, a Black passenger, for questioning while allowing white passengers to board. *See id.* ¶¶ 95, 99, 101.  Not only did Mr. Elie see no other Black passengers in the jet bridge when he was stopped, he also videotaped his experience demonstrating just this point.  *See id.* ¶¶ 95, 99 n.1.

These allegations more than suffice to show discriminatory effect.

### 2.     The district court misconstrued precedent and allegations in the complaint about discriminatory effect.

The district court failed to credit the extraordinarily stark disparity detailed in the complaint because it reasoned that Mr. André and Mr. English had not identified a "similarly situated comparator" who was treated differently from them.  Doc. 40 at 37.  This was wrong; the complaint does identify similarly-situated comparators. Because CCPD has said the jet bridge stops are "random," Mr. André and Mr. English are similarly situated to all other travelers at the Atlanta airport.  The complaint plainly alleges similarly-situated comparators by setting out the racial disparities in CCPD's treatment of Black versus white travelers.  As discussed above, although 8% of domestic air travelers at the Atlanta airport are Black, 56% of the passengers stopped pursuant to CCPD's airport-interdiction program were Black, while white passengers account for 67% of travelers at the Atlanta airport but make up only 32% of the persons stopped.  *Id.* ¶¶ 77-78.  And the experiences of Mr. André and Mr.

Elie detailed in the complaint further demonstrate that officers permitted similarly situated non-Black passengers to board while stopping Black passengers attempting to board. *See supra* 36-37.

In concluding that Mr. André and Mr. English had not shown a similarly-situated comparator, the district court relied on inapposite cases in which the challenged action was not random—as CCPD claims is the case here—but was based at least in part on characteristics unique to the claimant. *See, e.g.*, Doc. 40 at 37 (citing *United States v. Brantley*, 803 F.3d 1265 (11th Cir. 2015) (selective prosecution); *Campbell v. Rainbow City*, 434 F.3d 1306 (11th Cir. 2006) (discrimination in denying approval for building project); *Whitaker v. Bd. of Regents of Univ. Sys. of Ga.*, No. 20-13618, 2021 WL 4168151 (11th Cir. Sept. 14, 2021) (sex-based discrimination during investigation of sexual harassment claim against plaintiff)). In these inapposite cases, the similarly-situated analysis serves as a way to control for factors—other than race—that might explain the disparate impact. For example, in the selective prosecution and arrest contexts, a similarly-situated comparator is necessary to ensure that the difference in crime, manner, location, or weight of evidence does not account for the different prosecuting or arrest decisions. *See, e.g.*, *United States v. Cannon*, 987 F.3d 924, 937 (11th Cir. 2021) ("A similarly situated person in the selective prosecution analysis is one who engaged in the same type of conduct as the defendant and against whom the evidence was as strong or stronger than against the

-38-

defendant."); *Brantley*, 803 F.3d at 1271-72 (same); *United States v. Jordan*, 635 F.3d 1181, 1188 (11th Cir. 2011) (same); *Swint v. City of Wadley*, 51 F.3d 988, 1000 (11th Cir. 1995) (selective arrest claim). The same is true in non-criminal contexts when the challenged action is purportedly non-random. *See, e.g.*, *B.T. by and through Jackson v. Battle*, No. 21-10318, 2021 WL 4147087, at *5 (11th Cir. Sept. 13, 2021) (plaintiff alleging racial discrimination in use of force must show that individuals of other races engaged in similar conduct but did not provoke same reaction). In situations in which the claimant's behavior or characteristics might explain the government's action, it makes sense to require claimants to show that there is a similarly-situated individual and that the individual was treated differently.

When officers claim to select individuals randomly, however, there is no particular characteristic or behavior that would justify the differential treatment that must be controlled for. If the challenged action is indeed random, then by definition, the effect of the challenged action on a particular racial group should be consistent with the representation of that racial group in the relevant population. If (as here) the expected and actual racial compositions differ substantially, no factor other than race plausibly can explain the difference.

*Castaneda v. Partida* makes the point about the importance of random selection quite plainly. In *Castaneda*, the Supreme Court considered a claim of discrimination in the grand jury selection process. *See* 430 U.S. 482 (1977). Because 79.1%

of the relevant population was Mexican-American, if the jurors had been "drawn randomly" from the general population, approximately 79.1% of those summoned (688 out of 870 individuals) should have been Mexican-American, as well. *Id.* at 496 n.17. But only 39% of the persons summoned for grand jury service (339 out of 870) were Mexican-American. *Id.* There was a less than 1 in 10,140 chance of that breakdown occurring randomly. *See id.* The *Castaneda* Court easily found that this disparity "establish[ed] a prima facie case of discrimination." *Id.* at 496.

Just as in *Castaneda*, random stops of air travelers should result in a group of stopped travelers whose racial composition resembles that of air travelers generally. But the stops here do not remotely resemble the population of air travelers at the Atlanta airport. *See* Doc. 24 ¶ 77. The racial disparity here is much more extreme than that in *Castaneda*, where there was a less than 1 in 10,140 chance that the racial composition of grand jurors randomly occurred. 430 U.S. at 496 n.17. Here, there is a less than one-in-one-hundred-*trillion* chance that the racial composition of travelers stopped by officers acting pursuant to the airport-interdiction program was the result of random stops.[8] Doc. 24 ¶ 5.

---

[8] Standard deviations also can be used to measure the disparity between expected and observed demographics. Typically, if the disparity is greater than two or three standard deviations, then the "hypothesis" that the observed demographics occurred randomly "would be suspect." *Castaneda*, 430 U.S. at 496 n.17. Here, there is a difference of more than 34 standard deviations between the expected number of

-40-

In addition to erroneously concluding that the complaint does not allege a similarly-situated comparator, the district court manufactured its own set of facts to try to explain the glaring racial disparity. The district court imagined—flatly contrary to the allegations in the complaint—that (1) the CCPD program operates only on certain flights, and (2) those flights have dramatically different demographics from all other flights at the Atlanta airport. *See* Doc. 40 at 38-41. The complaint describes the experiences of particular individuals who were stopped while flying from Atlanta to California, but Mr. André and Mr. English quite clearly also alleged that the airport-interdiction program operates generally "out of the Atlanta Airport," Doc. 24 ¶ 61, and that CCPD officers "wait in the jet bridge of departing domestic flights" to question passengers attempting to board their flights, *id.* ¶ 62. At the motion-to-dismiss stage, those allegations as to the general nature of the airport-interdiction program must be accepted as true, and all reasonable inferences must be construed in the light most favorable to Mr. André and Mr. English. *See FindWhat Inv'r. Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011); *see also, e.g.*, *Nunez v. J.P. Morgan Chase Bank*, 648 F. App'x 905, 909 (11th Cir. 2016) (reversing grant of motion to dismiss because district court "rel[ied] on unsupported inferences … and versions of the facts that contradict[ed] the [complaint's] allegations").

---

stopped passengers who would be Black if the stops were random and the observed number of stopped passengers who were Black. *See* Doc. 29 at 14-15, 17.

Only by drawing inferences *against* Mr. André and Mr. English could the district court reach the baseless assumption that only certain flights were subject to the CCPD program. Doc. 40 at 38-40.

Not only was it improper for the district court to imagine a scenario that is contrary to the allegations in the complaint, but the court's imagined scenario also is implausible. In addition to assuming that the interdiction program operated only on certain flights, the district court assumed that the racial composition of travelers on those flights would diverge substantially—indeed in dramatic ways—from the typical racial composition of travelers on flights at the Atlanta airport. *See id.* at 39. As Mr. André and Mr. English alleged, "for there to be a statistically significant possibility that the racial disparities in the jet bridge stops were random, *52% of airline travelers boarding domestic flights in the Atlanta Airport would have to be Black.*" Doc. 24 ¶ 80 (emphasis added). That means the district court must have concluded that on flights "subject to CCPD's Airport Interdiction Program," 52% of the passengers were Black—fully 6.5 times the percentage of passengers who are Black on the average domestic flight at the Atlanta Airport (8%). The complaint does not so much as hint at that possibility, nor is it remotely plausible. To the contrary, the complaint alleges that Mr. André and Mr. Elie did not see any other Black passengers boarding their respective flights. *See id.* ¶¶ 50, 95. Those allegations do not support the inference that the majority of the passengers on their flights

were Black.  Nor does the allegation that 8% of domestic air travelers at the Atlanta airport are Black support such an inference.  The district court did not explain how it arrived at such an implausible conclusion.

Moreover, if it somehow were possible to conclude that the airport-interdiction program operates only on flights where 52% of travelers are Black, that conclusion alone would give rise to a separate discriminatory effect:  CCPD officers would have targeted flights with disproportionately high numbers of Black passengers.  Either way one slices it, the program had a discriminatory effect.

Finally, the district court tried to bolster its conclusion by adopting a rule that eight months of data simply is not enough to show discriminatory effect.  *See* Doc. 40 at 41-42.  That rule has no basis in caselaw.  The district court pointed to *Castaneda*, where the statistics covered an eleven-year period.  *See id.*  But the fact that *Castaneda* happened to have eleven years of data hardly establishes that the statistics here—eight full months of data—lack probative force.  To the contrary, courts have based findings of discriminatory effect on data spanning comparable time periods. *See, e.g.*, *Jean v. Nelson*, 711 F.2d 1455, 1488-89 (11th Cir. 1983) (statistical data from nine-month period showed discriminatory effect), *vacated on other grounds on reh'g*, 727 F.2d 957 (11th Cir. 1984) (en banc), *aff'd*, 472 U.S. 846 (1985); *see also Hunter v. Underwood*, 471 U.S. 222, 227 (1985) (evaluating historical effect of provision by considering impact less than two years after its adoption); *Lewis v. Gov. of*

*Ala.*, 896 F.3d 1282, 1288, 1294-95 (11th Cir. 2018) (plaintiffs challenged statute as discriminatory "[a] few months" after statute was passed and successfully alleged that statute had discriminatory effect), *vacated on other grounds on reh'g*, 944 F.3d 1287 (11th Cir. 2019) (en banc); *Pegues v. Miss. State Emp't Serv. of Miss. Emp't Sec. Comm'n*, 699 F.2d 760, 768-69 (5th Cir. 1983) (statistical evidence spanning six months supported prima facie claim of discriminatory treatment).  In any event, like the State in *Castaneda*, CCPD "presented no evidence showing why the [eight-month] period was not reliable."  430 U.S. at 496.  There is thus no legal basis to deem the eight months of data here statistically insignificant—especially at this stage where Mr. André and Mr. English have not yet had the benefit of discovery.

### B.    Mr. André And Mr. English Plausibly Alleged Discriminatory Purpose.

The district court also concluded Mr. André and Mr. English had not alleged a discriminatory purpose for the airport-interdiction program, but that once again ignores the allegations in the complaint.  The complaint alleges that the program "is motivated by discriminatory purpose," Doc. 24 ¶ 130, and that "officers conducting the jet bridge interdiction program select their targets based on race," *id.* ¶ 5; *see also id.* ¶ 9 ("Mr. André and Mr. English … were unconstitutionally singled out because of their race and detained by [CCPD] officers ….").

In support of these allegations, the complaint sets out specific facts that track factors this Court has identified as relevant to a finding of discriminatory purpose.

-44-

Distilling Supreme Court and Eleventh Circuit precedent, this Court in *Greater Birmingham Ministries* listed eight "evidentiary factors for determining whether racially discriminatory intent existed."  992 F.3d at 1321.  Those factors include "the impact of the challenged [action]," "the foreseeability of the disparate impact," "knowledge of that impact," and "the availability of less discriminatory alternatives."[9]  *Id.* at 1322.  The complaint plausibly alleges those factors.

As discussed, the factual allegations detail the program's profoundly discriminatory impact.  *Supra* 36-37.  When, as here, the impact of the challenged action on a particular racial group is so "stark" that it is "unexplainable on grounds other than race," the effect itself demonstrates discriminatory purpose.  *Arlington Heights*, 429 U.S. at 266.  Because the stops are purportedly random, it is particularly appropriate to conclude that the extreme discriminatory effect here is explainable only on grounds of race.  *See McCleskey v. Kemp*, 481 U.S. 279, 294-95 (1987) (discriminatory effect may show discriminatory purpose when there are not "innumerable factors that vary according to the characteristics of the individual … and the facts of the particular … offense").

---

[9] Other factors, like "contemporary statements and actions of key legislators," *Greater Birmingham Ministries*, 992 F.3d at 1322, relate to challenged statutes and are not applicable here.

Moreover, the complaint contains numerous allegations describing other factors that this Court has identified as relevant to demonstrating discriminatory purpose: "the foreseeability of the disparate impact," "knowledge of that impact," and "the availability of less discriminatory alternatives." *Greater Birmingham Ministries*, 992 F.3d at 1322.  CCPD was "on notice" of the "susceptibility" of drug interdiction programs to "arbitrary and selective enforcement."  Doc. 24 ¶ 74; *see also id.* ¶ 68 (Department of Justice warned that suspicionless stops of passengers as part of airport drug interdiction efforts are "often associated with racial profiling"). Moreover, "CCPD supervisors and officials regularly receive notice that the program's administration is racially discriminatory," as the data that CCPD collects reveals the program's stark discriminatory effect and thus "provides clear notice that the jet bridge interdiction program relies on racial profiling to select passengers for detention." *Id.* ¶ 81.  And at least one Black individual contacted CCPD about filing a complaint after he was stopped pursuant to the airport-interdiction program, and he alerted CCPD that "he was targeted because of his race." *Id.* ¶ 102.

Finally, the complaint makes clear that less discriminatory alternatives exist. One option is for CCPD not to engage in random stops, but rather to conduct stops only when "previously acquired information" provides a reason for the stop—an approach that the Department of Justice has recognized is less often "associated with

racial profiling." *Id.* ¶ 68 (quoting U.S. Gov't Office of the Inspector General, *Review of the Drug Enforcement Administration's Use of Cold Consent Encounters at Mass Transportation Facilities* (2015), at 2). Another alternative is to develop "written formal or informal policies or practices … to constrain the discretion of the officers when conducting the jet bridge interdiction program." *Id.* ¶ 74. Of course, given that the program consistently fails to uncover drugs, *see, e.g.*, *id.* ¶ 91, which is its ostensible purpose, *see, e.g.*, *id.* ¶ 2, CCPD also could have chosen not to "continue the program," *id.* ¶ 91.

The district court concluded that the complaint failed to allege a discriminatory purpose only by entirely ignoring the allegations regarding foreseeability and less discriminatory alternatives, *see supra* 46-47, and by repeating its earlier errors to insist that the statistics showing a racial disparity in stops were insufficient to show a stark pattern of racial disparity or to establish knowledge of that disparity.[10] Doc. 40 at 44. When the plausible allegations in the complaint are accepted, as they must be at this stage, it is clear that Mr. André and Mr. English plausibly alleged discriminatory purpose.

---

[10] The district court further faulted Mr. André and Mr. English for not alleging that CCPD supervisors "directed their officers to target passengers for interdiction based on their race," Doc. 40 at 44, but that kind of direct evidence of discriminatory purpose is not required. *See, e.g.*, *Arlington Heights*, 429 U.S. at 266 (circumstantial evidence can show purpose).

**C.    The Officers Are Not Entitled To Qualified Immunity.**

The district court concluded that qualified immunity applies to the officers because, according to the district court, Mr. André and Mr. English failed to plausibly allege an equal protection violation. *See* Doc. 40 at 50. As discussed above, that conclusion is wrong. The district court did not address the clearly-established prong of the qualified immunity analysis as to the equal protection claim, *see id.* at 50-52, but as Defendants acknowledge, Doc. 25-1 at 10-13, it is clearly established that the Equal Protection Clause prohibits selective policing based on race. *See, e.g.*, *Swint*, 51 F.3d at 1000 (By December 1990, "the right to be protected from intentional racial discrimination in law enforcement was clearly established."). And regardless of whether the officer Defendants are entitled to qualified immunity on the equal protection claim, the plausible allegations in the complaint plainly establish that Clayton County is liable for establishing and implementing the discriminatory jet-bridge interdiction program.

**III.   THE COMPLAINT PLAUSIBLY ALLEGED CLAIMS AGAINST CLAYTON COUNTY.**

The district court dismissed the Fourth and Fourteenth Amendment claims against Clayton County based largely on its conclusion that no constitutional violations occurred. Doc. 40 at 47-48. As explained above, that conclusion was erroneous. The complaint plausibly states claims under both the Fourth Amendment and the Equal Protection Clause. And to the extent that the district court believed that

Clayton County could not be held liable if no individual officer were liable, that was also error. *See Barnett v. MacArthur*, 956 F.3d 1291, 1301 (11th Cir. 2020) (*Monell* does not require that a jury "find an individual defendant liable before imposing liability on local government.").

In a footnote, the district court went on to state that the complaint failed "to allege a custom or policy supporting *Monell* liability." Doc. 40 at 48 n.13. That too was incorrect. A "custom or policy" exists when the municipality (1) has an "official policy," (2) a "widespread practice," or (3) displays "deliberate indifference" toward the "constitutionally offensive actions of its employees." *Baxter*, 54 F.4th at 1270; *see Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1308 (11th Cir. 2001). The allegations against Clayton County check all three boxes.

According to the district court, the problem was that in addition to Mr. André's and Mr. English's own stops, the complaint alleged only "two other incidents … that occurred twenty months apart from one another." Doc. 40 at 48 n.13. For that reason, the district court suggested that Plaintiffs had shown only "random acts or isolated incidents" by CCPD, rather than the "widespread and repeated" practice required to show a custom under *Monell*. *Id.*

The district court was wrong. The complaint plainly alleges a "widespread practice," *Baxter*, 54 F.4th at 1270, of CCPD officers unlawfully seizing travelers,

who are disproportionately Black.  Relying on data *provided by Defendants them-selves* in response to an open records request—the complaint identifies *402 incidents* over an eight-month period.  Doc. 24 ¶¶ 77, 84.  In addition, the complaint describes *in detail* three other incidents (Mr. Elie, Mr. Lewis, and the plaintiff in *Noell*).  *Id.* ¶¶ 93-113.  If that isn't enough to demonstrate the existence of a custom (at the pleadings stage, no less), it's hard to imagine what is.  *See, e.g.*, *Hoefling v. City of Miami*, 811 F.3d 1271, 1280 (11th Cir. 2016) (allegations that plaintiff experienced unlawful conduct and was aware of others who experienced same conduct, and that local government referred to the conduct as a "program" adequately pleaded policy or custom).

The complaint further alleges the jet bridge stops that Mr. André and Mr. Eng-lish experienced occurred pursuant to a "longstanding, formal CCPD program."  Doc. 24 ¶ 60.  The complaint details how—according to CCPD's own documents—a "'specialized' 'Airport Interdiction Unit,'" also known as the "Clayton County Nar-cotics Unit-Airport Investigations Group," conducts the jet bridge stops.  *Id.* ¶ 61.  CCPD records state that the Unit works "in cooperation and coordination with the staff [of] the various airlines as well as various local, state, and federal agencies stationed at the airport."  *Id.* ¶ 75.  The program traces back at least to 2014, when CCPD officers seized and searched Emily Noell in an Atlanta airport jet bridge.  *See id.* ¶ 113 (citing *Noell v. Clayton County*, No. 1:15-CV-2404-AT, 2016 WL

-50-

11794207 (N.D. Ga. Sept. 21, 2016)).  And the program has continued since then, as Plaintiffs make clear with Defendants' own data:  The Unit conducted 402 jet bridge stops from August 30, 2020, to April 30, 2021, an eight-month period.  *Id.* ¶ 84.

Moreover, in conducting the jet bridge stops, officers in the specialized unit dedicated to this program follow a protocol: intercepting passengers in jet bridges without particularized suspicion; blocking passengers' paths; flashing badges; taking IDs and tickets; and interrogating and searching passengers while retaining those documents. *Id.* ¶ 64.  Officers themselves even describe their questions as "protocol." *Id.* ¶ 56.  The officers then "complete and submit weekly logs recording the flight information, names, dates of birth, race, and gender of the passengers they stop." *Id.* ¶ 81.

When these plausible allegations are taken as a whole and accepted as true, with all reasonable inferences drawn in Plaintiffs' favor, as the law requires, it is hard to see how they fail to plead that the airport-interdiction program is a "policy," i.e., "a decision that is officially adopted by the municipality," *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997), or a widespread practice that constitutes a custom.

Finally, the complaint establishes CCPD's "tacit[] authoriz[ation]" or "deliberate indifference" toward the "constitutionally offensive actions of" its officers.

*Baxter*, 54 F.4th at 1270.  Of course, CCPD knew about the existence of the airport-interdiction program:  CCPD maintained an entire separate, specialized Airport Interdiction Unit.  Doc. 24 ¶ 61.  And it knew that the program stopped hundreds of passengers in jet bridges—the officers kept logs of all of their encounters, *id.* ¶ 81.

Beyond knowledge of the program itself, CCPD knew or should have known that the program infringed on passengers' constitutional rights.  As the complaint explains, *Noell* "provided CCPD with express notice that suspicionless jet bridge stops and searches violate Fourth Amendment rights."[11]  *Id.* ¶ 113; *see Noell*, 2016 WL 11794207, at *5 ("[I]t is beyond axiomatic that a post-security checkpoint airport seizure unsupported by any level of suspicion violates the constitution.").  *Noell* aside, CCPD certainly *should have known* that its program of jet bridge stops raises grave Fourth Amendment problems, given *Berry* and its progeny and the coerciveness of police interdictions in airports generally.  *See supra* 20-24; Doc. 24 ¶¶ 65-66, 72-73.  Because CCPD continued to allow its officers to stop and search passengers without an iota of suspicion and failed to provide any guidance "to constrain the discretion of the officers," Doc. 24 ¶ 74, or to mitigate the coercive nature of

---

[11] The district court's discussion of *Noell* appears in its qualified-immunity analysis, *see* Doc. 40 at 51 n.14, even though Mr. André and Mr. English did not invoke *Noell* on that issue.  Instead, in both the complaint and the response to the motion to dismiss, they cited *Noell* to demonstrate CCPD's notice of its unconstitutional program for *Monell* purposes.  *See* Doc. 24 ¶ 113; Doc. 29 at 19-20, 23.

these encounters, CCPD acted with "deliberate indifference" to its officers' Fourth Amendment violations.

CCPD also acted with deliberate indifference to its officers' equal protection violations. The complaint alleges that CCPD had actual or constructive notice of the racial discrimination occurring in the interdiction program and yet did not intervene. *Id.* ¶ 81. The complaint cites reports from federal agencies cautioning law enforcement about the racial-profiling risks inherent to drug-interdiction and cash-seizure operations at airports, which should have alerted CCPD to the possibility of equal protection violations in its own interdiction program. *Id.* ¶¶ 67-68. And the standardized logs maintained by CCPD provided clear notice that the program was violating Black passengers' constitutional rights. *Id.* ¶¶ 77-82. The complaint further alleges that a CCPD supervisory officer received a complaint that Mr. Elie was racially profiled in a jet bridge stop, and yet—rather than investigating—the officer told Mr. Elie that under department policy, he would have to travel back to Atlanta to file a complaint. *Id.* ¶¶ 102-03. Because CCPD failed to take corrective action in the face of such obvious evidence of racial discrimination, the complaint also adequately pleads deliberate indifference by CCPD.

## CONCLUSION

For the foregoing reasons, the Court should reverse the order of the district court.

Date:  January 12, 2024

Respectfully submitted,

*/s/ Jason T. Burnette*

Peter C. Canfield
**CANFIELD LAW LLC**
34 Inman Circle NE
Atlanta, GA 30309
Telephone: (678) 296-5413
pccanfield@gmail.com

Allegra J. Lawrence-Hardy
Rodney J. Ganske
**LAWRENCE & BUNDY LLC**
1180 West Peachtree St., NW, Ste 1650
Atlanta, Georgia 30309
Telephone: (404) 400-3350
Facsimile: (404) 609-2504
allegra.lawrence-hardy@lawrence-bundy.com
rod.ganske@lawrencebundy.com

Jason T. Burnette
Richard H. Deane, Jr.
Ashley F. Hinkson
Rebecca Nocharli
Samuel B. Reilly
**JONES DAY**
1221 Peachtree St. N.E., Suite 400
Atlanta, Georgia 30361
Telephone: (404) 581-8724
Facsimile: (404) 581-8330
jtburnette@jonesday.com
rhdeane@jonesday.com
ahinkson@jonesday.com
rnocharli@jonesday.com
sreilly@jonesday.com

Barry Friedman*
Aaron Scherzer
Sarah Sloan*
Benjamin Hoynes*
**POLICING PROJECT**
**AT NYU SCHOOL OF LAW**
Washington Square Legal Services, Inc.
40 Washington Square South, Ste 302
New York, NY 10012
Telephone: (212) 992-6950
barry.friedman@nyu.edu
aaron.scherzer@nyu.edu
benjamin.hoynes@nyu.edu
shs9979@nyu.edu
*\* Admitted Pro Hac Vice*

*Counsel for Plaintiffs-Appellants*
*Eric André and Clayton English*

-54-

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 27(a)(2)(B), this document contains 12,975 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated:  January 12, 2024                    Respectfully submitted,

                                            */s/ Jason T. Burnette*
                                            _____

                                            *Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2024, I caused a copy of the foregoing to be electronically filed with the Clerk of the Court by using the Court's Appellate PACER system, which will automatically send a notice of electronic filing to all counsel of record. Under 11th Circuit Rule 25-3(a), no independent service by other means is required.

I further certify that on January 12, 2024, four copies of the foregoing document were dispatched via third-party commercial carrier to the following:

David J. Smith, Clerk of Court
U.S. Court of Appeals for the Eleventh Circuit
56 Forsyth Street, NW
Atlanta GA 30303

Respectfully submitted,

/s/ Jason T. Burnette

Counsel for Plaintiffs-Appellants