𝔍𝔫 𝔱𝔥𝔢
𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
𝔣𝔬𝔯 𝔱𝔥𝔢 𝔈𝔩𝔢𝔳𝔢𝔫𝔱𝔥 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

ERIC ANDRÉ and CLAYTON ENGLISH,
*Plaintiffs-Appellants*,
v.

CLAYTON COUNTY, GEORGIA; KEVIN ROBERTS, in his official capacity as
Chief of the Clayton County Police Department; AIMEE BRANHAM,
individually and in her official capacity as a police officer of the Clayton County
Police Department; MICHAEL HOOKS, individually and in his official capacity
as an investigator of the Clayton County District Attorney; TONY GRIFFIN,
individually and in his official capacity as a police officer of the Clayton County
Police Department; KAYIN CAMPBELL, individually and in his official capacity
as a police officer of the Clayton County Police Department; and CAMERON
SMITH, individually and in his official capacity as a police sergeant of the Clayton
County Police Department,
*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Georgia, Hon. Mark H. Cohen,
No. 1:22-cv-04065-MHC

**BRIEF OF *AMICUS CURIAE* INSTITUTE FOR JUSTICE
IN SUPPORT OF PLAINTIFFS-APPELLANTS**

DANIEL L. ALBAN
   *Counsel of Record*
**INSTITUTE FOR JUSTICE**
901 North Glebe Road, Ste. 900
Arlington, Virginia 22203
703) 682-9320
dalban@ij.org

JOSHUA J. FOUGERE
ALARIC R. SMITH
AUSJIA L. PERLOW
DAVID H. KINNAIRD*
SUSAN K. WHALEY
**SIDLEY AUSTIN LLP**
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000

*Counsel for* Amicus Curiae
*Institute for Justice*

* Admitted only in Maryland and practicing law in the District of Columbia under the
supervision of principals of the firm who are members in good standing of the D.C. Bar.

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 and 29-1, *Amicus Curiae* Institute for Justice, through its undersigned counsel, certifies that the list of interested persons identified by Plaintiffs-Appellants in their Certificate of Interested Persons, filed on January 12, 2024, is correct and complete.

Dated: January 19, 2024

Respectfully submitted,

/s/ *Daniel L. Alban*
Daniel L. Alban

*Counsel for* Amicus Curiae
*Institute for Justice*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 and 29-1, the Institute for Justice, through its undersigned counsel, certifies that it is a private, nonprofit civil liberties law firm. It is not a publicly held corporation and does not have any parent corporation. No publicly held corporation holds 10 percent or more of its stock. No publicly held corporation has a direct financial interest in the outcome of this litigation.

Dated: January 19, 2024                    Respectfully submitted,

/s/ *Daniel L. Alban*
Daniel L. Alban

*Counsel for* Amicus Curiae
*Institute for Justice*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .......................................................C-1

CORPORATE DISCLOSURE STATEMENT .....................................................C-2

TABLE OF CONTENTS.................................................................................i

TABLE OF AUTHORITIES ........................................................................ ii

IDENTITY AND INTEREST OF *AMICUS CURIAE* ...........................................1

STATEMENT OF THE ISSUES.......................................................................3

SUMMARY OF ARGUMENT .......................................................................3

ARGUMENT ..............................................................................................7

    I.    Vigorous Judicial Scrutiny of Consent-Based Searches is Necessary to Prevent Government Abuse. ..................................................8

        A.    Civil Forfeiture Offers Powerful Financial Motives for Law Enforcement Agencies. ....................................................9

        B.    Suspicionless Stops Must Rely on Consent Because They Are Constitutionally Suspect Standing Alone. .....................................14

    II.    The Fourth Amendment's Reasonableness Standard Requires the Court to Account for the Nature of the Modern Airport..........................18

        A.    The High-Security Environment of Modern Day Airports Creates an Inherently Coercive Environment. ................................19

        B.    Encounters with Law Enforcement on a Jetway Create a Particularly Coercive Environment.................................................23

CONCLUSION...........................................................................................25

CERTIFICATE OF COMPLIANCE........................................................................26

CERTIFICATE OF SERVICE ............................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Boyd v. United States*,
  116 U.S. 616 (1886).................................................................6

*Brendlin v. California*,
  551 U.S. 249 (2007)..............................................................5

*Carpenter v. United States*,
  138 S. Ct. 2206 (2018)..........................................................1

*\*City of Indianapolis v. Edmond*,
  531 U.S. 32 (2000)...............................................3, 16, 17

*Culley v. Marshall*,
  143 S. Ct. 1746 (2023)..........................................................1

*Flora v. Sw. Iowa Narcotics Enf't Task Force*,
  292 F. Supp. 3d 875 (S.D. Iowa 2018) ...............................14

*Harjo v. City of Albuquerque*,
  326 F. Supp. 3d 1145 (D.N.M. 2018)............................1, 14

*Highlander v. Va. Dep't of Wildlife Res.*,
  No. CL23-4100 (14th Jud. Cir. Ct., Henrico Cnty., Va. June 6,
  2023) .......................................................................................1

*Ingram v. Wayne Cnty.*,
  81 F.4th 603 (6th Cir. 2023) .................................................1

*Leonard v. Texas*,
  580 U.S. 1178 (2017)........................................................9, 11

*Martin v. FBI*,
  No. 1:23-CV-00618 (D.D.C. Mar. 7, 2023), ECF No. 1 ......11

*Murray's Lessee v. Hoboken Land & Improvement Co.*,
  59 U.S. (18 How.) 272 (1855) .............................................15

\*Authorities cheifly relied upon are marked with asterisks

*Ohio v. Robinette*,
 519 U.S. 33 (1996)..........................................................................17

*\*Schneckloth v. Bustamonte*,
 412 U.S. 218 (1974)..............................................................3, 6, 17

*Smith v. State*,
 No. S23G0701 (Ga. Oct. 20, 2023) .....................................................1

*United States v. Aukai*,
 497 F.3d 955 (9th Cir. 2007) ...............................................................21

*\*United States v. Berry*,
 670 F.2d 583 (5th Cir. Unit B 1982) .....................................5, 18, 19, 20, 23, 24

*United States v. Elsoffer*,
 671 F.2d 1294 (11th Cir. 1982) ..........................................................17

*United States v. Jordan*,
 635 F.3d 1181 (11th Cir. 2011) ..........................................................17

*United States v. Moore*,
 No. 23-10971 (11th Cir. docketed Mar. 23, 2023) ............................12

*United States v. Waksal*,
 709 F.2d 653 (11th Cir. 1983) ...........................................................17

**Statutes**

O.C.G.A. § 9-16-17(a)(1) ....................................................................12

O.C.G.A. §16-13-49(b)(5) ...................................................................12

**Other Authorities**

*Acceptable Identification at the TSA Checkpoint*,
 TSA (last visited Jan. 18, 2024)..........................................................21

Annemarie Bridy, *Carpe Omnia: Civil Forfeiture in the War on
 Drugs and the War on Piracy*, 46 Ariz. St. L.J. 683 (2014)................9

Brian D. Kelly, *Does Forfeiture Work? Evidence from the States*
 (2021) ...............................................................................................2, 13

Brian D. Kelly, *Fighting Crime or Raising Revenue?* (2019)............................2, 13

Chris Joyner & Bill Rankin, *'Like a Slush Fund': Revenue Agents Bought Pricey Perks with Seized Assets*, Atl. J.-Const. (Mar. 12, 2020) ................................................................................10

*Jennifer McDonald, *Jetway Robbery? Homeland Security and Cash Seizures at Airports* (2020)................................................2, 9, 11

John Burnett, *Sheriff Under Scrutiny over Drug Money Spending*, NPR (June 18, 2008)................................................................10

Kevin Farrell, *Flying in the 1980s: What's Our Vector, Victor?*, USA Today, Mar. 16, 2016 ............................................20

*Layers of Security*, TSA (May 19, 2021)................................19, 21

*Lisa Knepper et al., *Policing for Profit* (3d ed. 2020)................2, 9, 10, 11, 12, 13

Max Crema & Lawrence B. Solum, *The Original Meaning of "Due Process of Law" in the Fifth Amendment*, 108 Va. L. Rev. 447 (2022)................................................................................15

Off. of the Assistant Sec'y, TSA, *TSA Mgmt. Directive No. 100.4: Transportation Security Searches* (2012)................................19

Off. of the Inspector Gen., U.S. DOJ, *Rep. No. 15-3, Review of the Drug Enforcement Administration's Use of Cold Consent Encounters at Mass Transportation Facilities* (2015) ..................22

Paul Seidenstat, *Terrorism, Airport Security, and the Private Sector*, 21 Rev. Pol'y Res. 275 (2004)................................................20

Randy Travis, *Gwinnett Sheriff Assigns Himself $70,000 Performance Car Bought with Seized Drug Money*, FOX5 Atl. (June 26, 2018) ....................10

*Security Screening*, TSA (last visited Jan 18, 2024) ..............................21

Thomas Y. Davies, *Correcting Search-and-Seizure History: Now-Forgotten Common-Law Warrantless Arrest Standards and the Original Understanding of "Due Process of Law"*, 77 Miss. L.J. 1 (2007)................................................................................15

Thomas Y. Davies, *Farther and Farther from the Original Fifth Amendment: The Recharacterization of the Right Against Self-Incrimination as a "Trial Right" in* Chavez v. Martinez, 70 Tenn. L. Rev. 987 (2003) ............................................................................................ 14

Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547 (1999) ...................................................................... 14

U.S. Commission on Civil Rights, *Civil Asset Forfeiture and its Impact on Communities of Color in Georgia* (2022) ...................................... 11

## IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

The Institute for Justice ("IJ") is a nonprofit, public-interest law firm committed to defending the foundations of a free society, including the Fourth Amendment's guarantee that each individual be secure in their person and property.

Over the last decade, IJ has advocated for victims of suspicionless searches and seizures and profit-driven civil forfeiture programs that deprive law-abiding citizens of their property. *See, e.g.*, *Ingram v. Wayne Cnty.*, 81 F.4th 603 (6th Cir. 2023) (successfully challenging county's practice of seizing personal vehicles without providing a post-seizure hearing to test probable cause); *Highlander v. Va. Dep't of Wildlife Res.*, No. CL23-4100 (14th Jud. Cir. Ct., Henrico Cnty., Va. Oct. 27, 2023) (challenging suspicionless "open fields" search and subsequent suspicionless seizure of hunting cameras); *Harjo v. City of Albuquerque*, 326 F. Supp. 3d 1145 (D.N.M. 2018) (successfully challenging city's civil forfeiture program on unconstitutional-profit-incentive grounds).

IJ also frequently offers its perspective as *amicus curiae* in critical Fourth Amendment and civil forfeiture cases, *see, e.g.*, *Carpenter v. United States*, 138 S. Ct. 2206 (2018); *Culley v. Marshall*, 143 S. Ct. 1746 (2023); *Smith v. State*, No.

[1] Appellees have indicated that they do not consent to the filing of this brief. As such, IJ has concurrently filed a motion for leave to file this brief. No counsel for a party authored this brief in whole or in part, and no person or entity, other than *amicus* and their counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

S23G0701 (Ga. Oct. 20, 2023), and publishes original research quantifying the problems posed by civil forfeiture and suspicionless searches and seizures, *see, e.g.*, Lisa Knepper et al., *Policing for Profit* (3d ed. 2020), [hereinafter *Policing for Profit*]; Jennifer McDonald, *Jetway Robbery? Homeland Security and Cash Seizures at Airports* (2020) [hereinafter *Jetway Robbery*]; Brian D. Kelly, *Fighting Crime or Raising Revenue?* (2019) [hereinafter *Raising Revenue*]; Brian D. Kelly, *Does Forfeiture Work? Evidence from the States* (2021) [hereinafter *Evidence from the States*].[2]

This case implicates those specific interests. Here, the district court failed to apply an appropriate Fourth Amendment analysis that accounts for the totality of the circumstances. If upheld, that ruling would implicitly sanction the suspicionless jetway interdictions at issue, contrary to the Fourth Amendment right to be free from unreasonable searches and seizures. And it would permit law enforcement to conduct fishing expeditions for air travelers carrying large amounts of cash— something that is perfectly legal when travelling domestically. This Court should reverse and clarify that a totality of the circumstances analysis requires courts to account for law enforcement's weighty financial incentives and all aspects of a post-9/11 airport security environment.

---

[2] All reports available at https://ij.org/report/?pillar=civil-forfeiture.

## STATEMENT OF THE ISSUES

Under *Schneckloth v. Bustamonte*, 412 U.S. 218 (1974), whether an individual voluntarily consents to a search or seizure is a "question of fact to be determined from the totality of all the circumstances." *Id.* at 227. Here, the question presented is whether the district court's assessment of whether Appellants voluntarily consented to questioning by police on the jetway of a flight necessarily required it to consider all of the circumstances surrounding that encounter, including the heightened security environment of the modern-day, post-9/11 airport and the profit incentives for police officers that may lead to such an encounter.

## SUMMARY OF ARGUMENT

The Clayton County Police Department ("CCPD") runs an airport interdiction program where officers "randomly" stop travelers on airplane jetways, ostensibly to combat drug trafficking. These types of broad, suspicionless search initiatives, standing alone, are impermissible under the Fourth Amendment. *See City of Indianapolis v. Edmond*, 531 U.S. 32, 42 (2000). To justify its program, CCPD contends that the individuals they interdict consent to the encounters. This Court should be skeptical of such claims.

First, these programs are motivated by a desire to raise revenue, not an effort to fight crime. Although CCPD asserts that the purpose of this program is to combat drug trafficking, less than 0.5% of its interdictions ever result in criminal charges

being brought. By contrast, over 6% of stops under the program result in cash forfeitures, bringing in $1,000,000 in profit over an eight month period. These numbers indicate that, consistent with IJ's data on civil forfeiture more broadly, CCPD uses its airport interdiction program as a means of revenue generation. Because of civil forfeiture's weak procedural protections and low burden of proof, this scheme is highly lucrative for the department, and the profit incentives give the officers strong motivation to manufacture consent.

It is essential that this Court affirm that the appropriate totality of the circumstances analysis for determining voluntariness must account for this impermissible financial motive. Faced with such a powerful motive, police departments will likely employ tactics that increase the coercive pressure placed on an individual during a stop. The Founders enacted the Fourth Amendment with the aim of ending these types of broad search-and-seizures based on minimal evidence of criminality that were regularly conducted by the British before the American Revolution. Insufficient judicial scrutiny of these types of airport interdiction programs risks allowing the governmental abuses that the Fourth Amendment was designed to prevent.

Second, interdiction programs like CCPD's capitalize on the compliance-inducing environment of post-9/11 airport security, where searches may be required at any point and travelers are required to answer questions about their travel and

luggage. In particular, interdiction officers induce travelers to acquiesce by asking them for their ticket and identification and asking questions about their travel plans and the contents of their luggage, as if they were going through additional, *mandatory* security screening. To determine if consent was given freely, courts must consider whether "a reasonable person would have believed that he was [] free to leave" the interaction based on a totality of the circumstances. *Brendlin v. California*, 551 U.S. 249, 255 (2007). Even in the pre-9/11 era of relaxed airport security, courts recognized that a reasonable person would feel pressure to conform with requests from an officer in an airport. In *United States v. Berry*, 670 F.2d 583, 596 (5th Cir. Unit B 1982) (en banc), this Court stated that airport stops are prone to coerciveness because of factors such as the "surprise from being accosted in a crowded airport" and "the pressure to cooperate with police to avoid an untoward scene." *Id*.

*Berry*'s analysis is even more applicable today. Since the September 11, 2001 terrorist attacks, airport security has drastically increased. From the moment they enter the airport, contemporary travelers are told they must comply with requests from government and airline officials in order to fly. They are required to pass through multiple levels of security screenings, hand over identification, undergo searches of their person and luggage, and answer pointed security questions about their travel plans and the contents of their luggage.

In this environment, a reasonable person approached by law enforcement on a jetway would believe she had no choice but to answer their questions and comply with their requests to search her baggage. This risk is further magnified when an interdiction takes place on a crowded, narrow jetway, where individuals are concerned about missing their flight or making a scene in front of other passengers, where officers can easily block an individual's path, and where passengers may not feel free to exit past the boarding gate lest they be prevented from re-boarding.

The district court erred by failing to account for these factors when it dismissed Appellants' complaint. This Court should reverse the decision below and clarify that careful scrutiny for genuine consent to the encounter is necessary to prevent "the criminal law [from being] used as an instrument of unfairness" and as a tool for undermining the foundational rights of liberty and property. *Schneckloth*, 412 U.S. at 225; *Boyd v. United States*, 116 U.S. 616, 635 (1886) ("It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.").

# ARGUMENT

Every passenger knows just how much the terrorist attacks of September 11, 2001 transformed air travel. Each day, millions of people go through one of the most extensive port of travel security programs in the world as a result. Plaintiffs Eric André and Clayton English were two such travelers. When officers intercepted Mr. Andre's and Mr. English's paths as they were boarding, they reasonably believed that nothing about airport security was optional. On the confined and crowded jetway, they complied as officers peppered them with questions, asked for boarding passes and ID, and asked to search Mr. English's bags without any reasonable suspicion. As the officers did this, Mr. Andre's and Mr. English's flights crept closer to departure whether or not each passenger ever boarded.

CCPD justifies such encounters by asserting that each traveler voluntarily "consents" to the experience. The encounters take place as part of an interdiction program purportedly designed to combat drug trafficking through "random," suspicionless searches of travelers. But travelers inside the secured area of an airport have already passed through vigorous screening—including electronic and/or physical searches of their person and luggage—by the United States Transportation Security Agency ("TSA").

Discretionary, suspicionless searches—like those to which Messrs. André and English were subjected—are inconsistent with the Fourth Amendment. A proper

Fourth Amendment analysis must recognize, for example, that CCPD and other law enforcement agencies know that performing large volumes of such stops can be highly profitable. A proper analysis also must allow courts to determine when "consent" is merely illusory. In the modern airport, a passenger who is stopped, questioned about the nature of their travel and the contents of their bags, and searched by a badge-wearing officer moments before departure and after going through layers of mandatory screening would not reasonably believe they were free to disregard the officers' questioning or refuse a search. The Court should reverse and make clear what constitutes genuine consent—and what does not.

## I. Vigorous Judicial Scrutiny of Consent-Based Searches is Necessary to Prevent Government Abuse.

Like many law enforcement agencies across the country, CCPD has established a broad interdiction program, purportedly to combat high-volume drug trafficking. Pls.' 1st Am. Compl. ¶¶ 60–62, ECF. No. 24 [hereinafter FAC]; Defs.' Mem. in Supp. of Mot. to Dismiss 13, ECF No. 25 [hereinafter Defs.' Mem.]. Yet, as Appellants allege, CCPD's program had a compelling financial motivation—the seizure of cash resulting from its "consensual" encounters with air travelers. This financial motivation is hardly uncommon. Law enforcement agencies across the nation have increasingly availed themselves of civil forfeiture to retain cash and property seized from private citizens. Those motivations are critical in analyzing the voluntary nature of a private citizen's encounter with law enforcement.

## A.  Civil Forfeiture Offers Powerful Financial Motives for Law Enforcement Agencies.

Civil forfeiture allows the government to seize and forfeit an individual's property based on mere suspicion that the property was involved in a crime.  Before the 1980s, governments rarely availed themselves of this remedy.  *See* Annemarie Bridy, *Carpe Omnia: Civil Forfeiture in the War on Drugs and the War on Piracy*, 46 Ariz. St. L.J. 683, 694–95 (2014).  Yet the enterprise has proven highly profitable in recent years, with state and federal governments keeping nearly $70 billion in forfeiture proceeds from 2000 through 2019.  *Policing for Profit* at 5.  In 2018 alone, forfeiture revenues exceeded $3 billion, a near six-fold increase from two decades earlier.  *Id.* at 15–17.  Members of the Supreme Court have noticed the uptick, acknowledging that "civil forfeiture has in recent decades become [a] widespread and highly profitable" mechanism for state and federal law enforcement alike.  *Leonard v. Texas*, 580 U.S. 1178, 1179 (2017) (Statement of Thomas, J., respecting denial of certiorari).

Airport interdiction programs, such as those at the heart of Appellants' complaint, have been a particularly fertile ground for forfeiture.  DHS agencies alone conducted more than 30,000 seizures at domestic airports from 2000 to 2016, netting more than $2 billion in forfeitures.  *Jetway Robbery* at 6.  Consistent with overall trends, the total value of forfeitures from these airport encounters continues to rise year over year.  *Id.*

Troublingly, the funds obtained through these seizures rarely reach the general public fisc; rather, they amount to pure profit for law enforcement agencies' budgets. Under Georgia law, for example, law enforcement agencies can retain the entire proceeds of a seizure for their own use once the property is forfeited. *See Policing for Profit* at 80. And Georgia is no outlier: as of 2020, law enforcement agencies in 32 states can retain 80–100% of the revenue from seized and forfeited property for their own use. *Id.* at 34. Even federal asset forfeiture laws, which enable local police departments to partner with federal law enforcement in asset seizure operations, permit local agencies to receive up to 80% of the proceeds from forfeited property. *Id.* at 46. Too often, these funds are misused and misappropriated, resulting in excessive spending by police departments for personal benefit rather than public good. *See, e.g.*, Chris Joyner & Bill Rankin, *'Like a Slush Fund': Revenue Agents Bought Pricey Perks with Seized Assets*, Atl. J.-Const. (Mar. 12, 2020), http://tinyurl.com/3k2mmwn6; Randy Travis, *Gwinnett Sheriff Assigns Himself $70,000 Performance Car Bought with Seized Drug Money*, FOX5 Atl. (June 26, 2018), http://tinyurl.com/nhzhrc8x; John Burnett, *Sheriff Under Scrutiny over Drug Money Spending*, NPR (June 18, 2008), http://tinyurl.com/4vej8ydz.

Civil forfeiture proves highly lucrative at scale in part because victims face substantial roadblocks to challenging these deprivations. Unlike a criminal case, a claimant in a civil forfeiture proceeding has no right to counsel and may make

critical errors in navigating the legal system should they proceed unrepresented. *See, e.g.*, Compl. ¶¶ 41–65, *Martin v. FBI*, No. 1:23-CV-00618 (D.D.C. Mar. 7, 2023), ECF No. 1 (describing innocent owner's inadvertent admission that her property was involved in a crime due to FBI's confusing notice). Even for a victim who can afford counsel, the personal cost of contesting a forfeiture often outweighs the benefit of the property's return. The median currency forfeiture across the states that track such data averages just $1,200, but attorneys' fees can exceed $3,000 in even a straightforward forfeiture proceeding. *Policing for Profit* at 20. Often, the legal costs are much higher.

The burden of civil forfeiture is not borne equally: "forfeiture operations frequently target the poor and other groups least able to defend their interests in forfeiture proceedings." *Leonard*, 580 U.S. at 1180; *see also* U.S. Commission on Civil Rights, *Civil Asset Forfeiture and its Impact on Communities of Color in Georgia* 20 (2022) (finding civil forfeiture disproportionately impacts people of color). These groups are also less likely to have access to a bank account or credit card, increasing the likelihood that they will carry cash while traveling. *See Policing for Profit* at 20. They thus risk losing an entire paycheck or even their entire life savings to civil forfeiture. *See, e.g.*, *Jetway Robbery* at 18.

Those who have the means to challenge a forfeiture face an uphill battle and a government-friendly standard. Under Georgia law, the state need show only that

the property was "related" to a crime—a broad standard itself—by a preponderance of the evidence. *See* O.C.G.A. §§ 9-16-17(a)(1), 16-13-49(b)(5) (defining "related" as any property "found in close proximity to any controlled substances or other property subject to forfeiture"). Thus, in most jurisdictions, including Georgia, the state can successfully forfeit property even if the property owner was never convicted of a crime, never charged with any criminal conduct, and, in many cases, never even arrested. *See Policing for Profit* at 39–40.

Take the case of Brian Moore, Jr., who had $8,500 seized from him by DEA agents in the Atlanta airport. He was never charged with a crime, and the government voluntarily moved to dismiss the proceeding to forfeit those funds relatively soon after proceedings commenced. Yet, Mr. Moore's attorneys *still* accrued more than $15,200 in fees for their work in connection with those forfeiture proceedings. Even today, Mr. Moore is still fighting for compensation under the Civil Asset Forfeiture Reform Act's mandatory fee-shifting provision, which permits the recovery of such fees in certain cases and incentivizes attorneys to represent individuals in those actions. *See United States v. Moore*, No. 23-10971 (11th Cir. docketed Mar. 23, 2023). Georgia has no equivalent fee-shifting provision, giving claimants a much worse economic outlook for contesting civil forfeitures.

Although proponents of civil forfeiture pitch it as a means to fight crime, evidence suggests that it has no meaningful impact on crime clearance rates or the use of illegal drugs. *See Evidence from the States* at 18–20. And states that have abolished civil forfeiture altogether—as New Mexico did in 2015—have not seen an increase in criminal activity relative to neighboring states that have not eliminated the process. *Policing for Profit* at 32–33. Rather, "forfeiture [has been] strongly linked to worsening [local] economic conditions," which suggests that "police make greater use of forfeiture when local budgets are tight." *Raising Revenue* at 3; *Evidence from the States* at 5. CCPD's own records indicate that despite stopping 402 travelers on the jetway, only two people were charged with a crime: one for possession of approximately ten grams of a controlled substance, and the other for possession of six prescription pills. FAC ¶¶ 84–86. In contrast, those 402 stops yielded 25 cash seizures totaling more than $1,000,000. *Id*. In every case where a victim challenged the seizure, CCPD settled and returned substantial portions of the seized funds, indicating the weakness of any evidence supporting these seizures and attempted forfeitures. FAC ¶¶ 86–87.

The end result is that many law enforcement agencies, including CCPD, are highly incentivized to pursue civil forfeiture—even when there is no public benefit to doing so—because they can keep all of the forfeiture proceeds for their own use. *Policing for Profit* at 34, 80. That revenue allocation, combined with weak

procedural protections for claimants, gives law enforcement agencies "an unconstitutional institutional incentive to prosecute forfeiture cases." *Harjo*, 326 F. Supp. 3d at 1193–98 (finding such an incentive where officers have "de facto control of how [excess forfeiture] revenue is spent"); *cf. Flora v. Sw. Iowa Narcotics Enf't Task Force*, 292 F. Supp. 3d 875, 902–05 (S.D. Iowa 2018) (holding similarly where 70% of revenue is retained by task force).

### B. Suspicionless Stops Must Rely on Consent Because They Are Constitutionally Suspect Standing Alone.

Financial incentives encourage broad interdiction programs. But broad interdiction programs contravene the Fourth Amendment. As such, genuine consent is often a necessary prerequisite to conducting searches and seizures pursuant to a program like CCPD's jetway interdiction initiative.

At the heart of the Fourth Amendment is the Founders' rejection of the general search-and-seizure authority based on minimal evidence of criminality that was commonplace prior to the Revolution. The "Framing-era common law did not permit officers to interrogate or take statements or confessions from suspects," let alone random civilians. Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547, 749 n.574 (1999). At the time of the Founding, "[t]he constable had neither a duty nor the authority to investigate the possibility of uncharged crimes; in fact, in the absence of a warrant, the constable had little more arrest authority than any other person." Thomas Y. Davies, *Farther and Farther*

*from the Original Fifth Amendment: The Recharacterization of the Right Against Self-Incrimination as a "Trial Right" in* Chavez v. Martinez, 70 Tenn. L. Rev. 987, 1004 (2003). Investigatory examination of suspected criminals was conducted by a justice of the peace—a judicial officer—and only after arrest. *Id.* at 1004–05.

Seizures of either person or property were only lawful when done pursuant to "due process of law," which referred to "'writs or precepts that go forth' from a court" or "warrant in law without writ," not compliance with statutory procedures. Max Crema & Lawrence B. Solum, *The Original Meaning of "Due Process of Law" in the Fifth Amendment*, 108 Va. L. Rev. 447, 465 (2022) (quoting *Process*, 2 Timothy Cunningham, *A New and Complete Law-Dictionary* (1765)); Thomas Y. Davies, *Correcting Search-and-Seizure History: Now-Forgotten Common-Law Warrantless Arrest Standards and the Original Understanding of "Due Process of Law"*, 77 Miss. L.J. 1, 54 (2007) (quoting 2 Sir Edward Coke, *The Institutes of the Lawes of England* 51 (1642)). Put differently, the seizing official needed either (1) a judicially-issued order authorizing the seizure—e.g., a warrant founded upon probable cause and particularity, or final process upon a valid judgment—or (2) authority arising by operation of law on par with every other citizen—like how any ordinary person could arrest a fleeing felon or abate a nuisance. Crema & Solum, *supra*, at 465; *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18

How.) 272, 283 (1855). Thus, officers were precluded from conducting discretionary fishing expeditions in the hopes of finding evidence.

The Supreme Court has reaffirmed that broad, suspicionless search and seizure programs, even in the name of "general crime control," are impermissible under the Fourth Amendment. *See City of Indianapolis v. Edmond*, 531 U.S. 32, 34–35 (2000). In *Edmond*, the Supreme Court considered the legality of a suspicionless-stop program similar to CCPD's interdiction program. There, the City of Indianapolis established vehicle checkpoints where police would stop a predetermined number of vehicles, "ask[] the driver to produce a license and registration," and "look[] for signs of impairment and conduct[] an open-view examination of the vehicle from the outside." *Id.* at 35. The Court rejected that program as unreasonable under the Fourth Amendment absent some purpose "beyond the normal need for law enforcement." *Id.* at 37–38. If screening programs like "roadblocks designed primarily to serve the general interest in crime control" were constitutional, then "the Fourth Amendment would do little to prevent such intrusions from becoming a routine part of American life." *Id.* at 42.

The Court's reasoning applies equally to airports. Like highways, airports present unique safety considerations absent in ordinary citizen-police encounters. Even still, just as the government cannot justify a general crime control roadblock

on highways, the government cannot justify "random" stops of air travelers to generally combat crime. *Id.* at 46.

To circumvent these prohibitions, the government often argues—as CCPD does here—that the targeted individual(s) consented to any questioning and search. And true enough, under the Fourth Amendment, an officer may question and even search an individual with no particularized suspicion when the individual voluntarily consents and "remains free to disregard the questions and walk away." *United States v. Waksal*, 709 F.2d 653, 658 (11th Cir. 1983). But the fact of consent is critical; it may not result from "duress or coercion." *Schneckloth*, 412 U.S. at 227.

The meaning of 'voluntariness' under the Fourth Amendment "is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227; *accord Ohio v. Robinette*, 519 U.S. 33, 38 (1996). That makes good sense: the term does not lend itself to a strictly common-sense, colloquial understanding. *See Schneckloth*, 412 U.S. at 224 ("[N]either linguistics nor epistemology [can] provide a ready definition of the meaning of 'voluntariness' [for purposes of the Fourth Amendment]."). The critical inquiry for courts then is whether the encounter and any purported consent to search is *genuinely* voluntary and utterly "absen[t] of coercion." *United States v. Elsoffer*, 671 F.2d 1294, 1297 (11th Cir. 1982); *United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011).

In the particular context of interdiction programs, moreover, law enforcement's incentives in obtaining consent are a relevant "circumstance" that must be accounted for. The financial incentives are immense, and officers may therefore employ tactics—whether intentional or not—that increase the coercive pressure on an individual to consent to a search. Courts should carefully scrutinize these encounters, particularly when, as here, a plaintiff alleges that an invalid seizure resulted from a financially motivated interdiction program.

## II. The Fourth Amendment's Reasonableness Standard Requires the Court to Account for the Nature of the Modern Airport.

Beyond the incentives problems, the district court failed to consider another highly relevant "circumstance" in the "totality of the circumstances" analysis—the reality of the modern-day airport. Even before the attacks of September 11, 2001 transformed airport security, courts recognized that they must "closely scrutinize" airport stops because they are, by their nature, prone to coerciveness that could "easily . . . escape a casual review." *Berry*, 670 F.2d at 596.

The district court failed to account for these realities in granting Appellees' motion to dismiss. Particularly in the high-security environment of post-9/11 American airports, modern air travelers are primed to believe that compliance with requests from government and airline officials is compulsory. Contemporary air travelers pass through multiple levels of mandatory security screenings: they hand over identification; they undergo pat downs; they answer pointed security questions

about their travel plans and the contents of their luggage; and they allow federal agents to physically search their luggage. These searches, screenings, and questionings can take place *anywhere* in the airport, not just at the TSA screening checkpoint. *See Layers of Security*, TSA (May 19, 2021), http://tinyurl.com/ 2c9tu62t; Off. of the Assistant Sec'y, TSA, *TSA Mgmt. Directive No. 100.4: Transportation Security Searches* (2012), http://tinyurl.com/ynb55drj (identifying numerous types of screenings that take place throughout the airport, including "Gate Screening," "Playbook Screening," and "Reverse Screening"). In this environment, it is natural and reasonable that an individual approached by law enforcement on a jetway would believe she had no choice but to answer their questions and comply with their requests to search her baggage.

### A. The High-Security Environment of Modern Day Airports Creates an Inherently Coercive Environment.

As this Circuit recognized even in 1982, "the very nature of [airport] stops" makes it "easy for implicit threats or subtle coercion to exert tremendous pressure on an individual to acquiesce to the officer's wishes." *Berry*, 670 F.2d at 596. Indeed, the *Berry* Court expressed concern that the "surprise from being accosted in a crowded airport . . . by a law enforcement officer for no apparent reason" and "the pressure to cooperate with police to avoid an untoward scene before the crowds of people" may induce compliance with an officer's request to question or search that individual. *Id.* For these reasons, "blocking an individual's path or otherwise

19

intercepting him to prevent his progress in any way is a consideration of great, and probably decisive, significance." *Id.* at 597. But, because of the nature of the airport environment, the Court also cautioned that even "[m]inor gradations in the degree of coercion involved," including small nuances in "tone and language," can "tip the balance" and turn an interaction into an illegal seizure. *Id.* at 596–97.

That was nearly half-a-century ago, when air travelers faced a vastly different security protocol. Although some screening occurred, it was minimal and little more than a pass through a metal detector located either at a screening checkpoint on the concourse or at the gate. Kevin Farrell, *Flying in the 1980s: What's Our Vector, Victor?*, USA Today, Mar. 16, 2016, http://tinyurl.com/3th2cuk7; Paul Seidenstat, *Terrorism, Airport Security, and the Private Sector*, 21 Rev. Pol'y Res. 275, 276 (2004). Travelers did not need to present identification or even a ticket to reach airport gates. Farrell, *supra*. Non-traveling family and friends could accompany departing passengers to their gates and greet arriving passengers as soon as they deplaned. *Id.*

This airport security scheme was fragmented and lethargic compared to today's. Seidenstat, *supra*, at 276. After the terrorist attacks of September 11, 2001, the federal government instituted a robust new regime that centralized government control over airport security and dramatically increased the scrutiny faced by travelers prior to boarding an airplane. Now, it is implicitly understood by the

average traveler that compliance with requests from law enforcement officials at an airport are a necessary prerequisite to boarding one's flight.

This begins from the moment someone enters the airport. When travelers check in and drop off bags, they must present a ticket and identification. Compliance is mandatory. Before they enter the concourse, they must go through security with a ticket and identification. *Acceptable Identification at the TSA Checkpoint*, TSA, http://tinyurl.com/38u29p5f (last visited Jan. 18, 2024). Compliance is mandatory. Passengers take off their shoes, empty their pockets, remove their electronics from their luggage, and submit to an x-ray of their bag and an x-ray or millimeter-wave scan of their person. *See Security Screening*, TSA, http://tinyurl.com/2s4ay3wr (last visited Jan 18, 2024). Compliance is mandatory. *See, e.g.*, *United States v. Aukai*, 497 F.3d 955, 961 (9th Cir. 2007) ("[W]here an airport screening search is otherwise reasonable and conducted pursuant to statutory authority, all that is required is the passenger's election to attempt entry into the secured area of an airport." (citation omitted)). If these screening devices trigger an alert, more intrusive searches or pat downs may follow. *Security Screening*, *supra*. Compliance is mandatory. Indeed, even after passing through TSA security screening, travelers are subject to additional safety screenings *anywhere in the airport*, including further screening measures at the gate. *Layers of Security, supra*. The message is crystal clear: comply or don't fly.

These modern-day enhancements to airport security only amplify this Court's prescient insight in *Berry*. Because travelers today are told they *must* comply with all security measures throughout the airport, including at the boarding gate, any person would reasonably believe that she is required to comply with the demands from *any* law enforcement officer in the airport. Indeed, the federal government has recognized as much. The Department of Justice Office of the Inspector General concluded that certain questioning by law enforcement after an individual passes through airport security "creates a risk that travelers will interpret the statement to mean they are required to consent to the encounter, similar to their obligations at a TSA checkpoint." Off. Of the Inspector Gen., U.S. DOJ, Rep. No. 15-3, *Review of the Drug Enforcement Administration's Use of Cold Consent Encounters at Mass Transportation Facilities*, at iv (2015).

This risk is magnified further in cases, like this one, where the tactics used by law enforcement officials closely mirror airport security procedures—for instance, asking passengers to present their ticket and ID, asking about their travel plans, the contents of their luggage, who packed their luggage, and ultimately to "allow" the officers to search their bag. FAC ¶¶ 37–39, 41–43. Such questions and requests lull travelers into thinking they are being subjected to a standard airport security screening. They are thus far more likely to comply when asked these questions (and others) by badge-wielding officers at an airport—even when this questioning is

really done for general crime control purposes, not airport security. Now more than ever, the very nature of the airport exerts pressure to comply, and courts should be careful to avoid "misinterpret[ing] acquiescence to an officer's demands as consent." *Berry*, 670 F.2d at 596.

## B. Encounters with Law Enforcement on a Jetway Create a Particularly Coercive Environment.

In the already coercive environment of a contemporary airport, the confines of airplane jetways present a uniquely high risk of coercion. The jetway is a narrow bridge that serves as a point of no return in travel as passengers head from the gate to their plane. Sequestering and interrogating a passenger on a jetway exerts significant pressure on her because she may feel trapped: unable to proceed to board the plane, nor free to leave by turning around and exiting past the boarding gate lest she be prevented from re-boarding. Moreover, as passengers board the plane, the jetway becomes extremely crowded. As a result, jetway interdiction targets feel particularly wary of drawing attention to themselves or creating a scene by refusing an officer's request. *See Berry*, 670 F.2d at 596. And, as was the case with the office in *Berry*, where the individual was forced by officers to "proceed against his will," the small space of a jetway allows officers to physically confine an individual by blocking her path to the plane and isolating her in a corner. 670 F.2d at 602.

The timing of a jetway interdiction only increases the coercive pressure. These encounters, by their very nature, take place immediately before a plane is

scheduled to depart, and passengers are keenly worried that any failure to cooperate with law enforcement may lead to further interrogation or confinement that would result in missing the flight. The last-minute nature of the stop also may reasonably lead an individual to believe that the officer is pulling *her* over for a specific reason. She may think that, in one of the multiple rounds of security, TSA agents flagged something about *her* that has triggered another round of mandatory screening before boarding. *Cf. Berry*, 670 F.2d at 597 ("Statements which intimate that an investigation has focused on a specific individual easily could induce a reasonable person to believe that failure to cooperate would lead only to formal detention.").

Viewed in light of *Berry* and a common sense understanding of the post-9/11 airport environment, jetway interdictions exploit passengers' anxieties about flying and complying with mandatory security screenings. Modern airport security protocols—developed after the worst terrorist attack in American history to deter future deadly attacks—are designed to be stressful and intimidating to compel compliance. Running drug (or cash) interdictions in an environment where everyone is primed to comply with law enforcement—it should go without saying—provides huge advantages to police departments. *Berry* compels the conclusion that jetway interdictions present a remarkably high risk of coercion and that courts should closely scrutinize claims from the government that individuals have voluntarily consented to such stops.

## CONCLUSION

For the foregoing reasons, the judgement of the district court should be reversed.

Dated: January 19, 2024

Respectfully submitted,

/s/ *Daniel L. Alban*
Daniel L. Alban

DANIEL L. ALBAN
   *Counsel of Record*
**INSTITUTE FOR JUSTICE**
901 North Glebe Road, Ste. 900
Arlington, Virginia 22203
(703) 682-9320
dalban@ij.org

JOSHUA J. FOUGERE
ALARIC R. SMITH
AUSJIA L. PERLOW
DAVID H. KINNAIRD*
SUSAN K. WHALEY
**SIDLEY AUSTIN LLP**
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000

*Counsel for* Amicus Curiae
*Institute for Justice*

*Admitted only in Maryland and practicing law in the District of Columbia under the supervision of principals of the firm who are members in good standing of the D.C. Bar.

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this document complies with the word limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7) because it contains 5,602 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f).

I further certify that this document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Respectfully submitted,

/s/ *Daniel L. Alban*
Daniel L. Alban

*Counsel for* Amicus Curiae *Institute for Justice*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 19, 2024, I electronically filed the foregoing with the Clerk of the Court using the Court's CM/ECF system, which will send notification of such filing to all registered CM/ECF users.

Respectfully submitted,

/s/ *Daniel L. Alban*
Daniel L. Alban

*Counsel for* Amicus Curiae *Institute for Justice*