No. 23-13253

# In the United States Court
# of Appeals for the Eleventh Circuit

---

ERIC ANDRÉ and CLAYTON ENGLISH

*Plaintiffs-Appellants*,

v.

CLAYTON COUNTY, GEORGIA, ET AL.,

*Defendants-Appellees*.

---

On Appeal from the United States District Court
for the Northern District of Georgia, No. 1:22-cv-04065-MHC

---

## BRIEF OF *AMICI CURIAE* EMPIRICAL LEGAL SCHOLARS
## IN SUPPORT OF APPELLANTS

---

Jeremy C. Marwell
VINSON & ELKINS, LLP
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, D.C. 20037
202-639-6507

Garrett T. Meisman
VINSON & ELKINS, LLP
845 Texas Avenue, Suite 4700
Houston, Texas 77002
713-758-2559

*Counsel for* Amici Curiae
*Empirical Legal Scholars*

No. 23-13253
*André v. Clayton County, Georgia*

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to 11th Cir. R. 26.1-1, *Amici Curiae* Empirical Legal Scholars certify by undersigned counsel that the following have an interest in the outcome of this case:

1.    Acevedo, Art – *Amicus Curiae*

2.    Aden, Hassan – *Amicus Curiae*

3.    Alban, Daniel L. – Counsel for *Amicus Curiae*

4.    Alston & Bird LLP – Counsel for *Amicus Curiae*

5.    American Civil Liberties Union of Georgia – *Amicus Curiae*

6.    André, Eric – Plaintiff-Appellant

7.    Anger, Tyler A. – Counsel for *Amici Curiae*

8.    Barkai, Yotam  – Counsel for *Amici Curiae*

9.    Blackwell, Keith – Counsel for *Amicus Curiae*

10.    Branham, Aimee – Defendant-Appellee

11.    Burnette, Jason Todd – Counsel for Plaintiffs-Appellants

12.    Cain, Molly M. – Counsel for *Amicus Curiae*

13.    Campbell, Kayin – Defendant-Appellee

14.    Canfield Law LLC – Counsel for Plaintiffs-Appellants

15.    Canfield, Peter – Counsel for Plaintiffs-Appellants

16.  Cavedon, Matthew P. – Counsel for *Amicus Curiae*

17.  Chief of the Clayton County Police Department – Defendant-Appellee

18.  Clayton County, Georgia – Defendant-Appellee

19.  Clayton, Jerry L. – *Amicus Curiae*

20.  Cohen, Mark H. – U.S. District Judge for the Northern District of

Georgia

21.  Deane, Jr., Richard Hunter – Counsel for Plaintiffs-Appellants

22.  Doe, Karla – Counsel for *Amicus Curiae*

23.  Elie, Jean  – *Amicus Curiae*

24.  English, Clayton – Plaintiff-Appellant

25.  Freeman Mathis & Gary, LLP – Counsel for Defendants-Appellees

26.  Friedman, Barry Evan – Counsel for Plaintiffs-Appellants

27.  Ganske, Rodney – Counsel for Plaintiffs-Appellants

28.  Gibson Dunn & Crutcher LLP  – Counsel for *Amicus Curiae*

29.  Griffin, Tony – Defendant-Appellee

30.  Hancock, Jack Reynolds – Counsel for Defendants-Appellees

31.  Haynes, Elissa B. – Counsel for Defendants-Appellees

32.  Heydari, Farhang – Counsel for Plaintiffs-Appellants

33.  Hinkson, Ashley Futrell – Counsel for Plaintiffs-Appellants

34.  Hogan, Howard – Counsel for *Amicus Curiae*

35.  Hooks, Michael – Defendant-Appellee

36.  Hoynes, Benjamin – Counsel for Plaintiffs-Appellants

37.  Institute for Justice – *Amicus Curiae*

38.  Jones Day – Counsel for Plaintiffs-Appellants

39.  Kemmitt, Christopher – Counsel for *Amicus Curiae*

40.  Koorji, Alaizah – Counsel for *Amicus Curiae*

41.  Law Enforcement Action Partnership – *Amicus Curiae*

42.  Lawrence & Bundy – Counsel for Plaintiffs-Appellants

43.  Lawrence-Hardy, Allegra – Counsel for Plaintiffs-Appellants

44.  Lynch, Loretta E. – Counsel for *Amici Curiae*

45.  Magnus, Chris – *Amicus Curiae*

46.  Marwell, Jeremy C. – Counsel for *Amici Curiae*

47.  Meisman, Garrett T. – Counsel for *Amici Curiae*

48.  Meyer, I, Paul David – Counsel for Plaintiffs-Appellants

49.  Moir, Sylvia – *Amicus Curiae*

50.  NAACP Legal Defense Fund ("LDF") – *Amicus Curiae*

51.  The Policing Project at the New York University School of Law – Counsel for Plaintiffs-Appellants

52.   Nocharli, Rebecca Marie – Counsel for Plaintiffs-Appellants

53.  Paul, Weiss, Rifkind, Wharton & Garrison LLP  – Counsel for *Amici Curiae*

54. Prescott, James Jondall – *Amicus Curiae*

55. Rahr, Sue – *Amicus Curiae*

56. Reilly, Samuel – Counsel for Plaintiffs-Appellants

57. Roberts, Kevin – Defendant-Appellee

58. Rubinfeld, Daniel L. – *Amicus Curiae*

59. Sabzevari, Arash Ali – Counsel for Defendants-Appellees

60. Scherzer, Aaron – Counsel for Plaintiffs-Appellants

61. Sigalos, Jason – Counsel for *Amicus Curiae*

62. Sloan, Sarah Hartman – Counsel for Plaintiffs-Appellants

63. Smith, Cameron – Defendant-Appellee

64. Spital, Samuel – Counsel for *Amicus Curiae*

65. Starr, Sonja B. – *Amicus Curiae*

66. Stephens Darrel W. – *Amicus Curiae*

67. Stern, Eric E. – Counsel for *Amici Curiae*

68. The Cato Institute – *Amicus Curiae*

69. Tuck, Andrew – Counsel for *Amicus Curiae*

70. Vinson & Elkins L.L.P. – Counsel for *Amici Curiae*

71. Wasserman, Robert – *Amicus Curiae*

72. Yang, Crystal S. – *Amicus Curiae*

# <u>TABLE OF CONTENTS</u>

Page

CERTIFICATE OF INTERESTED PERSONS....................................................C-1

TABLE OF CONTENTS...........................................................................................i

TABLE OF CITATIONS ....................................................................................... ii

IDENTITY AND INTEREST OF AMICI CURIAE .................................................1

STATEMENT OF THE ISSUES .............................................................................5

SUMMARY OF THE ARGUMENT ......................................................................6

ARGUMENT ...........................................................................................................9

    I.   Where the government purports to select a claimant from a pool of individuals at random, the entire pool (i.e., the entire population from which the selection is made) consists of "similarly situated" comparators for equal protection purposes. .............................................10

    II.  Only by misapplying the standard for a motion to dismiss and declining to draw reasonable inferences in favor of the plaintiffs could the district court ignore plaintiffs' identification of a similarly situated comparator. .................................................................................13

    III. The plaintiffs' statistical data and allegations strongly support finding both a discriminatory effect and discriminatory purpose, sufficient to survive a motion to dismiss....................................................16

CONCLUSION.......................................................................................................22

CERTIFICATE OF COMPLIANCE......................................................................24

CERTIFICATE OF SERVICE ..............................................................................25

## <u>TABLE OF CITATIONS</u>

**Cases:**                                                                                    **<u>Page(s)</u>**

*Avery v. Georgia*,
    345 U.S. 559 (1953) ............................................................................ 12

*Campbell v. Rainbow City*,
    434 F.3d 1306 (11th Cir. 2006).......................................................... 12

\* *Castaneda v. Partida*,
    430 U.S. 482 (1977) ................................................ 12, 16, 17, 20, 21

*Chavez v. Illinois State Police*,
    251 F.3d 612 (7th Cir. 2001) ........................................................ 12, 16

*Diaz-Rivas v. U.S. Attorney Gen.*,
    769 F. App'x 748 (11th Cir. 2019)...................................................... 21

*Edwards v. Dothan City Sch.*,
    82 F.4th 1306 (11th Cir. 2023)............................................................ 15

*Farm Labor Org. Comm. v. Ohio State Highway Patrol*,
    95 F. Supp. 2d 723 (N.D. Ohio 2000) .............................................. 12

*Farm Labor Org. Comm. v. Ohio State Highway Patrol*,
    308 F.3d 523 (6th Cir. 2002)............................................................ 12

*Gomillion v. Lightfoot*,
    364 U.S. 339 (1960) ............................................................................ 17

*Hunter v. Underwood*,
    471 U.S. 222 (1985) ............................................................................ 17

*Jean v. Nelson*,
    711 F.2d 1455 (11th Cir. 1983)........................................................ 20

*Jean v. Nelson*,
    727 F.2d 957 (11th Cir. 1984)........................................................... 20

*Jones v. White*,
    992 F.2d 1548 (11th Cir. 1993)........................................... 18, 19, 20

\* *Lewis v. City of Union City*,
    918 F.3d 1213 (11th Cir. 2019) (en banc)......................... 6, 10, 11, 12

*MacPhee v. MiMedx Grp., Inc.*,
    73 F.4th 1220 (11th Cir. 2023).......................................................... 14

**Cases—Continued:**                                                          **Page(s)**

*Major Tours, Inc. v. Colorel*,
  799 F. Supp. 2d 376 (D.N.J. 2011)....................................................... 12

*McCleskey v. Kemp*,
  481 U.S. 279 (1987) ........................................................... 18, 19, 21

*Peightal v. Metro. Dade Cnty.*,
  26 F.3d 1545 (11th Cir. 1994)................................................................ 19

*United States v. Aguilar*,
  883 F.2d 662 (9th Cir. 1989) .................................................................. 11

*United States v. Armstrong*,
  517 U.S. 456 (1996) ............................................................................... 10

*United States v. Brantley*,
  803 F.3d 1265 (11th Cir. 2015)............................................................... 11

*United States v. Cannon*,
  987 F.3d 924 (11th Cir. 2021) ................................................................ 11

*United States v. Davis*,
  793 F.3d 712 (7th Cir. 2015) (en banc) ................................................. 16

*United States v. Tex. Educ. Agency (Austin Indep. Sch. Dist.)*,
  564 F.2d 162 (5th Cir. 1977)................................................................... 12

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) .......................................................................... 18, 20

*Whren v. United States*,
  517 U.S. 806 (1996) ................................................................................. 6

*Yick Wo v. Hopkins*,
  118 U.S. 356 (1886) ............................................................................... 17

**Other Authorities:**

3 Rotunda, Ronald D. & Nowak, John E., *Treatise on Constitutional
  Law* § 18.4 (5th ed. 2023)......................................................................17

Federal Judicial Center, "Reference Guide on Statistics," in
  *Reference Manual on Scientific Evidence* (3rd ed. 2011) ....................................21

Finkelstein, Michael O., *The Application of Statistical Decision Theory
  to the Jury Discrimination Cases*, 80 Harv. L. Rev. 338  (1966) ......................19

**Other Authorities—Continued:**  **Page(s)**

Fisher, Franklin M., *Multiple Regression in Legal Proceedings*,
  80 Colum. L. Rev. 702 (1980)...................................................................... 11, 19

Gray, Mary W., *Statistics and the Law*, 56 Mathematics Magazine 67 (1983) ......16

Lamber, Julia et al., *The Relevance of Statistics to Prove Discrimination:
  A Typology*, 34 Hastings L.J. 553 (1983).............................................................13

## IDENTITY AND INTEREST OF AMICI CURIAE[1]

*Amici curiae* are empirical legal scholars interested in the correct use of statistical evidence in the law, whose scholarly work focuses on (among other things) statistical, economic, and other empirical analyses in a legal setting. *Amici* collectively possess considerable experience applying empirical frameworks to discrimination and criminal justice issues.

J.J. Prescott is the Henry King Ransom Professor of Law and the Co-Director of the Empirical Legal Studies Center at the University of Michigan Law School. His research revolves around criminal law, sentencing law and reform, employment law, and the dynamics of civil litigation, particularly settlement. Professor Prescott holds a PhD in economics from the Massachusetts Institute of Technology and a JD from Harvard Law School.

Daniel L. Rubinfeld is a Professor of Law at NYU School of Law and Robert L. Bridges Professor of Law Emeritus and Professor of Economics Emeritus at the

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(2), *amici* state that Appellants consent to their filing of this brief, but Appellees have declined to consent, and intend to review *amici*'s motion for leave to file this brief before taking a position on that motion. Accordingly, *amici* are submitting this brief together with a motion for leave. *See* Fed. R. App. P. 29(a)(2). Pursuant to Rule 29(a)(4)(E), *amici* further state that (i) no party's counsel authored the brief in whole or in part; (ii) no party or a party's counsel contributed money that was intended to fund preparing or submitting the brief; and (iii) no person—other than *amici* or their counsel—contributed money that was intended to fund preparing or submitting the brief.

University of California, Berkeley. His work focuses on antitrust and competition policy, law and economics, and public economics. Among other things, Professor Rubinfeld is a contributing author to the Federal Judicial Center's *Reference Manual on Scientific Evidence* (3rd ed. 2011) (chapter on multiple regression analysis). Professor Rubinfeld has previously been a fellow at the National Bureau of Economic Research, the Center for Advanced Study in the Behavioral Sciences, and the John Simon Guggenheim Memorial Foundation. He holds an honorary doctorate from the University of Basel in Switzerland, is a member of the American Academy of Arts and Sciences, and received his PhD in economics from the Massachusetts Institute of Technology.

Sonja B. Starr is the Julius Kreeger Professor of Law & Criminology at the University of Chicago Law School. Her research incorporates empirical methods as well as traditional doctrinal scholarship, and focuses on the criminal justice system, equal protection law, discrimination, and racial disparity. She is Co-Editor of the *Journal of Legal Studies*, the leading peer-reviewed journal in law and social sciences. She has previously served as Co-President of the Society for Empirical Legal Studies, Chair of the Law and Economics Section of the American Association of Law Schools, and a board member of the American Law and Economics Association.

Crystal S. Yang is the Bennett Boskey Professor of Law at Harvard Law School and a Research Associate at the National Bureau of Economic Research, where she is co-director of the Crime Working Group. Her teaching and research interests center around empirical law and economics, particularly in the areas of criminal justice and algorithmic fairness, including topics of discrimination and disparity, and including empirical projects on racial bias in the criminal justice system. Professor Yang is a Co-Editor at the *Journal of Public Economics* and serves on the editorial board at the *American Economic Journal: Economic Policy*. She holds a PhD in economics from Harvard University and a JD from Harvard Law School.

Here, the district court dismissed the plaintiffs' Equal Protection claim, holding in part that the Amended Complaint's statistical allegations could not establish that a similarly situated comparator received preferential treatment and thus that plaintiffs had not adequately alleged discrimination. In *amici*'s respectful view, the district court misconstrued the plaintiffs' statistical allegations and misunderstood or misstated the legal and doctrinal relevance of those allegations. Among other things, the district court misunderstood the concept of a "similarly situated comparator" in the context of a policy, like the one challenged here, that is purportedly applied on a random basis to the relevant population. Relatedly, the district court failed to draw reasonable inferences in plaintiffs' favor from the

statistical allegations contained in the amended complaint, as it was required to do at the motion-to-dismiss stage. Given their scholarly background, *amici* believe that their perspectives on the use of statistics in legal analysis, including the role of statistics in equal protection claims and in identifying a similarly situated comparator in assessing claims of discrimination, will be useful to this Court's disposition of this case.

## STATEMENT OF THE ISSUES

Of the issues identified in the Appellants' Opening Brief, *amici* focus here on issue II: "Whether the district court erred in dismissing the equal protection claim when the complaint contains detailed factual allegations about the airport-interdiction program's stark discriminatory impact—56% of the passengers stopped are Black while only 8% of the Atlanta airport's domestic passengers are Black—as well as its discriminatory purpose."

## SUMMARY OF THE ARGUMENT

The Equal Protection Clause of the Fourteenth Amendment prohibits differential treatment by government actors "based on considerations such as race." *Whren v. United States*, 517 U.S. 806, 813 (1996). To survive a motion to dismiss, a plaintiff alleging an equal protection violation like the one at issue here must plausibly allege that the government action has a discriminatory effect and was motivated by a discriminatory purpose. The district court erred by dismissing the plaintiffs' equal protection claim here. The court's primary rationale was that the plaintiffs purportedly failed to identify a "similarly situated" individual or comparator who was not subjected to the same treatment by officers from the Clayton County Police Department ("CCPD") and thus that plaintiffs had not adequately alleged discriminatory treatment. Doc. 40 at 37–42. That ruling misconstrues the plaintiffs' statistical allegations and misapplies relevant legal principles.

Under this Court's equal protection cases, a valid comparator must be similarly situated to the claimant in all material respects other than the characteristic allegedly subject to discrimination. This rule reflects the common-sense notion that the crux of discrimination is "treating *like cases* differently." Conversely, "[t]reating *different cases* differently is not discriminatory." *Lewis v. City of Union City*, 918 F.3d 1213, 1222-23 (11th Cir. 2019) (en banc). The point of a comparator analysis

is to exclude factors (other than the protected characteristic) that could have been a legitimate basis for the government's enforcement practices. Thus, if a party alleges selective enforcement of speeding or employment policies, it must show that the government did not enforce against comparators driving at a similar speed or with similar job performance. Stated more generally, the criteria articulated for enforcing a particular policy (e.g., speeding, job performance) are used to define the relevant comparator group.

In this case, however, the CCPD officers purported to select individuals for searches *at random*. Defendants thus have disclaimed that there were any factors or criteria influencing their enforcement selection, other than the mere fact of a person's presence in the relevant population (here, the boarding group for a given flight). Accordingly, given Plaintiffs' allegations that the CCPD interdiction program operates generally on flights out of the Atlanta Airport, all travelers on flights at the Atlanta Airport (i.e., all travelers on flights subject to CCPD interdiction) during the relevant period were similarly situated, in respects material here, to plaintiffs Eric André and Clayton English for purposes of adjudicating a motion to dismiss. And thus, plaintiffs' statistical allegations regarding the overall racial composition of air travelers provided the appropriate comparator group for purposes of determining whether this policy was enforced in a discriminatory fashion.

7

The district court stated that the Amended Complaint contained no allegation as to the race of travelers on *CCPD-monitored flights*, as opposed to the air traveling public more generally. But the complaint plainly *does* include statistical allegations as to the racial breakdown of travelers in the Atlanta Airport. And in the context of the complaint's overall allegations regarding the nature and administration of this program and its general applicability at the Atlanta Airport, it is reasonable to infer that all flights within the Atlanta Airport were subject to CCPD interdictions. Even if, contrary to the allegations in the operative complaint, the demographic composition of flights subject to the interdiction program varied somewhat from the rest of the airport, that difference would have to be implausibly dramatic to explain the observed disparity here. By failing to draw reasonable inferences in favor of plaintiffs, the district court applied the wrong legal standard in granting defendants' motion to dismiss.

A comparison of the population of relevant travelers to those selected for CCPD interdictions reveals an unusually stark and statistically significant pattern of differential treatment by race. Although the population of travelers in the Atlanta airport (and, by reasonable inference, the population of air travelers on flights subject to CCPD interdictions) was only 8% Black and 67% white, the travelers stopped by

CCPD officers during the relevant period were 56% Black and 32% white.[2]  As alleged in the Amended Complaint, the likelihood that this observed disparity was a product of random chance is vanishingly small:  far less than one in one hundred trillion.  Such a stark pattern establishes not only that the officers' conduct had a discriminatory effect, but also supports a conclusion that enforcement of the policy was motivated by a discriminatory purpose.  The plaintiffs pleaded a valid equal protection claim, and the district court erred in dismissing that claim.

## **ARGUMENT**

The district court's decision to dismiss the plaintiffs' equal protection claim relied heavily, if not exclusively, on one critical assumption: that the Amended Complaint failed to identify a similarly situated traveler that was not subjected to a search by Clayton County Police Department officers in the Atlanta Airport.  That assumption, and the district court's resulting decision to dismiss the equal protection claim, was unfounded.  Given that CCPD officers purported to select people for searches under this program at "random," the relevant comparator was the population of air travelers in the Atlanta Airport (i.e., travelers on flights subject to CCPD interdictions).  Those travelers were similarly situated to André and English in all relevant respects other than race.  And the racial composition of the population

---

[2] The remaining travelers in these populations consist of non-Black people of color. *See* Doc. 24 ¶ 77.

of air travelers could be reasonably inferred from well-pleaded allegations. A statistical comparison based on that data offers compelling evidence that CCPD officers engaged in a stark pattern of differential treatment by traveler race, consistent with racial discrimination, thus satisfying the threshold requirements of pleading discriminatory effect and discriminatory purpose. The district court's dismissal of the equal protection claim should therefore be reversed.

I.    **Where the government purports to select a claimant from a pool of individuals at random, the entire pool (i.e., the entire population from which the selection is made) consists of "similarly situated" comparators for equal protection purposes.**

Claims like the one raised by André and English here are evaluated under "ordinary equal protection standards." *United States v. Armstrong*, 517 U.S. 456, 465 (1996). Specifically, a claimant must establish that the government's conduct (1) "had a discriminatory effect" and (2) "was motivated by a discriminatory purpose." *Id.* To satisfy the "discriminatory effect" requirement in a racial discrimination context, a claimant must point to "similarly situated individuals of a different race" who did not experience the treatment at issue. *Id.*

A similarly situated comparator need not be "nearly identical" to the claimant, but rather must be "similarly situated in all material respects" other than the characteristic allegedly subject to discrimination. *Lewis v. City of Union City,* 918 F.3d 1213, 1226–27 (11th Cir. 2019) (en banc). In other words, the definition of the comparator group must "insure that all distinctions extraneous to the [protected

10

characteristic] are removed." *United States v. Aguilar*, 883 F.2d 662, 707 (9th Cir. 1989), *superseded by statute on other grounds*; *see* Franklin M. Fisher, *Multiple Regression in Legal Proceedings*, 80 Colum. L. Rev. 702, 708–09 (1980) (explaining the significance of controlling for relevant variables).

So in employment discrimination cases, for example, similarly situated comparators will ordinarily have engaged in the same conduct, been subject to the same employment policies, been under the jurisdiction of the same supervisor, and had the same employment and disciplinary history. *Lewis*, 918 F.3d at 1227–28. Defining the comparator group in this fashion reflects the reality that "[a]n employer is well within its rights to accord different treatment to employees who are differently situated in 'material respects'—e.g., who engaged in different conduct, who were subject to different policies, or who have different work histories." *Id.* at 1228. In a selective prosecution context, a comparator must have "engaged in the same type of conduct," thus implicating the government's "enforcement priorities" in the same way. *United States v. Brantley*, 803 F.3d 1265, 1271–72 (11th Cir. 2015); *see also United States v. Cannon*, 987 F.3d 924, 937–39 (11th Cir. 2021). To take just one more example, in a claim of selective enforcement of a zoning ordinance, a plaintiff must identify comparators that made similar submissions requesting a materially similar type of approval for a materially similar project.

11

*Campbell v. Rainbow City*, 434 F.3d 1306, 1313–17 (11th Cir. 2006); *Lewis*, 918 F.3d at 1226.

But where a government purports to select individuals from a pool of people *at random*, the government has effectively disclaimed the existence of any other factors influencing the selection. One's presence in that pool is therefore the only criterion for eligibility. Put differently, the entire pool consists of similarly situated comparators. *See Castaneda v. Partida*, 430 U.S. 482, 495–96 (1977) (comparing racial composition of grand juries to population of entire county); *Avery v. Georgia*, 345 U.S. 559, 563 (1953) (Reed, J., concurring) (comparing statistical composition of venire for jury selection to county's entire eligible population and jury list); *United States v. Tex. Educ. Agency (Austin Indep. Sch. Dist.)*, 564 F.2d 162, 171 (5th Cir. 1977) (comparing students in segregated schools to entire student body of school district); *Chavez v. Ill. State Police*, 251 F.3d 612, 636–40 (7th Cir. 2001) (comparing motorists selected for highway drug stops to other "motorists on Illinois highways"); *Major Tours, Inc. v. Colorel*, 799 F. Supp. 2d 376, 393, 409 (D.N.J. 2011) (comparing bus owners allegedly targeted for inspections to other bus owners spending similar amount of time on road); *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 95 F. Supp. 2d 723, 737 (N.D. Ohio 2000), *aff'd*, 308 F.3d 523 (6th Cir. 2002) (comparing motorists selected for interrogations during highway stops to other motorists stopped by highway patrol). For "[s]ituations requiring a random

selection or decisionmaking process," in other words, the statistical comparison is "straightforward."   Julia Lamber et al., *The Relevance of Statistics to Prove Discrimination: A Typology*, 34 Hastings L.J. 553, 579–80 (1983).

Here, CCPD officers repeatedly declared that they stopped passengers boarding flights in the Atlanta Airport at "random."  Doc. 24 ¶¶ 56, 62, 97.   And there is no allegation in the complaint—and otherwise no indication or argument by defendants in the record before this Court—that CCPD has ever claimed to use any criteria for selecting one individual over another on a given flight, for this interdiction program.   Accordingly, all travelers on flights subject to CCPD interdictions at the Atlanta airport—regardless of any other characteristics—are similarly situated comparators to the plaintiffs in this case.   The race of those travelers, as properly alleged in (and supported by reasonable inferences from) the Amended Complaint (*see infra*, Part II), can therefore be used in a comparison to support the plaintiffs' equal protection claim.

## II.    Only by misapplying the standard for a motion to dismiss and declining to draw reasonable inferences in favor of the plaintiffs could the district court ignore plaintiffs' identification of a similarly situated comparator.

In the complaint, plaintiffs English and André alleged that (a) 56% of the passengers that CCPD stopped on jet bridges in the Atlanta Airport were Black, (b) only 8% of American air travelers are Black, and (c) the demographic breakdown of Atlanta Airport travelers reflects that of the nationwide population of air travelers.

Doc. 24 ¶ 77. The district court accepted these allegations as true, as it was required to do under the standard governing a motion to dismiss. Doc. 40 at 38–39; *MacPhee v. MiMedx Grp., Inc.*, 73 F.4th 1220, 1228 (11th Cir. 2023) ("At the motion to dismiss stage, we must accept all well-pleaded facts contained in the operative complaint as true and construe all reasonable inferences in the light most favorable to the plaintiff.").

But the district court refused to take the necessary next step and infer that the population of passengers on *flights subject to CCPD interdictions* has the same or similar demographic breakdown as that of travelers in the Atlanta airport generally (such that approximately 8% of passengers on flights subject to CCPD interdictions would be Black, and the population of remaining passengers would contain similarly situated comparators). Doc. 40 at 39–40. On that basis, the district court concluded that the plaintiffs had not identified a similarly situated comparator. *Id.*

This conclusion was legal error. As an initial matter, the Amended Complaint contains no allegation that CCPD officers limit their activities to certain flights. So it would have been reasonable for the district court to infer that passengers on *all* flights in the Atlanta Airport are subject to CCPD interdiction, and are thus eligible comparators. But at any rate, in the context of the allegations of the complaint as a whole, it was more than reasonable to infer that passengers on flights subject to CCPD interdictions would have a racial makeup similar to that of other travelers in

14

the Atlanta Airport. That is particularly true in the absence of any facts, allegations, or arguments by defendants suggesting that flights subject to CCPD interdictions have an unusually high proportion of Black passengers. *See Edwards v. Dothan City Sch.*, 82 F.4th 1306, 1312 (11th Cir. 2023) (reversing dismissal because district court failed to make reasonable inference).

In declining to draw this reasonable inference in favor of the plaintiffs, the district court reasoned that the specific anecdotal allegations in the Amended Complaint happened to concern flights to California. Doc. 40 at 38. But none of the plaintiffs' demographic statistics or their allegations regarding the operation of the interdiction program more broadly were limited to California-bound flights. Doc. 24 ¶¶ 77–80. In any event, as the plaintiffs alleged, 52% of travelers on the relevant flights would have needed to be Black for the observed racial disparities here to be statistically attributable to random chance. Doc. 24 ¶ 80. And there was no basis in the record to infer that California-bound flights have a demographic composition significantly different from other flights in the Atlanta airport—and certainly not to the extreme, more than six-fold degree of difference that would be necessary to generate the observed concentration (56%) of Black individuals being stopped for screening. *See* Appellants' Br. 42–43.[3]

---

[3] In the context of a motion to dismiss, it was inappropriate for the district court to speculate that the interdicted flights might have been chosen on the basis of some

15

To the extent the district court concluded that the plaintiffs failed to identify a similarly situated comparator, it was effectively drawing inferences *against* the plaintiffs, improperly inverting the legal standard governing a motion to dismiss.

## III. The plaintiffs' statistical data and allegations strongly support finding both a discriminatory effect and discriminatory purpose, sufficient to survive a motion to dismiss.

A claimant may rely on statistical comparisons to a group of similarly situated comparators to establish the existence of a discriminatory effect and, sometimes, discriminatory purpose. *Chavez*, 251 F.3d 636–40; *Castaneda*, 430 U.S. at 495–96 & n.17; *accord* Mary W. Gray, *Statistics and the Law*, 56 Mathematics Magazine 67, 72 (1983). Statistical evidence is "especially useful" when challenging a subjective, individual selection process—such as officers picking one traveler out of

---

non-random, non-race-based criterion (e.g., flights to California), and to further speculate that this criterion could have been associated with a sharply higher Black population than that found in the Atlanta airport population generally. To the extent the defendants wish to make such an argument, those assertions could be raised in an answer to the amended complaint, and would then be a question of fact that the plaintiffs could dispute and explore through discovery. Plaintiffs could, for instance, seek discovery on factual questions such as what the government's purported criteria were for targeting certain flights (if the defendants assert that selection was not random), as well as what specific flights were targeted. That inquiry would allow further testing of whether the observed racial disparity in individuals searched pursuant to the interdiction program can be explained by a reason other than race. It was inappropriate for the district court to draw inferences against the plaintiffs at the stage of a motion to dismiss, and to pretermit that factual development. *Cf. United States v. Davis*, 793 F.3d 712, 723 (7th Cir. 2015) (en banc) (in case involving alleged racial disparities in stash-house sting prosecutions, stating that "it might be appropriate to require the [government] to disclose," through discovery, "their criteria for stash-house stings").

a crowd in a jet bridge for a search.  3 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law* § 18.4 (5th ed. 2023).

For example, in *Yick Wo v. Hopkins*, the Supreme Court concluded that city officials violated the Equal Protection Clause by withholding laundry business permits from every Chinese applicant while granting permits to all non-Chinese applicants except one.  118 U.S. 356, 374 (1886).  Given these statistics, "the conclusion [could not] be resisted" that the sole reason for the discrimination was "hostility to the race and nationality" of the Chinese applicants.  *Id.*

The Supreme Court likewise held in *Gomillion v. Lightfoot* that a complaint "amply" stated a claim of racial discrimination by alleging that a state legislature redrew a city's boundaries "to remove from the city all save four or five of its 400 [Black] voters while not removing a single white voter or resident."  364 U.S. 339, 341–42 (1960).  Statistical proof of discrimination has also proven instrumental in other equal protection cases.  *E.g.*, *Hunter v. Underwood*, 471 U.S. 222, 227–33 (1985) (invalidating state law that disenfranchised disproportionately high number of Black people); *Castaneda*, 430 U.S. at 495–96 (finding *prima facie* case of discrimination where 39% of individuals selected for grand jury service were Mexican-American in county with 79% Mexican-American population).

The Supreme Court has clarified that, with certain exceptions such as for jury selection and Title VII cases where courts have more readily inferred discriminatory

17

purpose, statistical evidence of a discriminatory *effect* can separately establish discriminatory *purpose* only if it shows "a clear pattern, unexplainable on grounds other than race," that is "as stark as that in *Gomillion* or *Yick Wo*." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 & n.13 (1977); *accord McCleskey v. Kemp*, 481 U.S. 279, 293–94 (1987). One panel of this Court has characterized *Gomillion* and *Yick Wo* as having established discriminatory purpose where a statistical analysis "showed that the discriminatory impact was virtually 100 percent." *Jones v. White*, 992 F.2d 1548, 1573 (11th Cir. 1993). The Court need not (and should not) adopt that standard to reverse here given the procedural posture of a motion to dismiss (rather than the factual record in *Jones*), the stark nature of the statistical evidence and allegations, and the existence of additional, non-statistical allegations tending to show a discriminatory purpose. Regardless, applying a strict "100 percent" threshold would unnecessarily and inappropriately raise the standard for equal protection claims.[4] If a "100 percent" disparity were

---

[4] In any event, the Equal Protection issue here bears close similarities to the contexts in which the Supreme Court has "accepted statistics as proof of intent to discriminate" even in the absence of an extreme pattern. *McCleskey*, 481 U.S. at 293. Here, in a challenge to the supposedly random selection of individuals for subjection to an airport-interdiction program, the government has (and will have) "an opportunity to explain the statistical disparity." *Id.* at 296. Moreover, in assessing whether the observed enforcement patterns likely resulted from random chance, "the statistics relate to fewer entities, and fewer variables are relevant to the challenged decisions," as compared (for instance) to the highly individualized context of "capital sentencing decisions" that "rest on consideration of innumerable

legally necessary, various instances of statistically obvious discrimination could go unremedied as long as government actors made some token adjustments to their discriminatory behavior. For example, under such a standard, the authorities in *Yick Wo* and *Gomillion* could have easily accepted a few more members of the protected class and rejected a few more members of the comparator class to insulate their discriminatory schemes from judicial intervention.

The role of a statistical comparison in this context is to determine the likelihood that, controlling for other variables, the differential treatment between the claimant's class and the comparator group can be explained by chance. *See Peightal v. Metro. Dade Cnty.*, 26 F.3d 1545, 1556 & n.16 (11th Cir. 1994); Fisher, *supra*, at 705–06; *see also* Michael O. Finkelstein, *The Application of Statistical Decision Theory to the Jury Discrimination Cases*, 80 Harv. L. Rev. 338, 349–350 (1966). And the challenged government conduct need not affect every possible protected class member (or exempt every comparator) for chance to be a statistically non-viable explanation for the differential treatment.

This case presents a prime example. As alleged in the Amended Complaint, the air travelers stopped by CCPD during the relevant period were 56% Black and

---

variables." *Id.* at 293–95 & nn.14-15; *accord Jones*, 992 F.2d at 1573–74 (distinguishing, on similar grounds, the context of sentencing criminal defendants under state habitual offender statute).

32% white,[5] whereas the eligible population of travelers was 8% Black and 67% white. Doc. 24 ¶ 77. The likelihood that the disparity is due to chance is essentially zero: *far less than one in one hundred trillion. See* Doc. 24 ¶ 79. That statistical disparity is closely akin to the disparities found to be actionable in *Yick Wo* and *Gomillion*. As in those cases, the disparity here reveals a "blatant," *Jones*, 992 F.2d at 1573, and "clear pattern" of discrimination "unexplainable on grounds other than race," *Arlington Heights*, 429 U.S. at 266. *See also Castaneda*, 430 U.S. at 496 n.17 (finding statistical evidence sufficient to establish prima facie case of discrimination in jury selection where "the likelihood that such a substantial departure from the expected value [based on jurors being drawn randomly from the general population] would occur by chance is less than 1 in 10140"); *Jean v. Nelson*, 711 F.2d 1455, 1487–90 (11th Cir. 1983), *vacated on other grounds on reh'g*, 727 F.2d 957 (11th Cir. 1984) (finding discriminatory pattern adequately "stark" where chance of disparity was "less than two in ten billion" and number of Haitian detainees was at

---

[5] The district court suggested that the data sample underlying these numbers—drawn from an eight-month period covering the time that André and English were stopped, and including race data from 378 interdictions—was too small to be statistically significant. Doc. 24 ¶¶ 5, 77. But as Appellants explain, there was no basis for the district court to conclude that a larger sample was necessary as a matter of law. Appellants' Br. at 43–44. That is particularly true here, at the motion to dismiss stage, where the defendants are in control of the relevant records. Discovery, if permitted, might allow the plaintiffs to obtain additional data that would provide additional support for, and (if necessary) increase the confidence level of statistics supporting, their claims.

least 7.64 standard deviations above expected mean);[6] *Diaz-Rivas v. U.S. Attorney Gen.*, 769 F. App'x 748, 768 (11th Cir. 2019) (Jordan, J., dissenting) (concluding that statistical disparity constituted probative evidence of discriminatory purpose).

When the likelihood of a non-discriminatory explanation for a disparity is as close to zero as it is in this case, such a disparity is sufficiently stark to satisfy the requirements not only for discriminatory effect, but to support an inference of discriminatory purpose.  And, as Appellants explain, the complaint here plausibly alleges *additional* evidence of discriminatory purpose, consistent with the factors that are relevant under this Court's cases.  *See* Appellants' Br. 46–47; *cf. McCleskey*, 481 U.S. at 292–93 (reaching different outcome where litigant relied exclusively on statewide statistics, and "offer[ed] no evidence specific to his own case that would support an inference that racial considerations played a part").  Those allegations,

---

[6] A standard deviation is a statistical term that measures "how far a typical element deviates from the average."  Federal Judicial Center, "Reference Guide on Statistics," *in Reference Manual on Scientific Evidence* 211, 298 (3rd ed. 2011) (defining "standard deviation").  "Deviations from the average that exceed 3 or 4 [standard deviations] are extremely unusual."  *Id.*  In the context of analyzing the results of a supposedly random drawing, "if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the . . . drawing was random would be [statistically] suspect." *Castaneda*, 430 U.S. at 496 n.17.  Here, Appellants have explained that there is a "difference of more than 34 standard deviations between the expected number of stopped passengers who would be Black if the stops were random and the observed number of stopped passengers who were Black."  Appellants' Br. 40–41 n.8.  That racial disproportion is statistically significant at a level far beyond what is typically demanded either in litigation or in social science studies.

combined with the statistical evidence of an extraordinarily "stark" disparate effect, more than adequately pleaded a cognizable equal protection claim.

## **CONCLUSION**

This case presents a dramatic example of racially motivated violation of the Equal Protection Clause, supported by unusually compelling statistical evidence showing a stark disparate effect and tending to support a conclusion of discriminatory purpose.  At bottom, the district court failed to view the well-pleaded allegations in the light most favorable to the plaintiffs, and failed to draw reasonable inferences in the plaintiffs' favor with regard to the legal significance of those statistical allegations.  Only on that basis was the district court able to disregard the striking pattern of discrimination on display here and reject a viable equal protection claim at the motion to dismiss stage.  The district court's judgment dismissing the plaintiffs' equal protection claim can and should be reversed on that basis alone, in addition to the other grounds explained in the Appellants' brief.

Dated: January 19, 2024

Respectfully submitted,

*/s/ Jeremy C. Marwell*
Jeremy C. Marwell
VINSON & ELKINS, LLP
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, D.C. 20037
202-639-6507
jmarwell@velaw.com

Garrett T. Meisman
VINSON & ELKINS, LLP
845 Texas Avenue, Suite 4700
Houston, Texas 77002
713-758-2559
gmeisman@velaw.com

*Counsel for* Amici Curiae
*Empirical Legal Scholars*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the word limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 5,121 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.


Dated:  January 19, 2024          */s/ Jeremy C. Marwell*
                                 Jeremy C. Marwell
                                 VINSON & ELKINS LLP
                                 2200 Pennsylvania Avenue NW
                                 Suite 500 West
                                 Washington, D.C. 20037
                                 202-639-6507

                                 *Counsel for* Amici Curiae
                                 *Empirical Legal Scholars*

24

## **<u>CERTIFICATE OF SERVICE</u>**

Pursuant to Rule 25(d) of the Federal Rules of Appellate Procedure, I hereby certify that on January 19, 2024, I electronically filed the foregoing *Brief of Amici Curiae* with the Clerk of the Court for the U.S. Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system, and served copies of the foregoing via the Court's CM/ECF system on all ECF-registered counsel.

Dated:  January 19, 2024

*/s/ Jeremy C. Marwell*
Jeremy C. Marwell
VINSON & ELKINS LLP
2200 Pennsylvania Avenue NW
Suite 500 West
Washington, D.C. 20037
202-639-6507

*Counsel for* Amici Curiae
*Empirical Legal Scholars*