No. 23-13253

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ERIC ANDRÉ and CLAYTON ENGLISH,

*Plaintiffs-Appellants,*

v.

CLAYTON COUNTY, GEORGIA; KEVIN ROBERTS, in his official capacity as Chief of the Clayton County Police Department; AIMEE BRANHAM, individually and in her official capacity as a police officer of the Clayton County Police Department; MICHAEL HOOKS, individually and in his official capacity as an investigator of the Clayton County District Attorney; TONY GRIFFIN, individually and in his official capacity as a police officer of the Clayton County Police Department; KAYIN CAMPBELL, individually and in his official capacity as a police officer of the Clayton County Police Department; and CAMERON SMITH, individually and in his official capacity as a police sergeant of the Clayton County Police Department,

*Defendants-Appellees.*

On Appeal from the United States District Court for the Northern District of Georgia, Hon. Mark H. Cohen, No. 1:22-cv-04065-MHC

## REPLY BRIEF OF APPELLANTS
## ERIC ANDRÉ AND CLAYTON ENGLISH

Richard H. Deane, Jr.
JONES DAY
1221 Peachtree St., N.E., Suite 400
Atlanta, Georgia 30361
(404) 581-8502
rhdeane@jonesday.com

Jason T. Burnette
JONES DAY
1221 Peachtree St., N.E., Suite 400
Atlanta, Georgia 30361
(404) 581-8743
jtburnette@jonesday.com

*Counsel for Plaintiffs-Appellants*
*(additional counsel listed on signature page)*

*André v. Clayton County, Georgia*, No. 23-13253

## AMENDED CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-4, Appellants hereby submit this **Amended** Certificate of Interested Persons and Corporate Disclosure Statement (CIP), which makes three changes to the original certificate, all of which appear below in bold.

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, Plaintiffs-Appellants Eric André and Clayton English provide this Certificate of Interested Persons and Corporate Disclosure Statement:

1. André, Eric (Plaintiff-Appellant).

2. Branham, Aimee (Defendant-Appellee).

3. Burnette, Jason T. (Counsel for Plaintiffs-Appellants).

4. Campbell, Kayin (Defendant-Appellee).

5. Canfield, Peter C. (Counsel for Plaintiffs-Appellants).

6. Clayton County, Georgia (Defendant-Appellee).

7. Cohen, Mark H. (Judge, United States District Court for the Northern District of Georgia).

8. Deane, Richard H., Jr. (Counsel for Plaintiffs-Appellants).

9. Emmons, Chandler J. (Counsel for Defendants-Appellees).

10. English, Clayton (Plaintiff-Appellant).

11. Freeman Mathis & Gary, LLP (Counsel for Defendants-Appellees).

*André v. Clayton County, Georgia*, No. 23-13253

12. Friedman, Barry E. (Counsel for Plaintiffs-Appellants).

13. Ganske, Rodney J. (Counsel for Plaintiffs-Appellants).

14. Griffin, Tony (Defendant-Appellee).

15. Hancock, Jack R. (Counsel for Defendants-Appellees).

16. Heydari, Farhang (**Former** Counsel for Plaintiffs-Appellants).

17. Hinkson, Ashley F. (Counsel for Plaintiffs-Appellants).

18. Hooks, Michael (Defendant-Appellee).

19. Hoynes, Ben (Counsel for Plaintiffs-Appellants).

20. Hudson-Price, Annie (**Former** Counsel for Plaintiffs-Appellants).

21. Jones Day (Counsel for Plaintiffs-Appellants).

22. Lawrence-Hardy, Allegra J. (Counsel for Plaintiffs-Appellants).

23. Lawrence & Bundy LLC (Counsel for Plaintiffs-Appellants).

24. Meyer, Paul D. (**Former** Counsel for Plaintiffs-Appellants).

25. Nocharli, Rebecca (Counsel for Plaintiffs-Appellants).

26. Reilly, Samuel B. (Counsel for Plaintiffs-Appellants).

27. Roberts, Kevin (Defendant-Appellee).

28. Sabzevari, A. Ali (Counsel for Defendants-Appellees).

29. Scherzer, Aaron (Counsel for Plaintiffs-Appellants).

30. Sloan, Sarah (Counsel for Plaintiffs-Appellants).

31. Smith, Cameron (Defendant-Appellee).

*André v. Clayton County, Georgia*, No. 23-13253

32. The Policing Project at NYU School of Law (Counsel for Plaintiffs-Appellant).

No other persons, associations of persons, firms, partnerships, corporations, guarantors, insurers, affiliates, parent or subsidiary corporations, or other legal entities are financially interested in the outcome of this case or appeal.

/s/ Jason T. Burnette
Jason T. Burnette
JONES DAY
1221 Peachtree St. N.E., Suite 400
Atlanta, Georgia 30361
Telephone: (404) 581-8724
Facsimile: (404) 581-8330
jtburnette@jonesday.com

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
  DISCLOSURE STATEMENT...................................................................C-1

INTRODUCTION ...................................................................................1

ARGUMENT .........................................................................................2

I.    THE COMPLAINT PLAUSIBLY ALLEGED FOURTH AMENDMENT
      VIOLATIONS. ...............................................................................2

      A.    Binding Precedent Makes Clear That A Seizure Occurred...................2

      B.    Mr. English Did Not Voluntarily Consent To The Search. .................8

      C.    The Officers Are Not Entitled To Qualified Immunity. .......................9

II.   THE COMPLAINT PLAUSIBLY ALLEGED EQUAL PROTECTION
      VIOLATIONS. ...............................................................................11

      A.    CCPD Overwhelmingly Targets Black Passengers For Jet Bridge
            Stops. ...................................................................................11

      B.    Despite The Airport-Interdiction Program's Discriminatory Impact,
            CCPD Continued The Program...........................................................19

      C.    The Officers Are Not Entitled To Qualified Immunity. .....................22

III.  THE COMPLAINT PLAUSIBLY ALLEGED CLAIMS AGAINST
      CLAYTON COUNTY.....................................................................23

CERTIFICATE OF COMPLIANCE...................................................29

CERTIFICATE OF SERVICE ...........................................................30

# TABLE OF AUTHORITIES

**Page**

CASES

*ASEDAC v. Panama Canal Com'n,*
   453 F.3d 1309 (11th Cir. 2006) .........................................................27

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) .........................................................................22

*Barnett v. MacArthur,*
   956 F.3d 1291 (11th Cir. 2020) .........................................................25

*Baxter v. Roberts,*
   54 F.4th 1241 (11th Cir. 2022) .........................................................23

*Brown v. City of Fort Lauderdale,*
   923 F.2d 1474 (11th Cir. 1991) .........................................................26

*\*Castaneda v. Partida,*
   430 U.S. 482 (1977)..............................................................13, 14, 21

*Corbett v. TSA,*
   767 F.3d 1171 (11th Cir. 2014) ...........................................................4

*Delaware v. Prouse,*
   440 U.S. 648 (1979)..........................................................................22

*Florida v. Bostick,*
   501 U.S. 429 (1991)............................................................................7

*Florida v. Royer,*
   460 U.S. 491 (1983)............................................................................8

*Flowers v. Mississippi,*
   588 U.S. 284 (2019)..........................................................................11

*Greater Birmingham Ministries v. Sec'y of State for State of Ala.*,
    992 F.3d 1299 (11th Cir. 2021) ................................................. 19, 21

*Griffin v. City of Opa-Locka.*,
    261 F.3d 1295 (11th Cir. 2001) ................................................. 23, 26

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*,
    572 U.S. 559 (2014) ...................................................................... 5

*Monell v. Dep't of Soc. Servs.*,
    436 U.S. 658 (1978) ................................................................... 23, 26

*Newbauer v. Carnival Corp.*,
    26 F.4th 931 (11th Cir. 2022) ......................................................... 9

*Noell v. Clayton Cnty*,
    No. 1:15-CV-2404, 2016 WL 11794207 (N.D. Ga. Sept. 21, 2016) ................ 24

*Nunez v. J.P. Morgan Chase Bank*,
    648 F. App'x 905 (11th Cir. 2016) .................................................. 17

*San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*,
    65 F.4th 1012 (9th Cir. 2023) ......................................................... 5

*Schneckloth v. Bustamonte*,
    412 U.S. 218 (1973) ...................................................................... 7

*Torres v. Madrid*,
    592 U.S. 306 (2021) ...................................................................... 3

*United States v. Armstrong*,
    722 F.2d 681 (11th Cir. 1984) ....................................................... 10

*United States v. Bacca-Beltran*,
    741 F.2d 1361 (11th Cir. 1984) ...................................................... 11

*United States v. Berry*,
    670 F.2d 583 (5th Cir. Unit B 1982) ............................................. 3–10

*United States v. Chemaly*,
  741 F.2d 1346 (11th Cir. 1984) ...................................................8–11

*United States v. Drayton*,
  536 U.S. 194 (2002)..............................................................................7

*United States v. Elsoffer*,
  671 F.2d 1294 (11th Cir. 1982) ......................................................4, 6

*United States v. Jensen*,
  689 F.2d 1361 (11th Cir. 1982) .........................................................10

*United States v. Jordan*,
  635 F.3d 1181 (11th Cir. 2011) .........................................................14

*United States v. Mendenhall*,
  446 U.S. 544 (1980).........................................................................7, 8

*United States v. Puglisi*,
  723 F.2d 779 (11th Cir. 1984) .......................................................5, 10

*United States v. Quinn*,
  123 F.3d 1415 (11th Cir. 1997) .........................................................14

*United States v. Thompson*,
  712 F.2d 1356 (11th Cir. 1983) ...........................................................4

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977)......................................................................20, 21

### OTHER AUTHORITIES

1 W. Blackstone, Commentaries on the Laws of England (1769) ...........................2

## INTRODUCTION

Appellants Eric André and Clayton English are two of at least hundreds of individuals who have been detained on the jet bridges of Atlanta's Hartsfield-Jackson Airport as part of a formal program operated by the Clayton County Police Department ("CCPD").  Although Defendants describe the encounters as "consensual" and "random," the allegations in the complaint make clear they were neither.  Officers interdicted Mr. André and Mr. English without reasonable suspicion for doing so, obstructed their paths to the plane, and took and retained their IDs and tickets while asking them a litany of questions, including about illegal drug possession.  And CCPD's airport-interdiction program overwhelmingly targets Black passengers.

Defendants tout the law enforcement justifications for the airport-interdiction program while raising factual arguments about the circumstances of the stops—neither of which is a valid basis for affirming the district court's order. Defendants' own statistics make clear that holding the program to the requirements of the Constitution will not disserve the public.  Out of 402 stops made by CCPD's airport-interdiction unit over an eight-month period, only three uncovered small amounts of drugs.  *See* Doc. 24 ¶ 84.  That is unsurprising.  By the time individuals are stopped on a jet bridge, they already have been subject to thorough TSA screening.  *See* Law Enforcement Amicus Br. at 15-32 (CCPD stops are an ineffective law enforcement tool and undermine the public's trust in law enforcement).

-1-

This case is not about law enforcement's authority to initiate consensual encounters with the public, or to detain individual passengers based on reasonable suspicion. No one disputes that law enforcement has such authority. But the Constitution does not permit officers to seize passengers without suspicion or selectively stop Black passengers. Binding precedent makes clear that the facts as alleged constitute both a seizure and a search under the Fourth Amendment and that intentional targeting of Black passengers violates the Equal Protection Clause. The district court dismissed Mr. André's and Mr. English's Fourth Amendment and equal protection claims only by ignoring the complaint's plausible allegations and making unreasonable inferences against Plaintiffs. This Court should reverse the district court's order.

## ARGUMENT

## I.   THE COMPLAINT PLAUSIBLY ALLEGED FOURTH AMENDMENT VIOLATIONS.

### A.   Binding Precedent Makes Clear That A Seizure Occurred.

It has been true since the founding that a person is "seized" if a government official blocks their path and restrains their freedom of movement, as CCPD officers did here to Mr. André and Mr. English. At common law, the "power of locomotion" without "restraint" was a critical part of personal liberty. 1 W. Blackstone, Commentaries on the Laws of England 130 (1769); *see* Cato Institute Amicus Br. at 4 (explaining this longstanding common-law rule). Over 250 years later, that remains

the law.  The Supreme Court recently reiterated that a person is seized when their "freedom of movement" is terminated.  *Torres v. Madrid*, 592 U.S. 306, 322 (2021).

The binding decision in *United States v. Berry*—analyzing when an airport stop constitutes a seizure—applies that longstanding rule.  After describing the uniquely "intimidating" nature of airport stops, the *Berry* Court described "specific factors … on which a court should place great weight" in determining whether a reasonable person would believe their freedom of movement was restrained.  670 F.2d 583, 596-97 (5th Cir. Unit B 1982).  Those factors include whether officers (1) "block[] an individual's path or otherwise intercept[] him to prevent his progress in any way"; (2) place "implicit constraints on an individual's freedom" by, for example, "retaining an individual's ticket for more than a minimal amount of time"; and (3) suggest that "individuals are suspected of smuggling drugs."[1] *Id.* at 597.  Defendants do not dispute that these factors exist here.  Instead, Defendants suggest that the *Berry* factors are optional and try to obscure *Berry* (and 250-year-old common law) by highlighting additional factors from contextually inapposite cases.

Defendants do not dispute that the first factor, which the Berry Court deemed "of great, and *probably decisive*, significance," *id.* (emphasis added), was fully present here.  Mr. André and Mr. English plainly alleged that CCPD officers blocked

---

[1] *Berry* listed a similar fourth factor: whether police state "that an innocent person would cooperate with police."  670 F.2d at 597.

their paths, and that officers even instructed Mr. English to move to the side of the jet bridge. *See* Doc. 24 ¶¶ 31, 35, 36, 51.

Defendants also do not dispute the existence of the second *Berry* factor, that Mr. André and Mr. English alleged that officers retained their boarding passes and driver's licenses while peppering them with questions. *See id.* ¶¶ 38, 41, 43, 53, 55. Instead, Defendants suggest that no seizure occurred because Mr. André and Mr. English were questioned only "briefly." Answer Brief ("AB") 17. In doing so, Defendants ignore entirely this Court's precedent holding that a seizure occurs if officers retain a ticket or ID beyond the very brief time necessary to examine it. *See United States v. Thompson*, 712 F.2d 1356, 1359-60 (11th Cir. 1983). Here, officers did not merely examine the documents, but retained them while asking Mr. André and Mr. English a litany of questions unrelated to those documents.[2] A reasonable person "hardly could have felt free to leave while [the agent] retained the ticket—especially since [the passenger] needed the ticket in order to continue his flight." *United States v. Elsoffer*, 671 F.2d 1294, 1297 (11th Cir. 1982). Notably, Mr. André and Mr. English were explicitly told only *after* the questioning that they were free to leave, Doc. 24 ¶¶ 44, 58, confirming that they were *not* free to leave before that.

---

[2] Defendants hardly help their position by asserting that the length of questioning here is comparable to "the time required by travelers to submit to additional x-ray screening or a pat down by a TSA agent." AB 17. No one doubts that TSA procedures are seizures and searches. *See, e.g.*, *Corbett v. TSA*, 767 F.3d 1171, 1179-80 (11th Cir. 2014).

Moreover, Defendants do not dispute that the officers asked Mr. André and Mr. English whether they were carrying illegal drugs, but they appear to dispute that those questions "intimate[d]" that CCPD officers suspected them of smuggling illegal drugs—the third *Berry* factor. *Berry*, 670 F.2d at 597; AB 17. The nature of the officers' questions belies Defendants' assertion, and they offer no support for it. Officers singled out Mr. André and Mr. English to ask, *inter alia*, whether they were carrying illegal drugs, including "cocaine [and] methamphetamine." Doc. 24 ¶¶ 33, 53.

Possessing little answer to the *Berry* factors, Defendants suggest that this Court is free to ignore, or place little weight, on them. *See* AB 15. Defendants argue that "*Berry* noted that its factors were simply ones that other courts *should*—not must—consider." *Id.* at 9-10. But *Berry*'s use of the word "should" hardly means the instruction was optional. *See United States v. Puglisi*, 723 F.2d 779, 783 (11th Cir. 1984) (describing *Berry* as "prescrib[ing] specific rules for airport stops"). Courts regularly use "should" to describe something mandatory. *See, e.g.*, *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559, 561 (2014) ("[A]n appellate court should review all aspects of a district court's [determination of attorney fees under the Patent Act] for abuse of discretion."); *San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*, 65 F.4th 1012, 1033 n.11 (9th Cir. 2023) (describing *Highmark* as holding that attorney fee determinations "must" be reviewed

for abuse of discretion).  Not only did *Berry* instruct that a court should "place great weight" on its factors, it stated the first factor alone is "of great, and *probably decisive*, significance"—adding that "[r]etention of tickets, especially if necessary in order to continue a trip, would … *strongly indicate* that a reasonable person would believe his freedom restrained."[3]  670 F.2d at 597, 603 n.26 (emphasis added); *accord Elsoffer*, 671 F.2d at 1297 (the second *Berry* factor "might well tip the balance in favor of holding that … a seizure has occurred").  Only by ignoring the express language of *Berry* and its progeny can Defendants claim the *Berry* factors are mere suggestions.

Further obscuring *Berry* and its progeny, Defendants point to factors from contextually inapposite cases that are not alleged here.  Defendants argue that no officer brandished a weapon, and that neither Plaintiff was touched or threatened physically or abused verbally.  AB 18.  Those factors come from cases that deal not with individuals like Mr. André and Mr. English who wanted to leave, but rather with individuals who had no desire to go anywhere when police approached them.

---

[3] Defendants confusingly argue that emphasizing one *Berry* factor is inconsistent with the totality-of-the-circumstances approach.  *See* AB 18 & n.7.  But *Berry* itself states that the first factor is "of great, and probably decisive, significance."  670 F.2d at 597.  And caselaw applying *Berry* states that the second factor "might well tip the balance in favor of holding that … a seizure has occurred."  *Elsoffer*, 671 F.2d at 1297.  In any event, Plaintiffs do not rely solely on one *Berry* factor; the complaint plausibly alleges three factors.

*See* AB 18-20 (citing *United States v. Drayton*, 536 U.S. 194 (2002); *Florida v. Bostick*, 501 U.S. 429 (1991); *INS v. Delgado*, 466 U.S. 210 (1984)). Defendants perfunctorily contend that "none of these cases … found a seizure based on a 'non-desire' to leave." AB 19 n.8. But the Supreme Court has expressly stated that the "free to leave" test is "inapplicable" when an individual does not want to leave. *Bostick*, 501 U.S. at 436. This makes sense. When an individual does not want to leave—as when they want to remain in a bus seat to continue their travels, as in *Bostick* and *Drayton*, or want to remain at their workplace, as in *Delgado*—the coercive nature of the encounter must be shown by other factors, such as whether an officer brandished a weapon or made threats. *See, e.g.*, *Drayton*, 536 U.S. at 203-04. It undoubtedly would have been a seizure had the officers brandished weapons or threatened Plaintiffs physically or verbally, but the absence of these factors does not change the fact that a reasonable person in Plaintiffs' positions would not have felt free to leave.

Defendants also highlight factors identified in *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973), and the plurality opinion in *United States v. Mendenhall*, 446 U.S. 544 (1980). AB 16. But the *Berry* Court itself acknowledged in a footnote that *Bustamonte* and *Mendenhall* might contain other relevant factors, yet still it concluded that the four factors it identified carry "great weight" in the specific context of whether an airport stop qualifies as a seizure. 670 F.2d at 597 & n.12. In arguing

-7-

that the absence of factors from *Bustamonte* and *Mendenhall* outweigh the presence of three of the *Berry* factors, Defendants are yet again implicitly asking this Court to overrule *Berry*.

The complaint plausibly alleges that CCPD officers restrained Mr. André's and Mr. English's freedom of movement by obstructing their paths down the jet bridge, holding their tickets and IDs while questioning them about illegal drugs.

### B.    Mr. English Did Not Voluntarily Consent To The Search.

The complaint also plausibly alleges that the search of Mr. English's bag was unconstitutional.  Because Mr. English was unlawfully seized, any consent to the search of his bag would be "tainted by the illegality and … ineffective to justify the search." *Florida v. Royer*, 460 U.S. 491, 508 (1983) (plurality opinion).  That should be the end of the matter.

Even if Mr. English were not unlawfully seized, however, the search still would be unlawful because he did not voluntarily consent to the search of his bag; instead his consent was coerced.  *See* Opening Brief ("OB") 32-34.

As an initial matter, Defendants incorrectly argue that the district court's voluntariness determination is "reviewed under a clearly erroneous standard."  AB 20-21.  That standard of review is reserved for factual determinations made by a court, for example, at a suppression hearing, *see United States v. Chemaly*, 741 F.2d 1346, 1349, 1352 (11th Cir. 1984), whereas a district court's decision regarding the legal

sufficiency of a complaint's allegation is reviewed de novo, with all allegations presumed to be true and all inferences drawn in favor of the plaintiff. *Newbauer v. Carnival Corp.*, 26 F.4th 931, 934 (11th Cir. 2022). To the extent Defendants' misstatement of the standard suggests that the district court made a factual finding on voluntariness, any such finding would have been improper at the pleading stage.

Mr. English pled a number of factors showing coercion. Officers retained documents Mr. English needed to travel, instructed him to step away from the other passengers, and did not inform him that he could refuse consent to the search. *See* Doc. 24 ¶¶ 33-41; *Chemaly*, 741 F.2d at 1353. Defendants attempt to distinguish *Chemaly* on the ground that Mr. English did not "plausibly allege that the officers made statements to him which demonstrated that he was guilty of smuggling drugs or that they retained his ID for more than a short time." AB 23. Not true. The complaint plainly alleges that the officers asked for and retained Mr. English's ID and boarding pass while they asked him if he was carrying illegal drugs, and that they continued to ask him questions while they searched his bag. *See* Doc. 24 ¶¶ 33, 37-38, 41-44.

## C.    The Officers Are Not Entitled To Qualified Immunity.

Besides arguing that no constitutional violations occurred, Defendants argue that the officers are entitled to qualified immunity because Plaintiffs did not identify a materially similar prior case. Defendants insist "the facts of *Berry* are inapplicable

-9-

here" in part because CCPD officers did not ask Mr. André or Mr. English to ac-

company them to a private office. *See* AB 26-27. That fact in *Berry* established not

"merely a seizure," but, rather, an arrest requiring probable cause. 670 F.2d at 604.

Plaintiffs here allege that they were seized, not that they were arrested. Regardless,

*Berry*'s observation that such a request may be particularly coercive does not negate

*Berry*'s unambiguous statement that in determining whether a seizure occurred in

the specific context of an airport stop, a court "should place great weight" on the

four factors it identified, three of which are present here. *Id.* at 597.

Defendants also insist that this case is similar to those in which this Court has

not found a seizure. *See* AB 27. But in those cases, the officers did not block the

individual's path or impede their progress, and either did not hold the individual's

travel documents while questioning them, or only held them for 20-30 seconds while

asking questions about discrepancies in those documents. *See United States v. Arm-*

*strong*, 722 F.2d 681, 684-85 (11th Cir. 1984); *Puglisi*, 723 F.2d at 784; *United*

*States v. Jensen*, 689 F.2d 1361, 1363 (11th Cir. 1982); OB 26-27. And the encoun-

ters took place in the open concourse area, not in the jet bridge. *See* OB 26-28.

There also is little to Defendants' claim of qualified immunity on the search

of Mr. English's bag, given that *Berry* and its progeny clearly establish that a seizure

occurred here, and that *Chemaly* clearly establishes that Mr. English's consent was

involuntary, thus rendering the search unlawful. *Chemaly*, 741 F.2d at 1353; *see also United States v. Bacca-Beltran*, 741 F.2d 1361, 1362-63 (11th Cir. 1984).

## II. THE COMPLAINT PLAUSIBLY ALLEGED EQUAL PROTECTION VIOLATIONS.

Mr. André and Mr. English also plausibly alleged that CCPD's airport-interdiction program violated their equal-protection rights. As originally understood, and as interpreted today, the Equal Protection Clause requires that the government apply the law equally to Black and white individuals. *See Flowers v. Mississippi*, 588 U.S. 284, 294-95 (2019). By purposely targeting Black passengers for jet bridge stops, Defendants have violated that fundamental tenet.

### A. CCPD Overwhelmingly Targets Black Passengers For Jet Bridge Stops.

The complaint plausibly alleges that the airport-interdiction program has a disproportionate effect on Black passengers. The complaint states that 56% of passengers stopped pursuant to CCPD's airport-interdiction program were Black even though only 8% of domestic air travelers at the Atlanta Airport are Black, whereas 32% of stopped passengers were white even though 67% of domestic air travelers at the Atlanta Airport are white. *See* Doc. 24 ¶¶ 77-78. Defendants claim that the jet bridge stops are random, s*ee, e.g.*, *id.* ¶ 62; AB 3, but the odds of that disparity occurring randomly is far less than *one in one hundred trillion*, Doc. 24 ¶ 79. If the stops in fact were random, then of the 378 stopped travelers for whom race was

recorded, no more than 39 would have been Black.  *Id.* ¶ 80.  In reality, more than five times that number—211—were Black.  *Id.* ¶ 77.

Like the district court, Defendants insist that this stark disparity does not constitute discriminatory effect because (according to Defendants) Mr. André and Mr. English failed to identify similarly situated comparators.  *See* AB 30-31; Doc. 40 at 37-38.  But the complaint plainly does identify similarly-situated comparators.  As amici empirical legal scholars explain, "where a government purports to select individuals from a pool of people *at random*, the government has effectively disclaimed the existence of any other factors influencing the selection.  One's presence in that pool is therefore the only criterion for eligibility.  Put differently, the entire pool consists of similarly situated comparators."  Empirical Legal Scholars Amicus Br. at 12.  Here, the "pool"—domestic travelers at the Atlanta Airport—is 8% Black and 67% white.  Doc. 24 ¶¶ 77-78.  But Black travelers are far more likely than their white counterparts to be stopped pursuant to CCPD's airport-interdiction program.  *Id.* ¶¶ 77-78.  By claiming that the stops are random, CCPD has "effectively disclaimed the existence of any other factors influencing" who is stopped, and all domestic travelers in the Atlanta Airport are therefore comparators.  No factor other than race can account for that dramatic disparity.

The individual experiences of Mr. André and Mr. Elie confirm that the airport-interdiction program affects Black travelers more than white travelers.  When Mr.

André was boarding, he saw "[a]bout a dozen other passengers" boarding with him, none of whom were Black, and Mr. André was the only one of those passengers who was stopped. Doc. 24 ¶¶ 50, 56-57. Likewise, when Mr. Elie was stopped, he saw no other Black passengers in the jet bridge and saw no other passenger stopped. *Id.* ¶¶ 95, 99, 101. Mr. Elie's video of his encounter shows that CCPD officers stopped Mr. Elie while permitting numerous other non-Black passengers to board. *Id.* ¶ 99 n.1 (citing https://www.youtube.com/watch?v=SjfKAoJppws).

*Castaneda v. Partida* makes clear that the statistics in the complaint more than plausibly allege discriminatory effect. In considering a claim of racial discrimination in the grand-jury-selection process,[4] the *Castaneda* Court explained that if jurors truly had been drawn randomly from the population, the percentage of persons summoned who were Mexican-American should have been consistent with the percentage of the relevant population that was Mexican-American. *See* 430 U.S. 482, 496 n.17 (1977). Because the percentage of persons summoned who were Mexican-American was *not* consistent with the percentage of the relevant population that was Mexican-American, and the government could not rebut this prima facie showing of

---

[4] Defendants contend that the plaintiff in *Castaneda* "provided no information surrounding the practices of individual deputies and how often the [sic] stop Black passengers versus passengers of other races or ethnicities." AB 34. But *Castaneda* is a case about the grand-jury-selection process. It says nothing whatsoever about deputies stopping Black passengers.

discrimination, the Court held that the government was denying Mexican-Americans "equal protection of the law in the grand jury selection process." *Id.* at 501. Defendants thus incorrectly describe *Castaneda* as finding "that statistical evidence over an eleven-year period failed to state an Equal Protection violation." AB 34.

As in *Castaneda*, because Defendants claim that the jet bridge stops are random, the racial demographics of stopped passengers should be consistent with the demographics of domestic travelers at the Atlanta Airport. They are far from it. Although 8% of travelers at the Atlanta Airport are Black, 56% of those stopped are Black. Doc. 24 ¶ 77-78. The odds of that disparity occurring randomly are vanishingly small. *See id.* ¶ 79.

In addition, Defendants, like the district court, rely on cases—such as selective-prosecution cases—in which the challenged action was not purportedly random, but instead was justified on the basis of an individual's unique characteristics. For example, Defendants cite *United States v. Quinn*, 123 F.3d 1415, 1426 (11th Cir. 1997), *see* AB 29, in which circumstances like a "prior record of drug offenses" could explain the challenged racial disparity in prosecutions for crack cocaine possession and were essential to account for. So too in *United States v. Jordan*, 635 F.3d 1181 (11th Cir. 2011), *see* AB 33, where differences in criminal histories, rather than race, could explain individual decisions whether to prosecute under the Armed Career Criminal Act. *See also* AB 29 (citing *Ah Sin v. Wittman*, 198 U.S. 500, 507-

-14-

08 (1905), in which different conditions of gambling establishments could explain different enforcement decisions); *id.* at 33-34 (citing *United States v. Cannon*, 987 F.3d 924, 938-39 (11th Cir. 2021), in which circumstances other than race could have explained different prosecuting decisions).

As the opening brief explains, those cases are inapposite.[5]  *See* OB 37-40. When someone's unique characteristics (other than race) could explain the different treatment they received, the similarly-situated analysis must control for those characteristics; otherwise, the difference in those characteristics could account for the different treatment.  *See id.* at 38-39.  But where, as here, the challenged action is purportedly random, there is no need to control for a factor other than race that could explain the government's action, because the government has stated that no such factor exists.  Because CCPD has maintained consistently that the jet bridge stops are "random," Doc. 24 ¶ 62; AB 3, no individual characteristic like criminal history can account for the disparity in jet bridge stops.  Only race can explain it.  Concluding that the statistics here plausibly allege discriminatory effect thus is entirely consistent with the selective prosecution cases Defendants cite.

_____

[5] Defendants characterize the opening brief as arguing that no similarly situated comparator is necessary when the challenged action is purportedly random.  *See* AB 31.  The opening brief makes no such argument.  It does, however, explain how the similarly situated analysis *differs* when the challenged action is "random," *see* OB 37-40, as Defendants' consistently have maintained, *see e.g.*, Doc. 24 ¶ 62, AB 3.

As a last-ditch effort to avoid the complaint's well-pleaded allegations of discriminatory effect, Defendants repeat the district court's error of imagining hypothetical scenarios that are flatly contrary to allegations in the complaint. Defendants characterize the complaint's allegation that the "Atlanta Airport's domestic airline population reflects the general population of American air travelers," Doc. 24 ¶ 78, as "unsupported" and "conclusory."[6] AB 32. Not so. The complaint explains that the Atlanta Airport "currently handles more domestic passenger traffic than any other airport in the United States, and 60% of the Atlanta Airport's domestic passengers only travel through the airport to catch a connecting flight." Doc. 24 ¶ 78. Those allegations are more than sufficient to support the assertion that the "Atlanta Airport's domestic airline population reflects the general population of American air travelers." To conclude instead that the Atlanta Airport's domestic airline population does *not* reflect the general population of American air travelers—and, further, that the racial composition of the Atlanta Airport's domestic airline population is as wildly different as Defendants suggest—would directly contradict the allegations in the complaint and require drawing unreasonable inferences *against* Mr. André and Mr. English, which is of course impermissible at the pleading stage. *See* OB 42-43.

---

[6] Defendants do not advance (and therefore have waived) the district court's erroneous conclusion that eight months of data cannot show discriminatory effect. *See* Doc. 40 at 41-42, OB 43-44.

-16-

If Defendants would like to present data or an expert witness to show that the demographics of domestic travelers at the Atlanta Airport are dramatically different from the demographics of domestic travelers nationally, they may do so later in this litigation. At the motion-to-dismiss stage, the plausible allegation that 8% of domestic travelers at the Atlanta Airport are Black must be accepted as true.

Defendants further urge the Court to assume that the airport-interdiction program operates only on flights from Atlanta to Los Angeles because, according to Defendants, the complaint "contains no allegation" that the program "occurred on any other flights." AB 32-33. But the complaint expressly states that CCPD officers stopped Preston Lewis when he was traveling to *San Francisco*.[7] Doc. 24 ¶¶ 105-07. Defendants thus urge a "version[] of the facts that contradict[s] the [complaint's] allegations." *Nunez v. J.P. Morgan Chase Bank*, 648 F. App'x 905, 909 (11th Cir. 2016).

---

[7] To the extent Defendants are making a *factual assertion* in their response brief that CCPD's airport-interdiction program operates only on flights from Atlanta to Los Angeles, *see* AB 32, that assertion not only is impermissible but is contradicted both by the allegation that Preston Lewis flew to San Francisco and by records Plaintiffs' counsel obtained from Defendants via public records requests prior to suit that document the 402 CCPD jet bridge stops alleged in the complaint. As Defendants know, those records show that stops occurred on flights between Atlanta and numerous cities, including Sacramento, San Diego, Seattle, Denver, Portland, Dallas/Fort Worth, Miami, Fort Lauderdale, Charlotte, and Kansas City.

Moreover, the suggestion that (1) the airport-interdiction program operates only on certain flights, and (2) those flights have wildly different racial demographics from the rest of the flights at the Atlanta Airport, is entirely imagined and contrary to the complaint. The complaint alleges that the airport-interdiction program operates "out of the Atlanta Airport," Doc. 24 ¶ 61, and that as part of the program, CCPD officers "wait in the jet bridge of departing domestic flights," *id.* ¶ 62. Not once does the complaint allege that the airport-interdiction program operates only on certain flights.

Even if the CCPD interdiction program operated only on certain flights, it would be utterly implausible for the racial composition of travelers on those flights to diverge so dramatically from the racial composition of travelers on all other flights at the Atlanta Airport. For it to be statistically possible that the racial disparities in jet bridge stops were random, 52% of travelers on flights "subject to CCPD's Airport Interdiction Program," Doc. 40 at 40, would have to be Black. Doc. 24 ¶ 80; OB 42. Neither Defendants nor the district court offer any explanation for why that would be the case given that only 8% of travelers at the Atlanta Airport are Black, or even point to anything in the complaint that would support such an inference. To the contrary, the complaint alleges that Mr. André and Mr. Elie did not see any other Black passengers boarding their respective flights with them, Doc. 24 ¶¶ 50, 95, which would be highly unlikely if 52% of passengers on their flights were Black.

And if CCPD *did* target flights where 52% of travelers were Black, then they would have targeted flights with 6.5 times the number of Black passengers than the average flight—which in and of itself would constitute a discriminatory effect. *See* OB 43.

### B. Despite The Airport-Interdiction Program's Discriminatory Impact, CCPD Continued The Program.

The complaint plausibly alleges discriminatory purpose by including allegations about the racially discriminatory impact of the airport-interdiction program, Defendants' knowledge of that impact, the foreseeability of that impact, and the availability of less discriminatory alternatives to the airport-interdiction program. *See* OB 44-47. Those allegations correspond to factors that this Court has identified as relevant to a finding of discriminatory purpose. *See Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1321-22 (11th Cir. 2021). In arguing that the complaint here failed to allege discriminatory purpose, Defendants misconstrue the complaint and the law.

As an initial matter, Defendants' peculiar contention that the complaint concedes that the discriminatory-purpose allegations were speculative, AB 35, utterly misreads the complaint. Mr. André and Mr. English repeatedly assert that the airport-interdiction program "is motivated by discriminatory purpose." Doc. 24 ¶ 130; *see also id.* ¶ 5 (CCPD officers "select their targets based on race"); *id.* ¶ 9 ("Mr. André And Mr. English … were unconstitutionally singled out because of their race[.]"). Defendants ignore these clear allegations and instead point to the word

-19-

"likely" in the phrase "CCPD likely targets passengers based on race," in a different sentence in the complaint. *See* AB 35. But Defendants omit the rest of that sentence, which is about the reasons *why* CCPD targets passengers based on race: "CCPD likely targets passengers based on race *because of* (1) the false stereotype that being Black is a proxy for drug trafficking, (2) the reality that Black individuals are less likely to have bank accounts and therefore more likely to carry assets as cash, and (3) the fact that Black individuals are, for good reason, more wary of engaging with the legal system to challenge a wrongful seizure." Doc. 24 ¶ 83 (emphasis added). When the phrase is read in context, Defendants' semantic argument falls apart because "likely" applies to the *reasons why* CCPD targets Black passengers, not whether CCPD targets Black passengers in the first place.

The wildly disproportionate impact of the airport-interdiction program on Black passengers makes clear that CCPD targets Black passengers because of their race. *See supra* 11-18. The law is clear that when the discriminatory effect of a challenged action is so "stark" that it is "unexplainable on grounds other than race," the discriminatory effect is sufficient on its own to establish discriminatory purpose. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). This standard is plainly satisfied here, where there is a less than one-in-one-hundred-trillion chance that the racial composition occurred randomly. This disparity is far more extreme than that found to establish discrimination in other cases. *See, e.g.*,

*Castaneda*, 430 U.S. at 496 n.17 (less than 1 in 10,140 chance of racial breakdown occurring randomly established prima facie case of discrimination).

The complaint also alleges that Defendants had knowledge of the discriminatory impact because "CCPD supervisors and officials regularly receive notice that the program's administration is racially discriminatory." Doc. 24 ¶ 81. Indeed, CCPD officers submit weekly logs detailing the race of the passengers they stop, and CCPD supervisory officers receive and review those logs. *Id.* ¶¶ 81-82; *see* OB 46. And Mr. Elie even told a CCPD supervisor that "he was targeted because of his race." Doc. 24 ¶ 102.

Defendants and the district court insist that the allegations that CCPD officials received notice about discriminatory impact cannot show discriminatory purpose because the complaint fails to allege that "CCPD supervisors directed their officers to target passengers based on race." AB 37; *see* Doc. 40 at 44. But the caselaw is clear that knowledge of disparate impact can demonstrate discriminatory purpose. *See Greater Birmingham Ministries*, 992 F.3d at 1321-22; *accord Arlington Heights*, 429 U.S. at 266 (circumstantial evidence can show purpose). Defendants cannot simply write that factor out of the discriminatory purpose analysis.

The complaint also alleges that the discriminatory impact was foreseeable. As the opening brief explains, the complaint alleges CCPD was on notice of the susceptibility of drug-interdiction programs to racial profiling because of the Department

of Justice's previous warnings that suspicionless stops pursuant to such programs are "often associated with racial profiling." *See* OB 46 (quoting Doc. 24 ¶ 68). And, contra Defendants' suggestion, *see* AB 35 n.1, a complaint can allege foreseeability without using the word "foreseeability." *Cf. Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009) (the plausible allegations in the complaint, not formulaic recitals, must demonstrate a plausible claim for relief).

Finally, just as the district court ignored allegations of less discriminatory alternatives, Defendants do not contest that the complaint plausibly alleges such alternatives, including conducting stops based on previously acquired information; developing policies or practices for truly conducting random interdictions; or, given that the airport-interdiction program is highly ineffective at uncovering drugs, simply not continuing the program. *See* OB 46-47; *see also* Law Enforcement Amicus Br. at 24-30 (explaining that suspicionless jet-bridge stops are ineffective); *Delaware v. Prouse*, 440 U.S. 648, 660 (1979) (stating, in context of traffic stops, random stops have "marginal at best" contribution to safety).

## C.    The Officers Are Not Entitled To Qualified Immunity.

Defendants make no argument for qualified immunity on the equal protection claim other than arguing that the underlying claim is meritless. *See* AB 37. And whether or not the individual officers are entitled to qualified immunity on the equal

protection claim, Clayton County nonetheless is still liable under the *Monell* doctrine for operating the discriminatory airport-interdiction program.

## III.   THE COMPLAINT PLAUSIBLY ALLEGED CLAIMS AGAINST CLAYTON COUNTY.

Mr. André and Mr. English plausibly alleged Fourth and Fourteenth Amendment claims against Clayton County. A county is liable for a constitutional violation when a "municipal policy or custom" was the "moving force" behind the violation. *Baxter v. Roberts*, 54 F.4th 1241, 1270 (11th Cir. 2022); *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Here, the complaint plausibly alleges that a CCPD "custom or policy" caused the constitutional violations Mr. André and Mr. English experienced by alleging that CCPD had an official policy or widespread practice of violating the Fourth Amendment and equal protection rights of passengers like Mr. André and Mr. English, or at least acted with deliberate indifference to those constitutional violations. *See Baxter*, 54 F.4th at 1270; *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1308 (11th Cir. 2001).

Like the district court, Defendants insist that the County cannot be liable because no constitutional violations occurred. *See* AB 38. But, as explained above and in the opening brief, the complaint plausibly alleges Fourth Amendment and Equal Protection Clause violations. *See supra* 2-22; OB 18-47.

Defendants otherwise insist that Clayton County is not liable because, according to Defendants, the complaint does not plausibly allege a custom or policy that

caused those violations.  *See* AB 39-41 (referring to allegations as "blanket conclusion[s]").  This is patently incorrect in light of the complaint's detailed allegations that CCPD had a "custom or policy" that violated Mr. André's and Mr. English's rights under the Fourth Amendment and Equal Protection Clause.

Take, first, the Fourth Amendment violations.  The complaint asserts that CCPD has a "'specialized' 'Airport Interdiction Unit,'" Doc. 24 ¶ 61, which conducted hundreds of unlawful stops in just an eight-month period, *id.* ¶¶ 77, 84.  Without any particularized suspicion, CCPD officers seized the passengers by blocking passengers' paths, taking passengers' IDs and tickets, and questioning them about whether they were carrying illegal drugs.  *Id.* ¶¶ 41, 56, 64, 93-113.  And CCPD authorized its officers to continue to engage in these jet bridge stops, despite its knowledge that such stops were unlawful.  *Id.* ¶ 113; *see Noell v. Clayton Cnty.*, No. 1:15-CV-2404, 2016 WL 11794207 (N.D. Ga. Sept. 21, 2016).[8]  The complaint thus plainly alleges that CCPD has an official policy of violating passengers' Fourth Amendment rights or, at the very least, has a widespread practice of doing so, or that

---

[8] Defendants also attempt to distinguish *Noell* by stating that it "did not involve CCPD's airport interdiction program."  AB 40.  But it involved CCPD officers stopping Ms. Noell at the Atlanta Airport and claims against Clayton County, Clayton County's police chief, and the individual CCPD officers for violating Ms. Noell's Fourth Amendment rights by stopping her without suspicion.  *See Noell*, 2016 WL 11794207, at *5 ("[A] post-security checkpoint airport seizure unsupported by any level of suspicion violates the constitution.").

it acted with deliberate indifference to its officers' Fourth Amendment violations. *See, e.g.*, *Barnett v. MacArthur*, 956 F.3d 1291, 1296-1300 (11th Cir. 2020).

The complaint likewise plausibly alleges a CCPD "custom or policy" supporting liability on the equal protection claim. Defendants, relying on cases decided at the summary judgment stage, repeat the district court's erroneous belief that the complaint contains allegations of only "isolated incidents." AB 41. That is plainly wrong. Relying on Defendants' data, the complaint describes *hundreds* of jet bridge stops that CCPD's specialized airport-interdiction unit conducted, which reveal the racial targeting of passengers. If hundreds of incidents of racial discrimination by a specialized unit does not demonstrate the existence of a custom at the pleading stage, it is hard to imagine what could. Two hundred eleven of the three hundred seventy-eight travelers (56%) who were stopped during the eight-month period and whose race was recorded were Black. Doc. 24 ¶ 77. The likelihood of this occurring randomly is essentially zero, leaving race as the only explanation. *Id.* ¶ 5. The complaint thus plausibly alleges that CCPD has an official policy, or at least a widespread practice, of targeting Black passengers for jet bridge stops because of their race, in violation of the Equal Protection Clause.

The complaint also plausibly alleges that CCPD acts with deliberate indifference to its officers' equal protection violations. CCPD had its officers fill out weekly logs of jet bridge stops, including the race of the passenger stopped. *See* Doc. 24

¶ 81.  Yet CCPD ignored the notice it had from those logs and took no corrective action.  *See id.* ¶¶ 77-82; *see also id.* ¶¶ 102-03 (Black passenger expressly told CCPD supervisor he was targeted because of his race); *id.* ¶¶ 67-68 (reports from federal agencies cautioned law enforcement about racial-profiling risks inherent in suspicionless drug-interdiction operations).  Defendants argue that this knowledge does not demonstrate that CCPD instructed its employees to target passengers based on race.  AB 40.  That is a non-sequitur.  A custom or policy exists when there is an official policy, a widespread practice, or deliberate indifference; an express instruction to violate the law is simply not required to demonstrate a custom or policy for purposes of *Monell* liability.  *See, e.g.*, *Griffin*, 261 F.3d at 1308-12; *see also Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991) (widespread practice sufficient to allege custom or policy because "policymaking officials … must have known about it but failed to stop it").  CCPD's knowledge that its airport-interdiction unit was disproportionately targeting Black passengers for jet bridge stops, and its failure to take any corrective action, is more than sufficient to demonstrate deliberate indifference, particularly at the pleading stage.

Taken as a whole and drawing all reasonable inferences in Plaintiffs' favor, as the Court must at this stage, the complaint plausibly alleges constitutional claims against Clayton County.[9]

---

[9] Defendants assert in a footnote that Mr. André and Mr. English "abandoned" certain claims "and requests for declaratory relief, attorney's fees, and punitive damages." AB 6 n.2. That assertion is waived because it appears only in a footnote. *ASEDAC v. Panama Canal Com'n*, 453 F.3d 1309, 1316 n.7 (11th Cir. 2006). In any event, Mr. André and Mr. English addressed every basis upon which the district court dismissed the substantive claims, which are threshold issues for relief. As such, they did not abandon their ultimate requests for relief, including prospective relief, damages, or fees.

Date:  May 23, 2024

Respectfully submitted,

*/s/ Jason T. Burnette*

Peter C. Canfield
CANFIELD LAW LLC
34 Inman Circle NE
Atlanta, GA 30309
Telephone: (678) 296-5413
pccanfield@gmail.com

Jason T. Burnette
Richard H. Deane, Jr.
Ashley F. Hinkson
Rebecca Nocharli
Samuel B. Reilly
JONES DAY
1221 Peachtree St. N.E., Suite 400
Atlanta, Georgia 30361
Telephone: (404) 581-8724
Facsimile: (404) 581-8330
jtburnette@jonesday.com
rhdeane@jonesday.com
ahinkson@jonesday.com
rnocharli@jonesday.com
sreilly@jonesday.com

Allegra J. Lawrence-Hardy
Rodney J. Ganske
LAWRENCE & BUNDY LLC
1180 West Peachtree St., NW, Ste 1650
Atlanta, Georgia 30309
Telephone: (404) 400-3350
Facsimile: (404) 609-2504
allegra.lawrence-hardy@lawrence-bundy.com
rod.ganske@lawrencebundy.com

Barry Friedman*
Aaron Scherzer
Sarah Sloan*
Benjamin Hoynes*
POLICING PROJECT
AT NYU SCHOOL OF LAW
Washington Square Legal Services, Inc.
40 Washington Square South, Ste 302
New York, NY 10012
Telephone: (212) 992-6950
barry.friedman@nyu.edu
aaron.scherzer@nyu.edu
benjamin.hoynes@nyu.edu
shs9979@nyu.edu
*Admitted Pro Hac Vice*

***Counsel for Plaintiffs-Appellants***
***Eric André and Clayton English***

-28-

## **CERTIFICATE OF COMPLIANCE**

1. This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(ii) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4, this document contains 6,492 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated:  May 23, 2024                          Respectfully submitted,

                                                          */s/ Jason T. Burnette*
                                                          _____

                                                          *Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 23, 2024, I caused a copy of the foregoing to be electronically filed with the Clerk of the Court by using the Court's Appellate PACER system, which will automatically send a notice of electronic filing to all counsel of record.  Under 11th Circuit Rule 25-3(a), no independent service by other means is required.

I further certify that on May 23, 2024, four copies of the foregoing document were dispatched via third-party commercial carrier to the following:

David J. Smith, Clerk of Court
U.S. Court of Appeals for the Eleventh Circuit
56 Forsyth Street, NW
Atlanta GA 30303

Respectfully submitted,

*/s/ Jason T. Burnette*

*Counsel for Plaintiffs-Appellants*